FILED

2020 Apr-29  PM 05:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| RANDANE WILLIAMS<br>SARAIL MICHAEL ARCHILLA<br>MAXIME P. BLANC<br>GEOVANNY GERARDO CASTELLANO<br>ANTONIO MELQUEZIDETH CASTRO<br>EDSON FLORES<br>RAY FULLER<br>JOSE ANTONIO GARCIA RIVERA (a/k/a<br>DOMINGO CASTILLO)<br>KARIM TAHIR GOLDING<br>ALEX HERNANDEZ<br>BAKHODIR MADJITOV<br>KENNETH MANNING<br>LANDRY (EMILY) MBENDEKE<br>TESFA MILLER<br>ALLEN ROGER OLANO ESPARZA<br>SERGIO QUITO<br>JOSEPH DEBONNAIRE SOHO<br>CHURVIN WEBSTER<br>Etowah Detention Center<br>827 Forrest Avenue<br>Gadsden, AL 35901,<br><br>*Petitioners-Plaintiffs*,<br><br>v.<br><br>DIANNE WITTE, *in her official capacity as*<br>*Interim New Orleans Field Office Director*,<br>U.S. Immigration and Customs Enforcement<br>1250 Poydras, Suite 325<br>New Orleans, LA 70113;<br><br>MATTHEW T. ALBENCE, *in his official*<br>*capacity as Deputy Director and Senior Official*<br>*Performing the Duties of the Director of the U.S.*<br>*Immigration and Customs Enforcement*,<br>U.S. Immigration and Customs Enforcement<br>500 12th St., S.W.<br>Washington, DC 20536; | **AMENDED PETITION FOR**<br>**WRIT OF HABEAS CORPUS**<br>**AND COMPLAINT FOR**<br>**INJUNCTIVE AND**<br>**DECLARATORY RELIEF**<br><br>No. 4:20-cv-304-AKK-JHE |

IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th St., S.W.
Washington, DC 20536;

JONATHAN HORTON, *in his official capacity
as Sheriff of Etowah County,*
KEITH PEEK, *in his official capacity as Chief
Deputy,*
Etowah County Detention Center
827 Forrest Avenue
Gadsden, AL 35901,

*Respondents-Defendants*.

Jessica Myers Vosburgh
 jessica@adelantealabama.org
**ADELANTE ALABAMA WORKER
CENTER**
2104 Chapel Hill Road
Birmingham, AL 35216
205.317.1481

Sirine Shebaya*
 sirine@nipnlg.org
Matthew S. Vogel*
 matt@nipnlg.org
Khaled Alrabe**
 khaled@nipnlg.org
**NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD**
2201 Wisconsin Avenue NW, Suite 200
Washington, DC 20007
718.419.5876

Jeremy Jong*
 jermjong@gmail.com
3527 Banks Street
New Orleans, LA 70119
504.475.6728

Baher Azmy*
 bazmy@ccrjustice.org
Ghita Schwarz*
 gschwarz@ccrjustice.org
Angelo Guisado*
 aguisado@ccrjustice.org
Guadalupe V. Aguirre*
 laguirre@ccrjustice.org
Astha Sharma Pokharel*
 asharmapokharel@ccrjustice.org
Brittany Thomas*
 bthomas@ccrjustice.org
**CENTER FOR CONSTITUTIONAL
RIGHTS**
666 Broadway, 7th Floor
New York, NY 11201
212.614.6427

*Counsel for Petitioners-Plaintiffs*
**pro hac vice* applications forthcoming
** admitted *pro hac vice*

April 27, 2020

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), Petitioners-Plaintiffs hereby file the following amended petition for a writ of habeas corpus and complaint for injunctive and declaratory relief:

### INTRODUCTION

1.      This case presents a request for immediate relief on behalf of eighteen Petitioners-Plaintiffs ("Plaintiffs"), who are especially vulnerable to serious injury or death if they contract COVID-19, the highly contagious and potentially lethal disease that is sweeping the globe. Respondent-Defendants ("Defendants") are holding Plaintiffs in civil immigration detention in the Etowah County Detention Center (ECDC) in Gadsden, Alabama. The coronavirus feeds on precisely the unsafe, congregate conditions in which Plaintiffs are being held, putting them at imminent risk of contracting COVID-19.

2.      The risks and consequences of COVID-19 cannot be overstated. COVID-19 has reached global pandemic status. As of April 26, 2020, more than 2,800,000 individuals worldwide have confirmed diagnoses, including almost 900,000, in the United States.[1] The World Health Organization reports that more than 193,000 individuals worldwide have died as a result of COVID-19, including more than 46,000 in the United States.[2] Those numbers are growing significantly every day, with more than 84,000 new cases worldwide in the past day alone.[3] By the time the Court reads this complaint, there will be more diagnoses, and more deaths, with no end in sight.

---

[1] WORLD HEALTH ORG., *Coronavirus Disease 2019 (COVID-19) Situation Report – 97* (Apr. 26, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200426-sitrep-97-covid-19.pdf?sfvrsn=d1c3e800_6.

[2] *Id.*

[3] *Id.*

3.      As of today's date, there were 6,429 COVID-19 cases in Alabama.[4] The number of infected people is rising exponentially; 219 people in Alabama have already died from the disease.[5] These data include 125 cases and eight deaths in Etowah County, Alabama.[6] Immediate relief is necessary before the coronavirus ignites within ECDC. As Judge John E. Jones, III, sitting in the Middle District of Pennsylvania, said in terms equally applicable to ECDC, "it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein." *Thakker v. Doll*, No. 1:20-CV-00480 (M.D. Pa. Mar. 31, 2020) at 8 (emphasis in original).

4.      There is no known treatment for or vaccine against COVID-19, and there is no known cure. The only known effective measures to reduce the risk of COVID-19 are to prevent infection through social distancing and vigilant hygiene. Yet "social distancing" is a meaningless term in ECDC, where detainees are in constant close contact with each other and with facility staff. Increased and vigilant hygiene is similarly unavailable under the conditions inside the detention center.

5.      ECDC is under the jurisdiction and direction of the regional U.S. Immigration and Customs Enforcement (ICE) Field Office located in New Orleans, which has jurisdiction over detention facilities in Alabama, Arkansas, Louisiana, Mississippi, and Tennessee. As of April 25, 2020, ICE reports that it has 317 confirmed cases of COVID-19 among detained people nationwide, including 81 at seven different facilities within the New Orleans Field Office's jurisdiction, and fourteen cases of COVID-19 among employees at the Alexandria Staging

---

[4] ALABAMA DEP'T OF PUBLIC HEALTH, DIV. OF INFECTIOUS DISEASES & OUTBREAKS, *COVID-19 in Alabama*, https://dph1.adph.state.al.us/covid-19/ (last accessed Apr. 27, 2020).

[5] *Id.*

[6] *Id.*

Facility, also within the New Orleans Field Office's jurisdiction.[7] Because ICE does not engage in regular testing, all of these numbers must be assumed to be far higher. ICE regularly transfers individuals from one of these facilities to another—including frequent transfers between ECDC and LaSalle ICE Processing Center and other Louisiana facilities as recently as last week—and continues to make such transfers and receive transfers from other parts of the United States even since the COVID-19 outbreak.[8]

6.    Plaintiffs fear for their lives because they have medical conditions—including diabetes, hypertension, lung disease, kidney disease, and compromised immune systems—and/or advanced age that place them amongst those sectors of the population that are most vulnerable to serious injury or death should they be infected with COVID-19. And for good reason: they are trapped in a facility that can only be described as a breeding ground for the disease. Despite warnings and pleas for release from public health experts and advocates, Defendants have chosen to continue to confine Plaintiffs in close proximity, without adequate personal protective equipment or hygiene supplies; to admit and transfer individuals to ECDC without COVID-19 testing or sufficient screening; to refuse to implement cleaning and protection procedures adequate to combat COVID-19; and to resist releasing even the most medically vulnerable individuals. The conditions and treatment at ECDC have created a dangerous situation that threatens Plaintiffs' lives, as well as the wellbeing of staff, others in the surrounding community, and the general public.

---

[7] IMMIG. AND CUSTOMS ENFORCEMENT, *ICE Guidance on COVID-19, Confirmed Cases*, https://www.ice.gov/coronavirus (last accessed Apr. 25, 2020).

[8] *See, e.g.*, Yeganeh Torbati, Dara Lind & Jack Gillum, *In a 10-Day Span, ICE Flew This Detainee Across the Country Nine Times*, PROPUBLICA (Mar. 27, 2020), https://www.propublica.org/article/coronavirus-ice-flights-detainee-sirous-asgari (documenting transfer of man through several facilities, including those within jurisdiction of New Orleans Field Office).

7.      Several recent federal court rulings ordering release have explained the health risks—to those who are detained, staff, and the outside community at large—created by large prison and detention populations. *See*, *e.g.*, *Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass. Mar. 26, 2020) (ordering release of detained immigrant in the midst of the COVID-19 pandemic and noting that "being in a jail enhances risk" and that in jail "social distancing is difficult or impossible"); *Basank v. Decker,* No. 1:20-cv-02518-AT (S.D.N.Y. Mar. 26, 2020) (ordering the release of ten people from three immigration detention facilities in New Jersey because "confining vulnerable individuals . . . without enforcement of appropriate social distancing and without specific measures to protect their delicate health 'pose[s] an unreasonable risk of serious damage to [their] future health'") (internal citation omitted); *Thakker v. Doll*, No. 1:20-cv-00480-JEJ (M.D. Pa. Mar. 31, 2020) (ordering release of 13 people from three immigration detention facilities in Pennsylvania because "preventative measures" against the "grave risk" of COVID-19 cannot be practiced in "tightly confined, unhygienic spaces"); *Fraihat v. Wolf*, No. 2:20-CV-590-TJH (C.D. Cal. Mar. 30, 2020) (ordering release of individual from immigration detention facility  because COVID-19 "can spread uncontrollably with devastating results in a crowded, closed facility"); *United States v. Ramos*, No. 18-CR-300009-FDS, 2020 WL 14778307, at *1 (D. Mass. Mar. 25, 2020) (stating that "it is not possible for a medically vulnerable inmate . . . to isolate himself in this institutional setting as recommended by the CDC, and guards and newly arrested individuals must enter the facility on a daily basis"); *Coronel v. Decker*, No. 20-cv-2472 (AJN), 2020 WL 1487274, at *3 (S.D.NY. Mar. 27, 2020) (noting that "being in immigration detention places petitioners at significantly higher risk of contracting COVID-19"); *United States v. Kennedy*, No. 18-20315, 2020 U.S. Dist. LEXIS 53359, at * (E.D. Mich. Mar. 27, 2020) (stating that the CDC "acknowledged that correctional detention facilities

'present unique challenges for control of COVID-19 transmission among incarcerated/detained

persons, staff, and visitors.'").

8.      Recognizing the urgency of this situation, judges, prosecutors and governors

across the country have been ordering releases to protect individuals and the public health. On

March 26, 2020, Attorney General Barr issued a directive to the federal Bureau of Prisons urging

reduction of the prison population through the use of home confinement.[9] Likewise, on April 2,

2020, Alabama Governor Kay Ivey issued a supplement to Alabama's State of Emergency

allowing local officials to reduce county jail populations in a way that does not jeopardize public

safety.[10] By April 10, after multiple inmates and staff contracted COVID-19, Mobile Metro Jail

had decreased its population from 1,580 to 1,100 to prevent further exposure of COVID-19 to

particularly vulnerable populations. Law enforcement officials in New Orleans, Nashville,

Houston, San Antonio, Charlotte, New York City, Chicago, Oakland, New Jersey, Cleveland,

and numerous other jurisdictions are releasing thousands of individuals in both civil and criminal

detention and incarceration because of the threat COVID-19 poses inside jails, prisons, and

detention centers. On March 22 the New Jersey Supreme Court issued a consent order for the

presumptive release of approximately 1,000 persons by March 26.[11]

9.      On March 24, the Los Angeles County Sheriff's Department in California had

released approximately 1,700 persons from county jails in response to COVID-19.[12] Sentencing

---

[9] Memorandum from Attorney General William Barr to Director of Bureau of Prisons, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000

[10] Gov. Kay Ivey, *Fifth Supplemental SOE COVID-19* (Apr. 2, 2020), https://governor.alabama.gov/assets/2020/04/2020-04-02-Fifth-Supplemental-SOE_COVID-19.pdf.

[11] Tracey Tulley, *1,000 Inmates Will Be Released from N.J. Jails to Curb Coronavirus Risk*, N.Y. TIMES (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

judges in Michigan have released over 500 people from county jails in the Detroit area, as of April 1.[13] By April 13, 912 persons were released from Allegheny County jail in Pennsylvania upon approval from the district court administrator.[14] In Boulder County, Colorado, the District Attorney's office has released more than 100 persons to reduce jail populations in light of COVID-19 as of April 4.[15] On April 13, almost a quarter of the persons previously in pretrial detention in Stanislaus County Jail in California were released due to concerns over COVID-19.[16]

10.     Such releases protect the people with the greatest vulnerability to serious illness and death from COVID-19. They also protect all those in custody or working in the prison, jail, or detention center, and reduce the burden on the surrounding region's healthcare infrastructure, as they lessen the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. This is particularly significant here, as Etowah County, a predominantly rural community in northeastern Alabama, has very limited healthcare infrastructure.

[12] Justin Carissmo, *1,700 inmates released from Los Angeles County in response to coronavirus outbreak*, CBS NEWS (Mar. 24, 2020),  https://www.cbsnews.com/news/inmates-released-los-angeles-county-coronavirus-response-2020-03-24/

[13] Amber Ainsworth, *Hundreds of inmates released from Metro Detroit county jails amid coronavirus (COVID-19) outbreak*, WDIV (NBC)/CLICKON DETROIT (Apr. 1, 2020), https://www.clickondetroit.com/news/local/2020/04/02/hundreds-of-inmates-released-from-metro-detroit-county-jails-amid-coronavirus-covid-19-outbreak/.

[14] *912 inmates released from Allegheny County Jail due to coronavirus concerns*, WTAE-ABC (Apr. 13, 2020), https://www.wtae.com/article/inmates-released-from-allegheny-county-jail-due-to-coronavirus-concerns/31953103.

[15] Daliah Singer, *In Colorado prisons and jails, a piecemeal approach to the threat of coronavirus*, THE COLORADO SUN (Apr. 2, 2020), https://coloradosun.com/2020/04/04/colorado-prisons-jails-coronavirus-covid-criminal-justice/

[16] Erin Tracy, *COVID-19 concerns will result in release of up to 300 Stanislaus County Jail inmates*, THE MODESTO BEE (Apr. 12, 2020), https://www.modbee.com/news/local/crime/article241929456.html.

11.    By contrast, Defendants' response to the threats this pandemic poses to the immigrants under their custody and care has been abysmal. Following public outcry, on March 17, 2020, ICE issued a statement that it would modify its enforcement efforts in apparent recognition of the need for alternatives to detention to protect public health.[17]

12.    The next day, however, in response to a lawsuit for the release of vulnerable ICE detainees in Washington state, the agency showed a deep failure to appreciate the urgency and threat the COVID-19 pandemic presents, stating that "Plaintiffs' assertion that detention per se poses an increased risk of health complications or death from COVID-19 is purely speculative."[18] ICE's head-in-the-sand response to the threats of this pandemic will prove deadly to Plaintiffs and surrounding communities if it is not remedied through this Court's intervention.

13.    On March 19, 2020, two medical experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties sent a whistleblower letter to Congress, to highlight "the need to implement immediate social distancing to reduce the likelihood of exposure to detainees, facility personnel, and the general public," and arguing that ICE detention presents a "tinderbox scenario" and "***it is essential to consider releasing all detainees who do not pose an immediate risk to public safety.***"[19] On multiple occasions since at least February 25, 2020, these experts had sounded the alarm within the agency about the impending risks to the health of those in immigration detention and the public at large unless swift mitigation measures, including releasing persons in immigration detention, are taken.

---

[17] IMMIG. AND CUSTOMS ENFORCEMENT, Press Release: *Updated ICE statement on COVID-19* (Mar. 18, 2020), https://www.ice.gov/news/releases/updated-ice-statement-covid-19

[18] Respondents-Defendants' Opposition at 8, *Dawson v. Asher*, ECF No. 28, Case No. 20-0409 (W.D. Wash. Mar. 18, 2020).

[19] Letter from Scott A. Allen, MD and Josiah Rich, MD, MPH to Congressional Committee Chairpersons (Mar. 19, 2020), https://assets.documentcloud.org/documents/6816336/032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.pdf (emphasis in original).

14.     Inside ECDC, Defendants are not consistently adhering to the measures ICE claims it is taking. For example, Defendants are bringing new individuals into the jail (both ICE detainees and county inmates) on a weekly or even daily basis without testing or sufficient screening, and continue to transfer individuals between detention centers without such protective measures. The facility has also adopted measures—including crowding the entire ICE population of over one hundred detainees into a single housing unit within the jail, and using a "fogger" machine to spray disinfectant throughout the housing units—that are in direct contravention of public health experts' recommendations on social distancing and proper hygiene, potentially putting Plaintiffs at even greater risk.

15.     This echoes a concern of the two Department of Homeland Security (DHS) medical experts, who say that "the track record of ICE facilities implementing [early screening, testing, isolation and quarantine] protocols historically has been inconsistent."[20] Moreover, even if ICE was consistently taking these precautions, the DHS experts have explained that they will not be enough without rapidly releasing those who do not pose an immediate danger to public safety. Defendants stubbornly refuse to heed the advice of public health experts, including their own.

16.     Plaintiffs are also suffering from a unconstitutional deprivation of liberty due to the excessively prolonged nature of their civil detention without review—ranging from thirteen months to nine years. Thus they are entitled to release or a constitutionally adequate bond hearing to assess the legality and necessity of their ongoing detention.

17.     Plaintiffs, who are confined in civil, nonpunitive detention, are at risk of serious injury or death because of Defendants' flawed choices and the conditions in ECDC. Defendants' failure to follow public health guidance endangers the lives of those they have chosen to detain.

---

[20] *Id*. at 5.

The only way to effectively inhibit the spread of COVID-19 and to protect Plaintiffs and others from the risks posed by COVID-19 infection is to immediately release Plaintiffs, so that they can actually adhere to the guidance from public health experts and take the necessary steps to protect themselves and the public.

18. Defendants cannot justify continuing to subject Plaintiffs to extraordinary risk of illness and death with any legitimate government objective, particularly in light of the alternatives available to them to release Plaintiffs under appropriate conditions. The danger posed by Plaintiffs' detention during the current outbreak of COVID-19 is "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk" and violates their constitutional right to safety in government custody. *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). Plaintiffs bring this action to remedy grave violations of their constitutional rights that imminently threaten them with serious illness and death.

19. Unless this Court intervenes to order the release of the Plaintiffs, they, along with many other detained individuals and entire communities, will face dramatically increased chances of contracting COVID-19, becoming seriously ill, and dying.

**JURISDICTION AND VENUE**

20. This action arises under the Due Process Clauses of the Fifth Amendment to the United States Constitution, the federal habeas corpus statute, 28 U.S.C. § 2241, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.

21. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (waiver of sovereign immunity), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §1361

(Mandamus Act), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause).

22.     Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 2241(d) and pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

**Petitioners-Plaintiffs**

23.     Petitioner-Plaintiff **Randane Williams** is a 30-year-old native and citizen of Jamaica who is currently detained without bond by ICE at ECDC. He has been in ICE custody since February 2018. He has been subject to an administratively final order of removal since December 18, 2018. His removal is stayed pending judicial review of his removal order in the Ninth Circuit Court of Appeals. He suffers from hypertension and a heart murmur. Mr. Williams is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his cousin in Atlanta, Georgia.

24.     Petitioner-Plaintiff **Sarail Michael Archilla** is a 44-year-old apparently stateless individual who is currently detained without bond by ICE at ECDC. He was born in Canada to parents of Jamaican descent, but it appears neither country recognizes him as their citizen. He has been in ICE custody since July 2017. He has been subject to an administratively final order of removal since approximately August 18, 2017. ICE has not been able to obtain a travel document for him from Canada, Jamaica, or any other country. Mr. Archilla suffers from hypertension and chronic asthma. He is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his girlfriend in St. Paul, Minnesota.

25.     Petitioner-Plaintiff **Maxime P. Blanc** is a 46-year-old native and citizen of Dominica who is currently detained without bond by ICE at ECDC. He has been in ICE custody

since June 2018. He has been subject to an administratively final order of removal since June 6, 2019. His removal is stayed pending judicial review of his removal order in the Eleventh Circuit Court of Appeals, which has appointed him pro bono counsel. *Blanc v. U.S. Atty. Gen.,* No. 19-12503 (11th Cir.). Mr. Blanc suffers from pre-diabetes, high cholesterol, and hypertension. He is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his cousin New York, New York.

26.     Petitioner-Plaintiff **Geovanny Gerardo Castellano** is a 60-year-old native and citizen of Nicaragua who is currently detained without bond by ICE at ECDC. He has been in ICE custody since January 2016. He has been subject to an administratively final order of removal since April 1, 1988. Mr. Castellano suffers from hypertension and a heart condition. Because of his age and medical conditions, he is at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his girlfriend in Chatsworth, California.

27.     Petitioner-Plaintiff **Antonio Melquezideth Castro** is a 38-year-old native and citizen of Belize who is currently detained without bond by ICE at ECDC. He has been in ICE custody since September 2017. He has been subject to an administratively final order of removal since December 13, 2018. On December 13, 2019, the Third Circuit Court of Appeals denied his petition for review of his removal order, but ICE has not yet executed his removal to Belize. Mr. Castro suffers from ongoing kidney disease and lung difficulties. Because of his medical conditions, he is at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his cousin in Plainfield, New Jersey or Brentwood, New York.

28.     Petitioner-Plaintiff **Edson Flores** is a 48-year-old native and citizen of Honduras who is currently detained without bond by ICE at ECDC. He has been in ICE custody since

2011. The Second Circuit Court of Appeals recently granted his petition for review of his

removal order and remanded his case to the Board of Immigration Appeals ("BIA"). Summary

Order, *Flores v. Barr*, No. 17-3421, ECF No. 144-1 (2d Cir. Oct. 26, 2019). He is currently

awaiting the BIA's decision. Mr. Flores suffers from hypertension, high cholesterol, and

diabetes. He required hospitalization in March of 2020, but was told by ECDC staff that they

could not take him because of COVID-19 risk. He is at high risk of severe illness or death if he

contracts COVID-19. If released, he will reside with his mother in New York, New York.

29.     Petitioner-Plaintiff **Ray Fuller** is a 54-year-old native and citizen of Jamaica who

is currently detained without bond by ICE at ECDC. He has been in ICE custody since 2014. The

Seventh Circuit Court of Appeals recently granted his petition for review of his removal order

and remanded his case to the BIA. *Fuller v. Whitaker*, 914 F.2d 514 (7th Cir. Jan. 23, 2019). Mr.

Fuller suffers from hypertension and a cardiopulmonary disease. He is therefore at high risk of

severe illness or death if he contracts COVID-19. If released, he will reside at an interfaith

community center in Chicago, Illinois.

30.     Petitioner-Plaintiff **Jose Antonio Garcia Rivera** (a/k/a Domingo Castillo) is a

62-year-old[21] man who is currently detained without bond by ICE at ECDC. He has been in ICE

custody since 2013. Mr. Garcia suffers from asthma. Because of his medical condition and age,

he is at high risk of severe illness or death if he contracts COVID-19. If released, he will reside

with his partner in Scranton, Pennsylvania.

31.     Petitioner-Plaintiff **Karim Tahir Golding** is a 35-year-old native and citizen of

Jamaica who is currently detained without bond by ICE at ECDC. He has been in ICE custody

---

[21] ICE is detaining and attempting to deport Mr. Garcia based on an allegation that his true identity is Domingo
Castillo, a native and citizen of the Dominican Republic born in 1963. Mr. Garcia was in fact born in Puerto Rico in
1958. But even assuming that ICE's allegations are correct, he would still be at high risk for severe COVID-19
based on his age and medical condition.

since October 2016. He has been subject to an administratively final order of removal since March 5, 2018. His removal is stayed pending judicial review of his removal order in the Second Circuit Court of Appeals, which has appointed him pro bono counsel. *Golding v. Barr*, No. 18-772 (2d. Cir.). Mr. Golding suffers from asthma. He is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his mother in Valley Stream, New York.

32.     Petitioner-Plaintiff **Alex Hernandez** is a 49-year-old native and citizen of Honduras who is currently detained without bond by ICE at ECDC. He has been in ICE custody since October 2016. He has been subject to an administratively final order of removal since July 24, 2017.  His removal is stayed pending judicial review of his removal order in the Ninth Circuit Court of Appeals, which has appointed him pro bono counsel. *Hernandez v. Barr,* No. 17-73332 (9th Cir.). Mr. Hernandez suffers from hypertension and other medical conditions. He is currently recovering from a recent surgery, which has left him in a weakened state and causes pain and inflammation. He is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his daughter in Los Angeles, California.

33.     Petitioner-Plaintiff **Bakhodir Madjitov** is a 38-year-old native and citizen of Uzbekistan who is currently detained without bond by ICE at ECDC. He has been in ICE custody since December 2017. He has been subject to an administratively final order of removal since July 24, 2014. He is currently seeking judicial review in the Eleventh Circuit Court of Appeals of the BIA's denial of his motion to reopen his removal order, but the Eleventh Circuit denied his request for a stay. Mr. Madjitov suffers from hypertension and a chronic heart condition that causes his heart to beat abnormally slow. He is therefore at high risk of severe

illness or death if he contracts COVID-19. If released, he will reside with his wife and children in Connecticut.

34. Petitioner-Plaintiff **Kenneth Manning** is a 61-year-old native and citizen of Jamaica who is currently detained without bond by ICE at ECDC. He has been in ICE custody since August 2016. The Second Circuit Court of Appeals recently granted his petition for review of his removal order and remanded his case to the BIA. *Manning v. Barr*, 954 F.3d 477 (2d Cir. Mar. 31, 2020). Mr. Manning suffers from prostate cancer and a chronic heart condition. Because of his medical conditions and age, he is at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his daughter in Maryland.

35. Petitioner-Plaintiff **Landry (Emily) Mbendeke** is a 40-year-old native and citizen of Cameroon who is currently detained without bond by ICE at ECDC. Ms. Mbendeke is a transgender female who was assigned male at birth. She has been in ICE custody since November 2017. She has been subject to an administratively final order of removal since May 20, 2019. Her removal is stayed pending judicial review of her removal order in the Second Circuit Court of Appeals, where she is represented by retained pro bono counsel. *Mbendeke v. Barr*, No. 19-1766 (2d Cir.). Ms. Mbendeke suffers from hypertension and ███████████. She is therefore at high risk of severe illness or death if she contracts COVID-19, and an outbreak in ECDC would also severely compromise the monitoring and routine care she requires to keep her condition under control. She has a place to live if released.

36. Petitioner-Plaintiff **Tesfa Miller** is a 38-year-old native and citizen of St. Vincent and the Grenadines who is currently detained without bond by ICE at ECDC. He has been in ICE custody since April 2018. The Eleventh Circuit Court of Appeals recently vacated the BIA's order in his removal case and remanded his case to the BIA on the government's motion. *See*

Order, *Miller v. Barr*, No. 19-13738 (11th Cir. Dec. 23, 2019). He is currently awaiting a decision from the BIA. He also has a pending U Visa application based on his status as a victim of attempted murder and his cooperation with law enforcement in the investigation of the crime. Mr. Miller suffers from hypertension, high cholesterol and chronic bronchitis.  He is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his mother in Riverdale, Georgia.

37.    Petitioner-Plaintiff **Allen Roger Olano Esparza** is a 37-year-old native and citizen of Peru who is currently detained without bond by ICE at ECDC. He has been in ICE custody since December 2016. He has been subject to an administratively final order of removal since September 14, 2018. His removal is stayed pending judicial review of his removal order in the Ninth Circuit Court of Appeals. *Olano-Esparza v. Barr*, No. 18-72758 (9th Cir.). The Ninth Circuit has held his case in abeyance pending the resolution of another case presenting a similar issue, *Menendez v. Whitaker*, No. 14-72730 (9th Cir.). *See id*., ECF No. 10 (Feb. 13, 2019). The Ninth Circuit has since granted the petition for review in *Menendez* and remanded to the BIA; the government is seeking rehearing. Mr. Olano suffers from hypertension, kidney disease, and an irregular thyroid.  Because of his medical conditions, he is at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his family friend in Escondido, California.

38.    Petitioner-Plaintiff **Sergio Quito** is a 45-year-old native and citizen of Ecuador who is currently detained without bond by ICE at ECDC. He has been in ICE custody since June 2016. He has been subject to an administratively final order of removal since March 19, 2018. The Second Circuit Court of Appeals denied his petition for review of his removal order on January 15, 2020, but ICE has not yet executed his removal to Ecuador. Mr. Quito suffers from

hypertension and epilepsy. He has had five seizures at ECDC. He is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his wife and daughter in New York, New York.

39.     Petitioner-Plaintiff **Joseph Debonnaire Soho** is a 46-year-old native and citizen of Ivory Coast who is currently detained without bond by ICE at ECDC. He has been in ICE custody since March 2019. He has been subject to an administratively final order of removal since August 1, 2019. Despite being subject to a final and executable order of removal, ICE has not been able to obtain a travel document for Mr. Soho and execute his removal to either Ivory Coast or, alternatively, Cameroon, where his father was born. Mr. Soho suffers from hypertension and anemia. He is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his wife and children in Atlanta, Georgia.

40.     Petitioner-Plaintiff **Churvin Webster** is a 57-year-old native and citizen of Anguilla who is currently detained without bond by ICE at ECDC. He has been in ICE custody since October 2017. He has been subject to an administratively final order of removal since May 17, 2019. His removal is stayed pending judicial review of his removal order in the Third Circuit Court of Appeals. *Webster v. U.S. Atty. Gen.*, No. 19-2256 (3d Cir.). The Third Circuit held his case in abeyance pending the disposition of another case presenting a similar issue, *Rosa v. Att'y Gen.*, No. 18-1765 (3d Cir.). The Third Circuit recently issued a precedential opinion granting the petition for review in *Rosa*, *see id.*, Opinion & Judgment (3d Cir. Jan. 29, 2020); the government is seeking rehearing. Mr. Webster suffers from hypertension and asthma. Mr. Webster is therefore at high risk of severe illness or death if he contracts COVID-19. If released, he will reside with his girlfriend in New Brunswick, New Jersey.

**Respondents-Defendants**

41.     Respondent-Defendant Dianne Witte is the Interim ICE New Orleans Field Office Director for Enforcement and Removal Operations. The New Orleans Field Office has jurisdiction over Alabama, Arkansas, Mississippi, Louisiana and Tennessee. This office is responsible for carrying out ICE's immigration detention operations in ECDC, where Plaintiffs are currently detained. Defendant Witte is a legal custodian of Plaintiffs. She is sued in her official capacity.

42.     Respondent-Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Albence is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Albence is a legal custodian of Plaintiffs. He is sued in his official capacity.

43.     Respondent-Defendant ICE is a federal law enforcement agency within the Department of Homeland Security. ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system. Defendant ICE is a legal custodian of Plaintiffs.

44.     Respondent-Defendant Jonathan Horton is the Sheriff of Etowah County, Alabama. As Sheriff, he is responsible for overseeing the administration and management of the Etowah County Detention Center, where Plaintiffs are detained. Respondent-Defendant Horton is a legal custodian of Plaintiffs. He is sued in his official capacity.

45.     Respondent-Defendant Keith Peek is the Chief Deputy of Corrections for the Etowah County Sheriff's Office. He is responsible for overseeing the administration and

management of the Etowah County Detention Center, where Plaintiffs are detained. Respondent-Defendant Peek is a legal custodian of Plaintiffs. He is sued in his official capacity.

## FACTUAL BACKGROUND

### A. COVID-19 Is an Unprecedented and Lethal Global Pandemic.

46.     COVID-19 is a disease caused by a novel coronavirus that has reached global pandemic status. As of April 26, 2020, more than 2,800,000 individuals worldwide have confirmed diagnoses, including almost 900,000, in the United States.[22] More than 193,000 individuals worldwide have died as a result of COVID-19, including more than 46,000 in the United States.[23] Those numbers are growing significantly every day, with more than 84,000 new cases worldwide in the past day alone.[24]

47.     Nationally, the Centers for Disease Control and Prevention (CDC) projections indicate that over 200 million individuals in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention, with as many as 1.7 million deaths in the worst projections.[25]

48.     President Trump has projected, optimistically, that the United States will experience up to 200,000 coronavirus-related deaths.[26]

---

[22] WORLD HEALTH ORG., *COVID-19 Situation Report – 97*, *supra* n.1

[23] *Id.*

[24] *Id.*

[25] *See* James Glanz, et al., *Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say,* N.Y. TIMES (Mar. 20, 2020), https://www.nytimes.com/interactive/2020/03/20/us/coronavirus-model-us-outbreak.html; Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths,* N.Y. TIMES (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html.

[26] *See* Rebecca Ballhause et al., *White House Extends Social-Distancing Guidelines Until End of April,* WALL STREET JOURNAL (Mar. 30, 2020), https://www.wsj.com/articles/coronavirus-deaths-top-30-000-as-china-opens-up-province-where-it-began-11585466594?mod=hp_lead_pos1 ("So, if we can hold that down, as we're saying to 100,000—it's a horrible number—maybe even less, but to 100,000 — so we have between 100,000 to 200,000 — we all together have done a very good job," the president said.").

49.     COVID-19 is a highly contagious disease that is easily transmitted through respiratory droplets, especially when one is within six feet of an infected individual. Due to this, President Trump issued guidelines recommending that all individuals "avoid nonessential travel, going to work, eating at bars and restaurants, or gathering in groups of more than 10" at least until April 30, 2020 and perhaps until June.[27] Its symptoms include fever, cough, shortness of breath, chills, muscle pain, headache, and sore throat.[28]

50.     People can also spread COVID-19 but be asymptomatic or pre-symptomatic,[29] making testing or seclusion of only those who are symptomatic an ineffective solution.

51.     COVID-19 can result in respiratory failure, kidney failure, and death. Infected individuals who do not die from the disease can face serious damage to the lungs, heart, liver, or other organs, resulting in prolonged recovery periods, including extensive rehabilitation from neurological damage and loss of respiratory capacity.

52.     COVID-19 can also severely damage lung tissue, affect cardiac functions, and cause widespread damage to other organs. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

53.     Younger and healthy individuals who contract COVID-19 may require supportive care. And those who develop serious complications will need advanced support, including highly specialized equipment that is in very limited supply, and an entire team of care providers giving

---

[27]  Michael D. Shear, *Trump Extends Social Distancing Guidelines Through End of April,* N.Y. TIMES (Mar. 29, 2020), https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html.

[28] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19),* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed Apr. 24, 2020)

[29] A study in Iceland, where COVID-19 testing is widespread, found that about half those who tested positive have no symptoms. Jason Gale, *Coronavirus Cases Without Symptoms Spur Call for Wider Tests*, BLOOMBERG (Mar. 22, 2020), https://www.bloomberg.com/news/articles/2020-03-22/one-third-of-coronavirus-cases-may-show-no-symptom-scmp-reports.

24-hour care, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support is especially difficult to provide to detained individuals, particularly at unsafe and under-resourced ICE detention facilities like ECDC.

54.    There is no vaccine against COVID-19, nor is there any known medication to prevent or cure infection from the virus.

55.    The only known effective measure to reduce the risk of severe illness or death to vulnerable individuals is to prevent them from being infected with the coronavirus. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including frequently washing hands with soap and water and disinfecting commonly touched areas, are the only known effective measures to prevent infection. In addition, those who are symptomatic, or who have come into contact with those who have tested positive for the virus, are advised to self-quarantine, removing themselves entirely from physical contact with others to as to prevent spread of the virus for a period of up to fourteen days.

56.    None of these practices are possible in detention facilities like ECDC, where large numbers of people are housed in close quarters in congregate settings, with minimal access to sinks, showers, toilets, water, personal hygiene and facility cleaning supplies.

**B.  COVID-19 is Exceedingly Dangerous for Individuals Like Plaintiffs, Who Have Underlying Health Conditions**.

57.    Older individuals and those with certain medical conditions face dramatically higher chances of serious illness or death from COVID-19.[30] Certain underlying medical conditions increase the risk of serious COVID-19 disease for individuals of any age, including

---

[30] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed Apr. 26, 2020).

moderate to severe asthma, chronic lung disease, hypertension and other serious heart conditions, diabetes, severe obesity, chronic liver or kidney disease, and compromised immune systems.[31]

58.    Individuals detained in immigration detention are also more susceptible to experiencing complications from infectious diseases than the population at large. This is especially true for individuals with underlying medical conditions. Moreover, correctional health experts agree that the CDC's risk factor for age should be lowered from 65 for the general population to 55 years of age for incarcerated individuals, and a recent study in The Lancet suggests that the risk associated with advanced age for the general population may start at 50 years old.[32]

59.    Plaintiffs in this case are individuals who are particularly vulnerable to serious illness or death if infected by COVID-19 and who are currently detained in ICE custody in ECDC:

60.    **Randane Williams** is a 30-year-old man who is currently detained by ICE at ECDC. He suffers from hypertension and a heart murmur. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Williams' medical condition qualifies as a disability under the Rehabilitation Act.

61.    **Sarail Michael Archilla** is a 44-year-old man who suffers from hypertension and chronic asthma. His asthma combined with the conditions in ECDC has caused him to cough up blood and brown fluid. He therefore at high risk of severe illness or death if he contracts

---

[31] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed Apr. 26, 2020).

[32] *See* Williams, Brie A. *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care.* AM. J. PUB. HEALTH (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; Verity, Robert *et al.*, *Estimates of the severity of coronavirus disease 2019: a model-based analysis.* THE LANCET – INFECTION DISEASES (Mar. 30, 2020). https://doi.org/10.1016/S1473-3099(20)30243-7.

COVID-19. Mr. Archilla's medical conditions qualify as a disability under the Rehabilitation Act.

62. **Maxime Blanc** is a 46-year-old man who suffers from pre-diabetes, high cholesterol, and asthma. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Blanc's medical conditions qualify as a disability under the Rehabilitation Act.

63. **Geovanny Gerardo Castellano** is a 60-year-old man who suffers from hypertension and heart disease. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Castellano's medical conditions qualify as a disability under the Rehabilitation Act.

64. **Antonio Melquezideth Castro** is a 38-year-old man who suffers from ongoing kidney issues and lung problems. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Castro's medical conditions qualify as a disability under the Rehabilitation Act.

65. **Edson Flores** is a 48-year-old man who suffers from hypertension, high cholesterol, and diabetes. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Flores's medical conditions qualify as a disability under the Rehabilitation Act

66. **Ray Fuller** is a 54-year-old man who suffers from hypertension and a cardiopulmonary disease. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Fuller's medical conditions qualify as a disability under the Rehabilitation Act.

67. **Jose Antonio Garcia Rivera** is a 62-year-old[33] man who suffers from asthma. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Garcia Rivera's medical conditions qualify as a disability under the Rehabilitation Act.

---

[33] Although ICE alleges that Mr. Garcia Rivera is 56 years old, *see supra* n.21, even assuming this is correct, his age and medical condition still place him at heightened risk of severe illness or death from COVID-19.

68.     **Karim Tahir Golding** is a 35-year-old man who suffers from asthma. He is therefore  at high risk of severe illness or death if he contracts COVID-19. Mr. Golding's medical condition qualifies as a disability under the Rehabilitation Act.

69.     **Alex Hernandez** is a 49-year-old man who suffers from hypertension and Barrett's esophagus, a condition that puts him at higher risk for cancer. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Hernandez's medical conditions qualify as a disability under the Rehabilitation Act.

70.     **Bakhodir Madjitov** is a 38-year-old man who suffers from a chronic heart condition that causes his heart to beat abnormally slow. As a result, he suffers from dizziness and shortness of breath. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Madjitov's medical condition qualifies as a disability under the Rehabilitation Act.

71.     **Kenneth Manning** is a 61-year-old man who suffers from prostate cancer and a chronic heart condition. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Manning's medical conditions qualify as a disability under the Rehabilitation Act.

72.     **Landry (Emily) Mbendeke** is a 40-year-old transgender woman who suffers from hypertension and ██████████. She is therefore at high risk of severe illness or death from COVID-19. Ms. Mbendeke's medical condition qualifies as a disability under the Rehabilitation Act.

73.     **Tesfa Miller** is a 38-year-old man who suffers from hypertension, high cholesterol and chronic bronchitis.  Mr. Miller is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Miller's medical condition qualifies as a disability under the Rehabilitation Act.

74.   **Allen Roger Olano Esparza** is a 37-year-old man who suffers from hypertension, kidney disease, and an irregular thyroid.  He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Olano's medical conditions qualify as a disability under the Rehabilitation Act.

75.   **Joseph Debonnaire Soho** is a 46-year-old man who suffers from hypertension and anemia. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Soho's medical conditions qualify as a disability under the Rehabilitation Act.

76.   **Sergio Quito** is a 45-year-old man who suffers from hypertension, a seizure disorder, and stomach ulcers. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Quito's medical conditions qualify as a disability under the Rehabilitation Act.

77.   **Churvin Webster** is a 57-year-old man who suffers from hypertension and asthma. He is therefore at high risk of severe illness or death if he contracts COVID-19. Mr. Webster's medical conditions qualify as a disability under the Rehabilitation Act.

### C.  Etowah County Detention Center Does Not and Cannot Meet Public Health Standards to Prevent Widespread Infections Inside the Facility.

78.   Alabama is experiencing a coronavirus outbreak and public officials have put in place a number of significant restrictions on public gatherings, including by closing down schools, bars, restaurants, and other public places, limiting the size of public gatherings, and issuing a state-wide 'shelter in place' order requiring residents to remain in their homes.[34]

---

[34] Cheryl Austin, Opinion: *The problems with COVID-19 testing. (And it's not what you think).*, AL.COM (Apr. 16, 2020), https://www.al.com/opinion/2020/04/the-problems-with-covid-19-testing-and-its-not-what-you-think.html; Amy Yurkanin, *Nursing homes seek alternatives as mask shortage hits Alabama*, AL.COM (Apr. 15, 2020), https://www.al.com/news/2020/04/nursing-homes-seek-alternatives-as-mask-shortage-hits-alabama.html; Jack Helean, *Alabama Governor issues statewide stay-at-home order*, ABC 3340 (Apr. 3, 2020), https://abc3340.com/news/coronavirus/alabama-governor-orders-a-statewide-shelter-in-place

79.     As of today's date, there are 6,429 COVID-19 cases in Alabama.[35] The number of infected people is rising exponentially: 219 people in Alabama have died from the disease.[36] These data include 125 cases and eight deaths in Etowah County, Alabama.[37] There is an immediate and impending threat that the coronavirus will spread uncontrollably in ECDC.

80.     Conditions in ECDC make rapid spread of COVID-19 very likely. Individuals detained in ECDC are housed in close quarters, often in cells with two to four occupants where beds spaced well under the distance of six feet apart that the CDC recommends to maintain social distancing.

81.     Since the onset of the COVID-19 pandemic, conditions in ECDC have worsened as jail officials have consolidated two separate units of immigrant detainees into a single unit, Unit 9. This consolidation places more than a hundred people in close proximity to one another, in a small space that is now even more crowded. This runs directly contrary to CDC guidance recommending social distancing and reducing contact with others.

82.     Detained individuals in ECDC use common spaces together, sharing dining tables, recreation areas, telephones, and bathrooms. The hallways and walkways along the unit tiers are tight, and detainees and facility staff are constantly in very close proximity to each other. Shared toilets, sinks, and showers are not sanitized or disinfected after each use. Staff arrive and leave on a shift basis, and even asymptomatic staff could carry the infection into the facility. Many correctional officers do not consistently wear masks or gloves, and detained

---

[35] ALABAMA DEP'T OF PUBLIC HEALTH, *COVID-19 in Alabama*, *supra* n. 4

[36] *Id.*

[37] *Id.*

individuals at ECDC were only provided with masks very recently, and were only provided with one each, which they must reuse.

83.     In ECDC, detained individuals are often responsible for cleaning their own units without proper protective equipment and with limited cleaning supplies.

84.     Additionally, frequent hand-washing is difficult at best given minimal access to soap. There may be signs instructing people to wash hands, but there is no effort to educate detained people about frequency or method, or provide them with adequate supplies to do so.

85.     Because of these conditions, outbreaks of infectious diseases are extremely common in confined detention centers such as ECDC and have resulted in the hospitalization or death of some individuals. Detained persons like Plaintiffs face inherent challenges to protect themselves from COVID-19 infection because they live, sleep, eat, and use the bathroom in close proximity with others, and because "[b]ehind bars, some of the most basic disease prevention measures are against the rules or simply impossible."[38] Individuals who are detained cannot protect themselves by social distancing and vigilant hygiene as they could in the community. Congregate settings such as these detention centers allow for rapid spread of infectious diseases that are transmitted person to person, especially those that—like COVID-19—are transmitted by droplets through coughing and sneezing. Recent data suggest that COVID-19 may also be spread through aerosolized fecal matter that is discharged and remains in the air for several hours after a toilet is flushed, especially when the toilet has no lid.

---

[38] Keri Blakinger & Beth Schwartzapfel, *When Purell is Contraband, How Do You Contain Coronavirus?*, THE MARSHALL PROJECT (Mar. 6, 2020), https://www.themarshallproject.org/2020/03/06/when-purell-is-contraband-how-do-you-do-you-contain-coronavirus (describing, for example, limited access to hand sanitizer and other precautionary measures).

86.     Therefore, a coronavirus brought into a detention facility will quickly spread among the dense group of detained individuals, including individuals, like Plaintiffs, who are at high risk of severe illness or death from COVID-19.

87.     It is particularly significant and dangerous that ECDC has continued to allow large numbers of detained people to enter and leave the facility, exposing hundreds within the detention center to close contact with potential new carriers. ICE has continued to transfer people into ECDC, as recently as last week, even after the CDC recommended against such transfer.

88.     In addition to ICE's use of ECDC to detain people, Etowah County also uses the facility as its county jail. The county has continued to book well over one hundred new people into the jail since the national emergency was declared in March. Although those detained by Etowah County and those detained by ICE are in separate units, staff and contractors move between units, and individuals detained in the county jail who have cleaning, commissary, meal delivery and other jobs leave their units and in some cases enter into the ICE units. This creates a dangerous path of transmission from the Etowah County community to ECDC and from unit to unit within ECDC – and then back out to the community, when staff and contractors return home and when individuals are released from the county jail.

89.     Given the shortage of COVID-19 tests in the United States, generally, Etowah cannot currently conduct aggressive, widespread testing to identify and track all COVID-19 cases. Alabama currently experiences problems with both testing shortages and inaccuracies.[39] Therefore, ECDC is not consistently and adequately testing detained individuals and staff for new, asymptomatic infection.

90.     In the absence of adequate testing, there is no way to be certain that COVID-19 is not already present in ECDC. And given the rapid spread of COVID-19 throughout Alabama,

---

[39] Cheryl Austin, *The problems with Covid19 testing (And it's not what you think.), supra* n.34

and daily entry of staff and guards from the community, and the continued influx and transfer of new people into detention facilities on a weekly or even daily basis, it is only a short matter of time before the disease becomes widespread among people detained in close, unsanitary conditions.

91.     Moreover, ECDC is also ill-equipped to manage an infectious disease outbreak. ECDC does not have 24-hour medical care with on-site physicians and it has very limited on-site medical facilities. Further, the medical systems in the communities surrounding ECDC are minimal, significantly reducing the capacity to provide emergency and intensive medical care.

92.     Putting infected individuals in solitary confinement is an ineffective way to prevent transmission of the disease because air continues to flow outwards from those rooms to the rest of the facility. This makes containing the illness and caring for those who have become infected virtually impossible.

93.     The coronavirus has already started to spread inside other prisons and jails throughout the U.S., and experts predict a mass contagion is only a matter of time.[40] For example, on March 20, 2020, New York City officials had confirmed just one case at their jail facilities. The next day, they confirmed 19. Two days later, there were 38.[41] By March 25, 2020, Rikers Island *alone* had 52 confirmed cases. As of April 8, 2020, it had over 165 confirmed cases amongst those who are incarcerated, and there are roughly 288 confirmed cases among jailed people, 488 among the correctional staff, and 78 among the jail's health care workers. As of April 21, 2020, there are at least 365 cases of COVID-19 among detained individuals at Rikers

---

[40] *See* Hannah Summers, *'Everyone Will Be Contaminated': Prisons Face Strict Coronavirus Controls*, THE GUARDIAN (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[41] A.P., *Coronavirus: 38 Test Positive in New York City Jails, Including Rikers Island*, THE GUARDIAN (Mar. 22, 2020), https://www.theguardian.com/us-news/2020/mar/22/coronavirus-outbreak-new-york-city-jails-rikers-island.

Island.[42] Those numbers continue to climb, with hundreds of corrections staff and medical workers now testing positive.[43] Three staff members have tested positive at the federal Bureau of Prisons (BOP) facility in Talladega, Alabama,[44] and two inmates and two staff have tested positive in the Aliceville BOP facility.[45] Seven inmates have died after a widespread outbreak of COVID-19 in the federal prison in Oakdale, Louisiana.[46] Ten incarcerated people and nine officers in the Mobile Metro Jail have confirmed cases.[47] Alabama state officials anticipate widespread infection and deaths in facilities throughout the state and have ordered hundreds of body bags.[48]

94.     Similarly, at ICE facilities across the nation, COVID-19 is spreading alarmingly fast. As of April 25, 2020, ICE has confirmed 317 cases of COVID-19 among detained people and 35 cases of COVID-19 among ICE employees at detention centers.[49] These numbers are certain to be undercounts, given that ICE has tested only a few hundred detained people for COVID-19 and that it does not report confirmed cases among employees of private contractors

---

[42] Alleen Brown, *Inside Rikers: An Account of the Virus-Stricken Jail from a Man who Managed to Get Out*, THE INTERCEPT (Apr. 21, 2020), https://theintercept.com/2020/04/21/coronavirus-rikers-island-jail-nyc/.

[43] *See* N.Y. DEP'T OF CORR. AND COMMUNITY SUPERVISION, *DOCCS COVID-19 Report*, https://doccs.ny.gov/doccs-covid-19-report (last accessed Apr. 26, 2020)

[44] Chris Norwood, *UPDATED: 3rd staff member at Talladega federal prison tests positive for COVID-19*, ANNISTON STAR (Apr. 3, 2020), https://www.annistonstar.com/the_daily_home/free/updated-3rd-staff-member-at-talladega-federal-prison-tests-positive-for-covid-19/article_356d93da-745c-11ea-a49d-c74156372b96.html.

[45] FED. BUREAU OF PRISONS, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed Apr. 26, 2020).

[46] *Id.*

[47] Mike Cason, *Mobile County sheriff says 10 jail inmates have COVID-19*, AL.COM (Apr. 15, 2020), https://www.al.com/news/2020/04/mobile-county-sheriff-says-10-jail-inmates-have-covid-19.html

[48] Connor Sheets, *Alabama had a ventilator and PPE stockpile, but it was depleted before COVID-19 hit*, AL.COM (Apr. 8, 2020), https://www.al.com/news/2020/04/alabama-had-a-ventilator-and-ppe-stockpile-but-it-was-depleted-before-covid-19-hit.html.

[49] *ICE Guidance on Covid-19, Confirmed Cases*, *supra* n.7

and local government employees, who operate the majority of ICE's detention facilities. Because of ICE's refusal to halt transfers, it is only a matter of time before the spread reaches ECDC, if it has not already.

95.     Despite these widespread warnings, ECDC—like ICE facilities across the country—remains woefully unprepared and incapable of taking necessary precautions to protect people in its custody against a life-threatening illness.

### D. ICE's Response to COVID-19 Is Insufficient to Prevent the Spread of This Life-Threatening Disease and Is Contrary to the CDC Infectious Disease Guidance ICE is Required to Follow.

96.     On or about March 23, 2020, the CDC issued guidance for detention facilities "including…federal and state prisons, local jails, and detention centers."[50]

97.     The CDC guidance states that "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced" and warns that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress… and incarcerated/detained persons may have medical conditions that increase their risk of severe disease from COVID-19."[51]

98.     Further, the CDC guidance mandates that detention facilities "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies… are on hand and available… provide a no-cost supply of soap to incarcerated/detained persons, sufficient to

---

[50] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[51] *Id.*

allow frequent hand washing…" and emphasizes the need for social distancing as a mechanism for preventing the transmission of COVID-19.[52]

99.    The CDC has also warned that individuals who are 65 and older or who have an array of underlying conditions, including individuals with asthma, blood disorders, heart disease, lung conditions, and those with compromised immune systems, are at a higher risk of developing serious complications if they were to contract COVID-19.[53] Correctional health experts agree that the age threshold should be lowered to at least 55 for incarcerated individuals, and a recent study in The Lancet suggests that the risk associated with advanced age for the general population may start at 50 years old.[54]

100.    ICE issued an "Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)" and has established a webpage entitled "ICE Guidance on COVID-19." On April 10, 2020, ICE's Enforcement and Removal Office (ERO) issued a "COVID-19 Pandemic Response Requirements" outlining recommendations for detention facilities.[55] These documents (collectively the "ICE Protocols") will not protect Plaintiffs. The protocols also do not address imminent shortages of medical supplies and staffing or education of detained people and staff about the virus, amongst other critical issues. Nor do they implement the CDC's guidelines for the management of the novel coronavirus in correctional and detention settings.

---

[52] *Id.*

[53] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Coronavirus Disease 2019 (COVID-19): People who are at higher risk for severe illness* (Mar. 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fpeople-at-higher-risk.html.

[54] *See supra* n.32.

[55] IMMIG. AND CUSTOMS ENFORCEMENT, ENFORCEMENT AND REMOVAL OPERATIONS, *COVID-19 Pandemic Response Requirements* (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

101.    For example, ERO's Pandemic Response Requirements urge that facilities "adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response."[56] But the CDC guidelines for correctional and detention facilities urge that "that "staff and incarcerated/detained people performing cleaning wear PPE."[57]  Cleaning staff, typically detained people themselves, are not provided with personal protective equipment ("PPE") for cleaning at ECDC. ERO further states that "social distancing may not be possible in congregate settings such as detention facilities," and instead, it recommends a number of alternative measures including directing detained people to "avoid congregating in groups of 10 or more, employing social distancing strategies at all times."[58] This is not possible at ECDC.

102.    The ICE Protocols do not even offer an effective way to determine who has the virus. Since some COVID-19 carriers can be asymptomatic or not show symptoms for weeks after exposure, "screening people based on observable symptoms is just a game of catch up." *In re. Extradition of Alejandro Toledo Manrique,* No. 19-mj-71055, 2020 WL 1307109 (N.D. Cal. March 19, 2020) (ordering release on bond in part because the government's management plan did not "say anything about testing").

103.    ICE has temporarily suspended social visitation in all detention facilities. But staff, contractors, and vendors continue to arrive and leave the detention centers. In addition, people are frequently transported to, from, and between facilities.

104.    Anything short of aggressive screening and testing of all detained individuals, staff, officials and other care and service providers who enter the facility is insufficient to

---

[56] *Id.* at 9.

[57] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *supra* n.50.

[58] ERO *Pandemic Response Requirements*, *supra* n.55 at 13.

prevent infection. Neither ICE nor ECDC has the resources necessary to engage in such measures, especially considering the shortage in available tests. Further, some of the available tests have a high rate of false negatives,[59] making social distancing imperative even if ICE engages in more widespread testing.

105.    The only measure ICE has committed to taking is to segregate those who meet CDC criteria for epidemiologic risk of exposure to the novel coronavirus. Even assuming adequate space, isolation of people who are ill is generally an ineffective way to prevent transmission of COVID-19 because air continues to flow outward from rooms to the rest of the facility and because asymptomatic people also transmit the disease. ICE's guidance relies heavily upon the practice of "cohorting," or grouping together, suspected cases. This practice will all but assure that the virus is spread from COVID-19 carriers to non-carriers in that unit and then throughout ECDC.

106.    Further, there is substantial evidence that ICE's COVID-19 protocols are not being followed in detention centers throughout the country, including in ECDC, and that ICE is otherwise failing to provide an adequate response—which has historically been the case—thus exacerbating the risk of harm to Plaintiffs.

107.    ICE has failed to follow the CDC guidelines designed to prevent the spread of COVID-19 in ECDC. There, over 100 detained individuals share one unit. They share dining tables, telephones, microwaves, and bathrooms, with no way to disinfect between uses. Soap is in short supply, and ICE has moved multiple new people into the immigration unit in the past several weeks, not to mention the many more individuals who are moved in and out of the county jail population.

---

[59] Rob Stein, *Study Raises Questions About False Negatives from Quick COVID-19 Test*, NATIONAL PUBLIC RADIO (Apr. 21, 2020), https://www.npr.org/sections/health-shots/2020/04/21/838794281/study-raises-questions-about-false-negatives-from-quick-covid-19-test.

108.   In ECDC, ICE has large numbers of people sleeping only a few feet apart; has failed to provide enough cleaning materials or frequency of cleaning to prevent spread of illness from surfaces; has not provided detained people with adequate soap or hygiene facilities for hand-washing crucial to prevent the spread of COVID-19; has failed to educate Plaintiffs as to proper COVID-19 safety precautions; has not provided sufficient masks, gloves or protective gear for detained people or most staff; and has booked dozens of new people into ICE and county custody in the jail since the CDC recommended against transfers on March 23, 2020.

109.   Importantly, the COVID-19 pandemic—and ICE's unreasonable response to it— will significantly strain ICE's already broken medical care system. Long before the COVID-19 outbreak, numerous public reports, including by DHS itself, have identified serious and substantial flaws in ICE's medical care system. For example, a 2017 DHS Office of Inspector General (OIG) report that assessed care at certain ICE facilities identified "lack of cleanliness and limited hygienic supplies" as well as "long waits for the provision of medical care."[60] Other reports echo these alarming findings about substandard medical care in ICE facilities.[61] Even compared with the general substandard medical care in ICE facilities, numerous reports going back nearly a decade document how ECDC has long stood out as providing particularly poor medical care.[62]

---

[60] DHS OFFICE OF THE INSPECTOR GENERAL, *Concerns About ICE Detainee Treatment and Care at Detention Facilities*, OIG-18-32 at 7 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

[61] *See, e.g.*, U.S. GOV'T ACCOUNTABILITY OFF., GAO-16-23: *Immigration Detention: Additional Actions Needed to Strengthen Mgmt. and Oversight of Detainee Med. Care* (Feb. 2016), https://www.gao.gov/assets/680/675484.pdf; HUMAN RTS. WATCH *et al.*, *Code Red: The Fatal Consequences of Dangerously Substandard Med. Care in Immigration Detention*, at 15, 19, 25, 46 (Jun. 2018), https://www.hrw.org/sites/default/files/report_pdf/us0618_immigration_web2.pdf; J. David McSwane, *ICE Has Repeatedly Failed to Contain Contagious Diseases, Our Analysis Shows. It's a Danger to the Public*, PROPUBLICA (Mar. 20, 2020), https://www.propublica.org/article/ice-has-repeatedly-failed-to-contain-contagious-diseases-our-analysis-shows-its-a-danger-to-the-public.

[62] HUMAN RTS. WATCH & CIVIC, *Systemic Indifference: Dangerous & Substandard Medical Care in US*

110.    Faced with the current pandemic, ECDC is acting contrary to public health guidance. Leadership in the Etowah County Sheriff's Office has stated that they have purchased a fogger machine that is able to sanitize 6,000 square feet in about ten minutes and that this device will be used to clean cell units and other areas of the jail. The overwhelming scientific consensus of the past few decades is that studies show both a lack of microbicidal efficacy from disinfectant fogging and adverse effects on those in facilities where disinfectant fogging is used. The CDC does not recommend environmental fogging.[63]

111.    Immigration detention facilities have faced outbreaks of other infectious diseases in recent years due to overcrowding, poor hygiene measures, medical negligence, and poor access to resources and medical care. As recently as last year, ICE mishandled and failed to take

---

*Immigration Detention* (May 8, 2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention (featuring data and interviews with individuals detained at ECDC and other detention centers known for inadequate medical care); SOUTHERN POVERTY LAW CENTER *et al.*, *Shadow Prisons: Immigrant Detention in the South* (Nov. 2016), https://www.nationalimmigrationproject.org/PDFs/2016_21Nov-shad-pris-rpt.pdf (detailing ECDC's failure to provide adequate medical and mental health care, and failure to maintain basic sanitation, living conditions); U.S. COMM'N ON CIVIL RTS., *With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities* (Sept. 2015), https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2015.pdf (finding that ECDC has "not complied with NDS [National Detention Standards] contractual standards to provide detainees with nutritious food"); Memorandum from Megan Mack, Officer, Office of Civil Rights and Civil Liberties, and David Palmer, Acting Associate General Counsel (Legal Counsel), Office of General Counsel, to Sarah Saldaña, Director, U.S. Immigration and Customs Enforcement, and Gwendolyn Keyes Fleming, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Recommendations Regarding Ongoing Issues and Open Complaints at the Etowah County Jail* (May 28, 2015), http://shutdownetowah.org/wp-content/uploads/2015/07/Adelante-Production-May-7-2019.pdf; WOMEN'S REFUGEE COMM'N, *Politicized Neglect: A Report from Etowah County Detention Center* (Mar. 2012), https://www.womensrefugeecommission.org/research-resources/politicized-neglect-a-report-from-etowah-county-detention-center/; Paul Moses, *'The Worst Place Ever' is ICE's Etowah County Detention Center in Alabama,* DAILY BEAST (Jun. 8, 2018), https://www.thedailybeast.com/the-worst-place-ever-is-ices-etowah-county-detention-center-in-alabama (describing case of ECDC detainee who was paralyzed and died after not receiving adequate medical care for an infection).

[63] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Updates: Guideline for Disinfection and Sterilization in Healthcare Facilities: Environmental Fogging (Dec. 2009)*, https://www.cdc.gov/infectioncontrol/guidelines/disinfection/updates.html (last accessed Apr. 23, 2020).

adequate measures to protect detained individuals in Louisiana against outbreaks of chicken pox and mumps.[64]

112.    And ICE has a long history of mishandling infectious and communicable diseases, struggling to contain them, and failing to follow nationally accepted standards. In a 2019 report, the DHS OIG concluded that ICE "does not adequately hold detention facility contractors accountable for not meeting performance standards," "issued waivers to facilities with deficient conditions, seeking to exempt them from complying with certain standards," and "does not adequately share information about ICE detention contracts with key officials."[65]

113.    Moreover, ICE has routinely failed to remedy inhumane conditions because, according to the OIG, "ICE does not adequately follow up on identified deficiencies or consistently hold facilities accountable for correcting them, which further diminishes the usefulness of inspections. . . . with some deficiencies remaining unaddressed for years."[66]

114.    ICE has even publicly acknowledged the need to limit the spread of the virus and the number of people in its detention centers, announcing that it will delay enforcement actions to arrest fewer immigrants and will use alternatives to detention as a response to the COVID-19 outbreak for new people they arrest in the field.[67] Although ICE has released some individuals at

---

[64] Emma Ockerman, *Migrant Detention Centers Are Getting Slammed with Mumps and Chickenpox*, VICE NEWS (Jun. 14, 2019), https://www.vice.com/en_us/article/mb8k5q/migrant-detention-centers-are-getting-slammed-with-mumps-and-chicken-pox.

[65] *See* DHS OFFICE OF INSPECTOR GENERAL, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, OIG-19-18, at 1 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[66] *See* DHS Office of the Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67, at 1 (Jun. 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[67] *See* Maria Sacchetti and Arelis R. Hernández, *ICE to stop most immigration enforcement inside the U.S., will focus on criminals during coronavirus outbreak*, THE WASHINGTON POST (Mar. 18, 2020), https://www.washingtonpost.com/national/ice-halting-most-immigration-enforcement/2020/03/18/d0516228-696c-11ea-abef-020f086a3fab_story.html.

some of its detention centers, it has failed to release high COVID-19 risk individuals at ECDC despite its acknowledgment of the public health and medical reasons to do so,[68] and has not stopped bringing new people into ECDC and transferring them among different detention centers.

115.    Indeed, in testimony to Congress on April 17, 2020, Acting ICE Director Matthew T. Albence said that ICE would not be releasing any more individuals – not because the COVID-19 health risks have abated, but because releasing medically vulnerable individuals at risk of serious illness or death could give the impression that the Trump Administration is "not enforcing our immigration laws."[69]

116.    Given the rapid spread of COVID-19, the likelihood of spread before a person infected with the virus is symptomatic, highly limited availability of testing, ICE's repeated failure to meet adequate standards for controlling infectious disease outbreaks in its facilities, ECDC's long track record of abysmal medical care, nutrition, and sanitation, and current conditions at ECDC, Defendants cannot prevent the spread of COVID-19 at ECDC.

**E.  The Consensus of Public Health Experts Is That Individuals Most Vulnerable to COVID-19 Should Immediately Be Released to Protect Them From Serious Illness or Death.**

117.    The only viable public health strategy currently available in the United States is risk mitigation. For this reason, public health experts with experience in immigration detention and correctional settings have consistently recommended the release of vulnerable detained individuals from custody.

---

[68] Noah Lanard, *ICE Is Ignoring Recommendations to Release Immigrant Detainees to Slow the Spread of Coronavirus*, MOTHER JONES (Mar. 20, 2020), https://www.motherjones.com/politics/2020/03/ice-is-ignoring-recommendations-to-release-immigrant-detainees-to-slow-the-spread-of-coronavirus/.

[69] HOUSE COMM. ON OVERSIGHT AND REFORM, *DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus,* (Apr. 17, 2020), https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees.

118.    As early as February 25, 2020, Dr. Scott Allen and Dr. Josiah Rich, medical experts to DHS, shared concerns with the agency about the specific risk to detained immigrants as a result of COVID-19. These experts warned of the danger of rapid spread of the coronavirus in immigration detention facilities. In a whistleblower letter to Congress, Dr. Allen and Dr. Rich recommended that "[m]inimally, DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." They concluded that "acting immediately will save lives not of only those detained, but also detention staff and their families, and the community-at-large."[70]

119.    Indeed, governments in the United States and worldwide have recognized the threat posed by COVID-19 spread among detained and incarcerated populations and have released detained individuals for that reason. In the United States, several jurisdictions including Los Angeles, New York, and Chicago have also released detained individuals for the same reasons.[71] Here in Alabama, the Mobile County Jail has released one third of its incarcerated population.[72]

120.    Releasing the most vulnerable people, such as Plaintiffs, would also reduce the burden on regional hospitals and health centers. In case of an outbreak at a detention center,

---

[70] Letter from Dr. Allen and Dr. Rich to Congressional Committee Chairpersons, *supra* n.19.

[71] Jan Ransom & Alan Feuer, *We're Left for Dead: Fears of Virus Catastrophe at Rikers Jail*, NEW YORK TIMES (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html ; Maura Dolan, Alene Tchekmedyian & Paige St. John, *California releases more jail inmates amid coronavirus crisis*, LOS ANGELES TIMES (Mar. 20, 2020), https://www.latimes.com/california/story/2020-03-20/california-releases-more-jail-inmates-amid-coronavirus-crisis; David Struett, *Cook County Jail releases several detainees 'highly vulnerable' to coronavirus*, CHICAGO SUN-TIMES (Mar. 17, 2020),
https://chicago.suntimes.com/coronavirus/2020/3/17/21183289/cook-county-jail-coronavirus-vulnerable-detainees-released-covid-19.

[72] Christopher Harress, *Amid COVID-19 pandemic, Mobile Metro Jail releases a third of inmates*, AL.COM (Apr.10, 2020), https://www.al.com/news/2020/04/amid-covid-19-pandemic-mobile-metro-jail-releases-a-third-of-inmates.html.

those institutions would bear the brunt of having to treat infected individuals from detention centers and would have fewer medical resources available for the general population.

121.    ICE has the authority to release individuals from custody on medical grounds and has routinely exercised its authority to release particularly vulnerable detained individuals like Plaintiffs. The former Acting Director of ICE, John Sandweg, has stated that "ICE can, and must, reduce the risk [COVID-19] poses to so many people, and the most effective way to do so is to drastically reduce the number of people it is currently holding."[73] It can do so through outright release or through the use of a panoply of alternatives to detention at its disposal.[74]

## LEGAL FRAMEWORK

### A.  Plaintiffs Have a Substantive Due Process Right to Protection from Serious Illness and Potentially Lethal Harm.

122.    Because Plaintiffs are in federal civil immigration detention, their constitutional rights flow from the procedural and substantive guarantees of the Fifth Amendment. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Moore v. Nielsen*, No. 18-cv-01722-LSC-HNJ, 2019 WL 2152582, at *4–5 (N.D. Ala. May 3, 2019) (magistrate's report and recommendation).

123.    When the government holds individuals in its custody, it assumes the affirmative obligation to provide for their basic human needs, including medical care, reasonable safety, and protection from harm. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989); *Hamm v. DeKalb County*, 774 F.2d 1567, 1573 (11th Cir. 1985); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). A government

---

[73] John Sandweg, *I Used to Run ICE. We Need to Release the Nonviolent Detainees*, THE ATLANTIC MONTHLY (Mar. 22, 2020), https://www.theatlantic.com/ideas/archive/2020/03/release-ice-detainees/608536/; Camilo Montoya-Galvez, "*Powder kegs": Calls grow for ICE to release immigrants to avoid coronavirus outbreak*, CBS NEWS (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-ice-release-immigrants-detention-outbreak/.

[74] For example, ICE can easily achieve its objective without endangering Plaintiffs' lives by placing them in its Intensive Supervisory Appearance Program (ISAP). The Government Accountability Office's most recent report found that ISAP participants appeared for their future hearings. CONG. RESEARCH SERVICE, *Immigration: Alternatives to Detention (ATD) Programs* (Jul. 8, 2019), https://fas.org/sgp/crs/homesec/R45804.pdf.

"transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause" when it fails to satisfy its "affirmative duty to protect." *DeShaney*, 489 U.S. at 200.

124.   "Under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Hare*, 74 F.3d at 651; *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). Therefore, persons detained civilly, including in immigration detention like Plaintiffs, are entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *see Marsh v. Fla. Dep't of Corrections*, 330 F. App'x 179 (11th Cir. 2009). Unlike convicted criminals, where the state interest in detention is much higher and punishment is unconstitutional only if it is cruel and unusual, for persons in civil and pretrial detention, due process prevents imposition of *any* punishment. *See Lynch v. Baxley*, 744 F.2d 1452, 1462-63 (11th Cir. 1984). A person detained civilly has due process rights that are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Hare*, 74 F.3d at 639 (citations omitted).

125.   Courts have held that the due process rights of a person in immigration detention should be evaluated at an even higher standard than that of persons detained pretrial. *See Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004). But at the very least, the standard applicable in the pretrial criminal detention context applies here.

126.   The government violates the due process rights of a person in civil detention when the conditions of her confinement amount to punishment. If "a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not

constitutionally be inflicted upon detainees qua detainees." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Jacoby v. Baldwin County*, 835 F.3d 1338, 1345 (11th Cir. 2016).

127.    To show that a condition of confinement amounts to punishment, the detained person need not demonstrate that an official subjectively or maliciously intends to punish; instead "intent may be inferred from the decision to expose the detainee to an unconstitutional condition." *Jacoby*, 835 F.3d at 1345.

128.    In addition, it is cruel and unusual punishment under the Eighth Amendment, and therefore necessarily a violation of the Fifth Amendment's Due Process Clause, for a federal official to show deliberate indifference to a substantial risk of serious harm to a detained person. *Hamm,* 774 F.2d at 1574. This occurs, for example, when officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Doe v. Robertson,* 751 F.3d 383, 388 (5th Cir. 2014).

129.    The government may violate the Eighth (and Fifth) Amendment when it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also id.* at 34 (citing with approval *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974),[75] which held that prisoners were entitled to relief under the Eighth Amendment when they showed, *inter alia*, the mingling of "inmates with serious contagious diseases" with other prison inmates).

130.    Specifically, housing detained persons in crowded conditions where they are at risk of infectious disease is unconstitutional, even when it "is not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those

---

[75] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (decisions of the former Fifth Circuit handed down prior to September 30, 1981 are binding in the Eleventh Circuit).

exposed." *Helling v. McKinney*, 509 U.S. at 33 (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)). Nor can officials "be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33.

131.    Despite their awareness of the rapid spread of COVID-19, the importance of social distancing and sanitary practices for its prevention, the threat that it poses to the lives of those who, like Plaintiffs, have certain underlying medical conditions, and the impossibility of protecting Plaintiffs who are held in ICE detention centers, Defendants continue to detain Plaintiffs. This amounts to a punitive condition of confinement or, at the very least, deliberate indifference to a substantial risk of serious harm to Plaintiffs – either of which suffices to show a due process violation and compels an order of release.

## B. ICE Lacks a Constitutionally Sufficient Purpose for Continued Detention of Medically Vulnerable Individuals.

132.    Civil confinement "constitutes a significant deprivation of liberty that requires due process protection," and, thus, the government "must have 'a constitutionally adequate purpose for the confinement.'" *Jones v. United States*, 463 U.S. 354, 361 (1983) (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 574 (1975)); *see also Foucha*, 504 U.S. at 80 ("We have always been careful not to 'minimize the importance and fundamental nature' of the individual's right to liberty.") (quoting *United States v. Salerno*, 481 U.S. 739, 750 (1987)).

133.    Due process requires that the nature and duration of a noncriminal confinement bear "some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *J.R. v. Hansen*, 803 F.3d 1315, 1321 (11th Cir. 2015).

134.    The only legitimate purpose, consistent with due process, for federal civil immigration detention is to prevent flight risk and ensure the detained person's attendance for a

legal hearing adjudicating their status or potential removal, or to otherwise ensure the safety of the community. *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

135.    The purpose of ensuring attendance at a future hearing or removal is fundamentally eviscerated where detained persons such as Plaintiffs are exposed to the coronavirus, symptomatic, seriously ill, or even dead. Continued detention in such circumstances is arbitrary, purposeless restraint entirely inconsistent with the principle of proportionality at the heart of due process.

136.    Once an otherwise valid basis for detention no longer applies, substantive due process requires the state to release the detained person. *Foucha*, 504 U.S. at 86 (ordering petitioner's release from commitment to mental institution because there was no longer any evidence of mental illness); *Kansas v. Hendricks*, 521 U.S. 346, 363-64 (1997) (upholding statute requiring civil confinement for sex offenders in part because it provided for immediate release once an individual no longer posed a threat to others).

137.    The government's only legitimate interest in Plaintiffs' continued detention – either to minimize flight risk pending removal or to prevent danger to the community, *Zadvydas*, 533 U.S. at 690 – is no longer applicable. Yet the purportedly legitimate government purposes for detention simply fall away when someone is facing lethal harm. Continued detention despite changed circumstances that render the basis of detention null, is the height of arbitrariness. *See Reno v. Flores*, 507 U.S. at 343 ("a blanket rule that simply *presumes* that detention is more appropriate than release to responsible adults is not narrowly focused on serving that interest.).

138.    At the same time, there are more "narrowly focused" means to ensure Plaintiffs' appearance in legal proceedings or for removal, which do not subject them to the dangers of detention, for example, supervised or conditional release would suffice to meet the government's

interest without subjecting Plaintiffs to severe danger. For example, one way ICE can easily achieve its objective without endangering Plaintiffs' lives is by placing them in its Intensive Supervisory Appearance Program (ISAP). The Government Accountability Office's most recent report found that ISAP participants appeared for their future hearings.[76]

139.    The Government also cannot establish that it has a compelling interest in keeping Plaintiffs detained. Each Plaintiff has a serious medical ailment and is immunocompromised. Given that the only established method to protect oneself from the virus is to self-isolate, the likelihood of a post-release danger to the community from elderly or ill persons is infinitesimal and cannot justify the maximal deprivation of liberty – detention – with a resulting risk of serious illness or death.

### C.  Plaintiffs' Prolonged Detention Violates Due Process

140.    Plaintiffs' exceedingly prolonged detention without meaningful review violates due process. Although the particular circumstances of each Plaintiff's detention differ in certain respects, they share a common core of essential facts that render their prolonged detention unconstitutional. They have been detained for exceedingly long periods of time, ranging from thirteen months to nine years. Each Plaintiff is either currently presenting a substantial challenge to his or her removal before the federal courts or in agency proceedings, or faces barriers to removal pursuant to an executable removal order, that render removal unlikely in the reasonably foreseeable future. And, as described above, they are all being detained in conditions that present an imminent risk to their lives and wellbeing.

141.    "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). In the

---

[76] CRS, *Immigration: Alternatives to Detention (ATD) Programs*, *supra* n.74

immigration context, the Supreme Court has recognized only two valid purposes for civil detention—to mitigate the risks of danger to the community and to prevent flight. *Id*.; *Demore v. Kim*, 538 U.S. 510, 528 (2003). Because Plaintiffs' ongoing deprivation of liberty is not sufficiently related to either of these purposes, their detention violates due process. Due process also requires "adequate procedural protections" to ensure that the government's asserted justification for confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (citations and internal quotation marks omitted).

142.    Two main provisions of the Immigration and Nationality Act (INA) govern the detention of noncitizens pending removal: 8 U.S.C. §§ 1226 and 1231.[77] Section 1226 governs detention of individuals "pending a decision on whether [they are] to be removed from the United States," 8 U.S.C. § 1226(a), while Section 1231 governs detention of individuals during and, in some cases, after the "removal period," *id*. §1231(a)(1)(A), while they are awaiting removal after exhausting the available legal avenues to challenge a final removal order.

143.    Detention under § 1226 is generally discretionary. *Jennings v. Rodriguez*, __ U.S. __, 138 S.Ct. 830, 846 (2018). An individual detained under subsection (a) of that statute is immediately eligible to request release on bond or conditional parole. *See* 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1(d). In some cases, Section 1226 mandates detention—namely, subsection (c) provides that the government "shall take into custody" any noncitizen who has committed certain criminal offenses including aggravated felonies that render them deportable or inadmissible, subject to a narrow witness protection exception. *See* 8 U.S.C. § 1226(c).

144.    Section 1231 comes into play once an individual has exhausted the legal avenues

---

[77] Separate statutory provisions, which do not apply here, govern the detention of particular categories of noncitizens. *See* 8 U.S.C. §§ 1225(b) (individuals classified as "arriving aliens") and 1226A (suspected terrorists).

to challenge her removal order and there is no longer any legal impediment to her removal. That section mandates detention only during the initial 90-day "removal period," 8 U.S.C. § 1231(a)(1)(A)—the time window during which the government typically effectuates the individual's removal. The removal period "begins on the latest of the following:

> (i) The date the order of removal becomes administratively final.
>
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
>
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

*Id*. §1231(a)(1)(B). The removal period may be extended beyond 90 days if the individual "fails or refuses to make timely application in good faith for travel or other documents necessary to [his] departure or conspires or acts to prevent [his] removal." *Id*. §1231(a)(1)(C). Under these circumstances, the regulations require ICE to serve the individual with a Notice of Failure to Comply, advising her that the removal period has been extended and explaining the steps she must take in order to demonstrate compliance. *See* 8 C.F.R. §241.4(g)(5)(ii).

145.   After the initial 90-day removal period, detention under Section 1231 is no longer mandatory: the government "may" detain beyond the removal period certain "[i]nadmissible or criminal aliens" or individuals determined "to be a risk to the community or unlikely to comply with the order of removal." *Id*. §1231(a)(6). The regulations provide for periodic custody reviews, and specify that noncitizens detained beyond the conclusion of the removal period are eligible for release on an order of supervision or bond. *See* 8 C.F.R. §§ 241.4, 241.5(b).

146.   In *Zadvydas*, the Supreme Court recognized that the Due Process Clause imposes limitations on the government's discretionary detention authority under the INA. 533 U.S. at 690. The following year, the Supreme Court held in *Demore* that mandatory pre-removal period detention under Section 1226(c) was not per se unconstitutional. 538 U.S. at 513 (respondent's

detention under § 1226(c) "for the brief period necessary for his removal proceedings" did not violate due process). The question of whether the statute permits prolonged detention without a bond hearing—and if so, whether such prolonged, categorical detention violates due process—was not before the Court. Justice Kennedy, who provided the crucial fifth vote in *Demore*, stressed in his concurrence that greater procedural safeguards, including individualized custody determinations, might be required "if the continued detention became unreasonable or unjustified." *Id*. at 532-33 (Kennedy, J., concurring).[78]

147.    In the wake of *Demore*, every federal appeals court to consider the issue concluded, either as a matter of statutory construction or by reaching the due process question, that mandatory detention without a bond hearing pending removal is impermissible once it exceeds a reasonable time limitation. *See Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199 (11th Cir. 2016); *Reid v. Donelan*, 819 F.3d 486 (1st Cir. 2016); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015); *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011); *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003). In *Sopo*, the Eleventh Circuit "readily joined" its sister circuits in holding, "as a matter of constitutional avoidance," that Section 1226(c) contains an implicit reasonable time limitation, 825 F.3d at 1213-14, to be determined on a case-by-case basis by considering a variety of factors, including the length of detention, the reasons removal proceedings have become protracted, the likelihood of removal, and confinement in prison-like conditions. *Id*. at 1217-18.

_____

[78] As the Eleventh Circuit recently recognized, the average length of removal proceedings has undergone a "dramatic increase" since the Supreme Court decided *Demore*. *Sopo*, 825 F.3d at 1213. Moreover, in an exceptional move, the Department of Justice has admitted that the statistics drawn from its brief that were relied on heavily by the majority in *Demore*—claiming that detention under § 1226(c) lasts an average of "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal," *Demore* at 530—were false, vastly underestimating the length of time that individuals spent in detention while challenging their removal. *See* Letter from U.S. Dep't of Justice, Office of the Solicitor General to the Honorable Scott S. Harris, Clerk of the U.S. Supreme Court, regarding *Demore v. Kim*, S. Ct. No. 01-1491 (Aug. 26, 2016), http://online.wsj.com/public/resources/documents/Demore.pdf.

148.    Recently, the Supreme Court ruled that the Ninth Circuit erred in applying the canon of constitutional avoidance to interpret the detention statutes to require an individualized bond hearing for all noncitizens detained for over six months under Sections 1226(c) and 1225(b). *Jennings,* 138 S.Ct. at 836. The question of whether prolonged detention without a bond hearing pending removal proceedings violates due process was not before the Court in *Jennings*. *Id*. at 851. The Court remanded to the Ninth Circuit to consider the constitutional question in the first instance. *Id*.

149.    The Third Circuit has already addressed the question, determining that prolonged categorical detention of individuals challenging their removal violates due process. *See Diop*, 656 F.3d at 233; *cf. Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 222 (noting that *Diop*'s constitutional holding was not abrogated by *Jennings* and reaffirming the *Diop* court's recognition that "when detention becomes unreasonable, the Due Process Clause demands a hearing, at which the Government bears the burden of proving that continued detention is necessary"). The vast majority of district courts—including courts in every circuit in the nation—have found that prolonged detention during removal proceedings violates due process when it becomes unreasonably prolonged.[79] Although *Jennings* abrogated the statutory

---

[79] *See, e.g., Reid v. Donelan*, 390 F. Supp. 3d 201, 215 (D. Mass. 2019); *Cabral v. Decker*, 331 F. Supp. 3d 255, 260-62 (S.D. N.Y. 2018); *Kabba v. Barr*, 403 F. Supp. 3d 180, 190 (W.D. N.Y. 2019); *De Oliveira Viegas v. Green*, 370 F. Supp. 3d 443, 449 (D. N.J. 2019); *Vega v. Doll*, No. 3:17-cv-1440, 2018 WL 3756755, at *4-5 (M.D. Pa. Aug. 8, 2018); *Alexis v. Sessions*, No. 18-cv-1923-H, 2018 WL 5921017, at *8 (S.D. Tex. Nov. 13, 2018); *Hamama v. Adducci*, 349 F. Supp. 3d 665, 690 (E.D. Mich. 2018), *vacated and remanded,* 946 F.3d 875 (6th Cir. 2020) (district court lacked jurisdiction to enter nationwide injunction for class of Iraqi national subject to prolonged detention under §§ 1225(b), 1226(a), 1226(c), and 1231(a)(6)); *Baez-Sanchez v. Kolitwenzew*, 360 F. Supp. 3d 808, 814 (C.D. Ill. 2018); *Vargas v. Beth*, 378 F. Supp. 3d 716, 728 (E.D. Wis. 2019), *appeal dismissed*, No. 19-1965 (7th Cir. July 18, 2019); *Muse v. Sessions*, 409 F.Supp.3d 707, 718 (D. Minn. 2018); *Martinez v. Clark*, No. 18-cv-1669-RAJ-MAT, 2019 WL 5968089, at *9-11 (W.D. Wash. May 23, 2019), *report and recommendation adopted,* 2019 WL 5962685 (W.D. Wash. Nov. 13, 2019); *Singh v. Choate*, No. 19-cv-00909-KLM, 2019 WL 3943960, at *7 (D. Colo. Aug. 21, 2019), *appeal filed*, No. 19-1416 (10th Cir. Oct. 29, 2019); *cf. Lukaj v. McAleenan*, No. 3:19-cv-241-J-34MCR, 2019 WL 4979745 (M.D. Fla. Oct. 8, 2019) (petitioner's detention without bond under § 1226(c) for almost 14 months violated due process), *order vacated on reconsideration*, 2020 WL 248724 (M.D. Fla. Jan. 16, 2020) (decision was predicated on factual error that parties failed to convey to the court; petitioner was actually detained under § 1231(a) by time of court's decision because he had filed a PFR but was not granted a stay of

48

holdings of the First, Second, Third, Sixth, and Eleventh Circuits, those courts' reasoning remains strong persuasive authority with respect to the due process analysis of the detention statutes. Each of those courts identified "serious constitutional concerns," *Sopo*, 825 F.3d at 1213, with a reading of the statutory scheme that would permit prolonged categorical detention without periodic review by a neutral magistrate or other rigorous safeguards—the reading ultimately adopted by the Supreme Court in *Jennings*. Indeed, many district courts analyzing constitutional challenges to prolonged detention after *Jennings* have applied the factors enumerated in *Sopo* and the pre-*Jennings* statutory decisions of the other circuits. *See, e.g., Moore v. Nielsen*, No. 4:18-cv-01722-LSC-HNJ, 2019 WL 2152582, at *10-11, 13 (N.D. Ala. May 3, 2019) (holding that petitioner's prolonged mandatory detention under § 1225(b) violated due process "based upon the persuasive guidance in *Sopo*").

150.    Plaintiffs' categorical detention should be presumed unreasonable because it has already far exceeded six months. Categorical civil detention for over six months likely violates due process. *See Demore*, 538 U.S. at 529-30 (upholding only "brief" detention under Section 1226(c), which lasts an average of "about five months in the minority of cases in which the alien chooses to appeal"); *Id.* at 532 (Kennedy, J., concurring) ("individualized determination as to his risk of flight and dangerousness" may be warranted "if the continued detention became unreasonable or unjustified"); *Zadvydas*, 533 U.S. at 701 ("Congress previously doubted the constitutionality of detention for more than six months"); *see also McNeil v. Dir., Patuxent Inst.*, 407 U.S. 245, 249, 250-52 (1972) (recognizing six months as an outer limit for confinement

---

removal, rendering moot petitioner's challenge to § 1226(c) detention). Similarly, "[n]early all district courts that have considered the issue agree that" prolonged mandatory detention under Section 1225(b) "will—at some point— violate the right to due process." *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1116–17 (W.D. Wash. 2019) (internal quotation marks and citations omitted) (collecting § 1225(b) cases), *appeal dismissed sub nom. Banda v. U.S. Dep't of Homeland Sec.*, No. 19-35683 (9th Cir. Oct. 9, 2019); *see also, e.g., Moore*, No. 4:18-cv-01722-LSC-HNJ, 2019 WL 2152582, at *9-10; *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 860 (D. Minn. 2019); *Portillo v. Hott*, 322 F. Supp. 3d 698, 707-09 (E.D. Va. 2018).

without individualized inquiry for civil commitment).

151.    Even if a bond hearing is not required after six months in every case, due process requires, at a minimum, a bond hearing after detention has become unreasonably prolonged. *See Diop*, 656 F.3d at 234. In determining the reasonableness of detention under the INA, courts have looked to whether the noncitizen has raised a "good faith" challenge to removal that is "legitimately raised" and presents "real issues." *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 476 (3d Cir. 2015). Reasonableness is also a "function of the length of the detention," *id*. at 477 (detention is presumptively unreasonable if it lasts six months to a year); *accord Sopo*, 825 F.3d at 1217-18, and the prospect of future detention pending the resolution of challenges to the individual's removal. *Chavez-Alvarez*, 783 F.3d at 477-78 (finding detention unreasonable after ninth months of detention, when parties "could have reasonably predicted that Chavez-Alvarez's appeal would take a substantial amount of time, making his already lengthy detention considerably longer"); *accord Sopo*, 825 F.3d at 1218; *Reid*, 819 F.3d at 500. The "conditions of confinement" also bear on the reasonableness analysis. *Chavez-Alvarez*, 783 F.3d at 478; *accord Sopo*, 825 F.3d at 1218 ("whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention" is factor in reasonableness determination). Accordingly, the factors present in all of Plaintiffs' cases—the exceedingly prolonged duration of their detention, the likely duration of their future detention absent court intervention, their high risk of severe illness or death should they contract COVID-19, and their confinement in a county jail that is plagued by systemic civil rights concerns and infamously poor conditions during this pandemic[80]—render their detention unreasonable.

---

[80] Even before the outbreak of COVID-19, the Etowah County Jail has been the subject of repeated complaints, reports, and investigations for corruption and human rights violations, including by DHS itself. *See supra* n.62 (citing numerous reports on inadequate medical care, sanitation, and nutrition at ECDC); *see also, e.g*., DHS Office of Civil Rts. and Civil Liberties, *Fiscal Year 2015 Report to Congress* at 28-29, 35 (Jun. 2016),

152.    In addition to an individualized hearing before a neutral decisionmaker, due process requires the government to provide Plaintiffs with other procedural safeguards to protect against the erroneous deprivation of liberty. First, the government must bear the burden of proof by clear and convincing evidence to demonstrate that each Plaintiff is a danger or flight risk. *See Singh v. Holder*, 638 F.3d 1196, 1203-05 (9th Cir. 2011); s*ee also United States v. Salerno*, 481 U.S. 739, 750, 752 (1987) (upholding pre-trial detention where "full-blown adversary hearing," requiring "clear and convincing evidence" and "neutral decisionmaker"); *Foucha*, 504 U.S. at 81-83 (striking down civil detention scheme that placed burden on the detainee); *Zadvydas*, 533 U.S. at 692 (finding post-final-order custody review procedures deficient because, *inter alia*, they placed burden on detainee). Additionally, in order to show that an individual's continued detention is reasonably related to the detention statutes' primary purpose of ensuring appearance during removal proceedings and effectuating her removal, *see Zadvydas* at 697, the government must also consider alternatives to detention and an individual's ability to pay bond. *See Hernandez v. Sessions*, 872 F.3d 976, 990-91 (9th Cir. 2017); *see also id*. at 991 (ICE's ISAP alternatives to detention program has resulted in appearance rates close to 100 percent) and 990 ("[d]etention of an indigent 'for inability to post money bail' is impermissible if the individual's 'appearance at trial could reasonably be assured by one of the alternate forms of release'") (quoting *Pugh v. Rainwater*, 572 F.2d 1053, 1058 (5th Cir. 1978) (en banc)).

153.    Finally, the periodic reviews afforded to some Plaintiffs under ICE's post-order custody review (POCR) process fall far short of due process requirements because they lack

---

https://www.dhs.gov/sites/default/files/publications/crcl-fy-2015-annual-report.pdf (prior investigations and "numerous complaints" DHS continues to receive from Etowah "raise serious civil rights concerns"; recommending that ICE "cease use of the facility" unless it can implement "comprehensive" reforms); Connor Sheets, *Here's how federal inmates made an Alabama sheriff $1.5 million*, AL.COM (Dec. 30, 2018), https://www.al.com/news/2018/12/heres-how-federal-inmates-made-an-alabama-sheriff-15-million.html (Etowah County Sheriff and county government reportedly misappropriated $3 million in funds paid to them under the ICE contract).

basic procedural safeguards, such as the opportunity to be heard before a neutral decisionmaker,

cross-examine witnesses, have counsel appear to present argument on the detainee's behalf,

create a contemporaneous record of proceedings, or appeal an erroneous determination. *See* 8

C.F.R. §214.4 (setting out procedures and standards for POCRs); *Diouf v. Napolitano* ("*Diouf*

*II*"), 634 F.3d 1081, 1092 (9th Cir. 2011) (180-day POCR regulations "raise serious

constitutional concerns" because they "do not afford adequate procedural safeguards";

insufficient to address prolonged detention); *see also Zadvydas* at 690-91 (comparing *Kansas*,

521 U.S. at 364-69 (upholding involuntary civil commitment for periods of one year at a time, in

light of "strict procedural safeguards" such as right to jury trial and the government's burden of

proof beyond a reasonable doubt) and *Salerno,* 481 U.S. at 750–752 (in upholding pretrial

detention, stressing "stringent time limitations," the fact that detention is reserved for the "most

serious of crimes," the requirement of proof of dangerousness by clear and convincing evidence,

and the presence of judicial safeguards), with *Foucha,* 504 U.S. at 81-83 (striking down insanity-

related detention system that placed burden on detainee to prove non-dangerousness)).

### D.  Habeas Is a Broad, Flexible Remedy That Authorizes Courts to Order Release from Unlawful Detention as Law and Equity Requires.

154.     Plaintiffs seek relief under the federal habeas statute, 28 U.S.C. § 2241, which is

itself infused with long-standing common law equitable principles. *See* 28 U.S.C. § 2241(c)(3)

(the writ extends to those prisoners "in custody in violation of the Constitution or laws or treaties

of the United States"). "Habeas is at its core a remedy for unlawful executive detention." *Munaf*

*v. Geren*, 553 U.S. 674, 693 (2008).

155.     Habeas invests in federal courts broad, equitable authority to "dispose of the

matter as law and justice require," 28 U.S.C. § 2243, as the "very nature of the writ demands that

it be administered with the initiative and flexibility." *Harris v. Nelson*, 394 U.S. 286, 292 (1969);

*see Boumediene v. Bush*, 553 U.S. 723, 780 (2008) ("Habeas is not 'a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose.'") (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

156.   Accordingly, the illegality of custody under the "Constitution or laws . . . of the United States" may stem from the fact of detention and the duration of detention – what is often referred to as the "historical core" of habeas – and for unlawful placement or conditions of detention. *See Wilwording v. Swenson*, 404 U.S. 249, 251 (1971) (habeas challenging "living conditions and disciplinary measures" is "cognizable in federal habeas corpus"); *Johnson v. Avery*, 393 U.S. 483 (1969) (permitting federal habeas challenge to legality of prison regulation prohibiting provision of legal assistance to other prisoners). *See also Aamer v. Obama*, 742 F.3d 1023, 1031-38 (D.C. Cir. 2014) (surveying history, purpose and Supreme Court jurisprudence and "the weight of the reasoned precedent in the federal Courts of Appeal" relating to habeas and concluding "habeas corpus tests not only the fact but also the form of detention.").

157.   A court is fully empowered to remediate the particular illegality here – an outbreak of lethal and unavoidable virus that threatens Plaintiffs and violates their constitutional rights to be free from arbitrary and punitive detention – by ordering their release. Habeas corpus is, "above all, an adaptable remedy," *Boumediene*, 553 U.S. at 780, and federal courts retain "broad discretion in conditioning a judgment granting habeas relief . . . 'as law and justice require'." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (quoting § 2243). That authority includes an order of release, *Boumediene*, 553 U.S. at 779, so as "to insure that miscarriages of justice within [the writ's] reach are surfaced and corrected." *Harris*, 395 U.S. at 291.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT**
*Unlawful Punishment / Deliberate Indifference*

158.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

159.    The Due Process Clause of the Fifth Amendment guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement, and requires that the government have a constitutionally adequate, nonpunitive purpose for continued detention. These requirements are violated when a condition of detention is not reasonably related to a legitimate government objective and when government officials are deliberately indifferent to a substantial risk of harm to the detainee.

160.    Defendants continue to detain Plaintiffs, whose underlying health conditions render them particularly vulnerable to contracting COVID-19, spreading it to others, and suffering serious injury or death as a result.

161.    The conditions of detention in ECDC increase Plaintiffs' risk of contracting COVID-19. There have been hundreds of cases and several deaths from COVID-19 reported in the county where the facility is located. Defendants have not, and could not possibly, implement social distancing measures that are required to prevent the rapid spread of COVID-19 in ECDC. Defendants also have not implemented any adequate hygiene practices as recommended by the CDC.

162.    Defendants have failed in their obligation to adequately protect Plaintiffs from exposure to COVID-19. This puts Plaintiffs at a substantial risk of serious illness or death.

163.    Defendants know about the prevalence of COVID-19 in Alabama, and the risk that it poses to individuals with certain underlying conditions. Under these circumstances, Plaintiffs' continued detention by Defendants amounts to deliberate indifference to a substantial risk of harm to Plaintiffs.

164.    Defendants' exposure of Plaintiffs to this substantial risk of serious illness or death amounts to punishment.

165.    Plaintiffs' ongoing confinement lacks a reasonable relationship to any legitimate government purpose. Plaintiffs do not pose a danger or a flight risk that cannot be mitigated by appropriate conditions of release, and these considerations alone are insufficient to countervail the severe risk of severe illness or even death that Plaintiffs face if they are not released.

166.    Absent judicial relief in the form of release from detention, Plaintiffs are suffering and will continue to suffer irreparable harm.

## SECOND CLAIM FOR RELIEF:

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT
### *Prolonged Detention*

167.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

168.    Civil immigration detention violates due process if it is not reasonably related to its purpose. *See Zadvydas*, 533 U.S. at 690 (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)); *Demore*, 538 U.S. at 513. As categorical detention becomes increasingly prolonged, a "sufficiently strong special justification" is required to outweigh the significant deprivation of liberty. *Zadvydas*, 533 U.S. at 690-91.

169.    Prolonged civil detention also violates due process unless it is accompanied by strong procedural protections to guard against the erroneous deprivation of liberty. *Zadvydas*, 533 U.S. at 690-91; *Foucha*, 504 U.S. at 81-83. To justify Plaintiffs ongoing prolonged detention, due process requires that the government establish, at an individualized hearing before a neutral decisionmaker, that Plaintiffs' detention is justified by clear and convincing evidence of flight risk or danger, even after consideration of whether alternatives to detention could

sufficiently mitigate that risk, and taking into account their ability to pay bond. *See Salerno*, 481 U.S. at 750, 752; *Singh*, 638 F.3d at 1203; *Hernandez*, 872 F.3d at 990.

170.    Plaintiffs' prolonged detention, which ranges from more than thirteen months to nine years, is not reasonably related to the statutory purpose of ensuring their appearance during removal proceedings or preventing danger to the community, or of ensuring their presence for imminent removal. *See Zadvydas* at 690.

171.    Nor have Plaintiffs been afforded the necessary procedural safeguards to guarantee against the erroneous deprivation of their liberty, especially as their detention grows increasingly prolonged. ICE's internal post-order custody review process does not afford Plaintiffs with a constitutionally adequate process to obtain review of their prolonged detention. *See Diouf II*, 634 F.3d at 1092.

172.    The weight of the government's interests in ensuring a lack of flight risk and preventing danger to the community is severely diminished during the pendency of the COVID-19 pandemic. Further, mandating Plaintiffs' continued detention at risk of serious illness or death during a global pandemic is grossly disproportionate to the government's interests. Categorical detention under these circumstances is not sufficiently tailored, fails to account for reasonable alternatives, and denies Plaintiffs the right to be meaningfully heard.

173.    To ensure adequate procedural protections exist, the extraordinary circumstances alleged justify this Court's intervention to order Plaintiffs' outright release during the pendency of the COVID-19 crisis, or at least release until immigrations proceedings regain regularity, at which point it may order bond hearings and requests for parole.

174.    Absent judicial relief in the form of release from detention, Plaintiffs are suffering and will continue to suffer irreparable harm.

**THIRD CLAIM FOR RELIEF:**

**VIOLATION OF IMMIGRATION AND NATIONALITY ACT – 8 U.S.C. § 1231**
*Prolonged Detention*

175.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

176.    In the event that this Court determines that Plaintiffs' detention is governed by 8 U.S.C. § 1231, they are subject to the discretionary, post-removal period detention provision Section 1231(a)(6).

177.    In *Zadvydas*, the Supreme Court recognized that due process considerations constrain the government's discretionary detention authority under Section 1231(a)(6). 533 U.S. at 699. When detention under that provision exceeds six months, it is no longer presumptively reasonable, and the government must release the individual unless it can show that his removal is significantly likely in the reasonably foreseeable future. *Id*. at 701.

178.    Plaintiffs have been detained for over six months since their removal orders became administratively final.

179.    There is no significant likelihood that the government will remove Plaintiffs in the reasonably foreseeable future. Several Plaintiffs' removal are stayed pending judicial review of a substantial challenge to their removal—a process that will likely take many more months or even years, and may ultimately result in a finding that Plaintiffs are not removable or merit relief from removal. Meanwhile, for those Plaintiffs subject to a legally final and executable order of removal, Defendants have thus far failed to secure their removal.

180.    No sufficiently strong special justification exists to justify Plaintiffs' continued detention without a bond hearing, especially given the lengthy deprivation of liberty they have already experienced. *See Zadvydas* at 690-91; *Kansas*, 521 U.S. at 364-69; *Salerno*, 481 U.S. at 750–752.

181.    Thus, Plaintiffs are entitled to immediate release from detention or, alternatively, a prompt individualized hearing where the government bears the burden of proving danger or flight risk.

### FOURTH CLAIM FOR RELIEF:

### HABEAS AUTHORITY TO ORDER RELEASE FROM UNLAWFUL DETENTION

182.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

183.    The Court has broad, equitable authority under the habeas statute, 28 U.S.C. §§ 2241, 2243 and the common law, to dispose of Plaintiffs' cases as law and justice require, based on the unique facts and circumstances of their cases, in order to remedy Plaintiffs' unlawful conditions of detention.

184.    The Court should exercise this authority to grant Plaintiffs' habeas corpus petition and to fashion any and all additional relief, necessary to effectuate Plaintiffs' expeditious release from unlawful detention. In the absence of such relief, Plaintiffs are suffering and will continue to suffer irreparable harm.

### FIFTH CLAIM FOR RELIEF:

### VIOLATION OF THE REHABILITATION ACT
***Failure to Provide Reasonable Accommodation to Persons with Disabilities***

185.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

186.    Section 504 of the Rehabilitation Act requires federal agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

187.    DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to

discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; *see also* 29 U.S.C. § 794(a). The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

188.    The removal process is a benefit administered by DHS and Plaintiffs are entitled to participate in the removal process. The services, programs, and activities within the detention centers where DHS detains Plaintiffs receive substantial federal financial assistance.

189.    Plaintiffs' underlying medical conditions qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

190.    By exposing them to a heightened risk of contracting COVID-19, Defendants are preventing Plaintiffs from participating in the removal process by reason of their disability.

191.    By failing to take account of their special vulnerability to severe illness or death if they were to contract COVID-19, Defendants are preventing Plaintiffs from participating in the removal process by reason of their disability.

192.    By failing to provide Plaintiffs adequate protection from COVID-19 through the only effective means to reduce the risk of severe illness or death, Defendants have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the detention centers with respect to Plaintiffs.

193.    The only available "reasonable accommodation" that would mitigate Plaintiffs' disability is release from detention. Defendants have failed to implement this reasonable accommodation, which would not be unduly burdensome nor require a fundamental alteration in the removal process or the programs and activities of the detention center.

194.    Defendants' ongoing detention of Plaintiffs constitutes discrimination because it is either disparate treatment of, or at the very least has a disparate impact on, people with qualifying disabilities who are at severe risk of serious illness or death if they were to contract COVID-19.

195.    For these reasons, Defendants' ongoing detention of Plaintiffs violates the Rehabilitation Act.

<strong><u>PRAYER FOR RELIEF</u></strong>

WHEREFORE, Petitioners-Plaintiffs request that this Court:

1.  Issue a writ of habeas corpus and order Plaintiffs' immediate release or placement in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that their continued detention violates the Due Process Clause and/or the Rehabilitation Act;

2.  In the alternative, issue a temporary restraining order or preliminary and permanent injunctive relief ordering Defendants to immediately release Plaintiffs or place them in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that their continued detention violates the Due Process Clause and/or the Rehabilitation Act;

3.  In the further alternative, order a plan, to be immediately submitted to the Court and overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines

the specific mitigation efforts, in line with CDC guidelines, necessary to prevent, to the degree possible, contraction of COVID-19 by Plaintiffs not immediately released;

4. If immediate release is not granted on the basis of this Petition alone, then expedited review of the Petition, including oral argument, via telephonic or videoconference if necessary;

5. Declare that Defendants' continued civil detention of individuals at increased risk for severe illness, including all people over the age of 55 and persons of any age with underlying medical conditions that increase the risk of serious illness or death upon contracting COVID-19 violates the Due Process Clause and/or the Rehabilitation Act;

6. Award Plaintiffs all costs incurred in maintaining this action, including reasonable attorneys' fees under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified by law; and

7. Grant Plaintiffs any other and further relief this Court deems just and proper.

Dated: April 27, 2020
       Birmingham, Alabama

Respectfully submitted,

*/s/ Jessica Myers Vosburgh*
Jessica Myers Vosburgh
 jessica@adelantealabama.org
**ADELANTE ALABAMA WORKER CENTER**
2104 Chapel Hill Road
Birmingham, AL 35216
205.317.1481

Sirine Shebaya*
 sirine@nipnlg.org
Matthew S. Vogel*
 matt@nipnlg.org
Khaled Alrabe**
 khaled@nipnlg.org
**NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD**

2201 Wisconsin Avenue NW, Suite 200
Washington, DC 20007
718.419.5876

Baher Azmy*
 bazmy@ccrjustice.org
Ghita Schwarz*
 gschwarz@ccrjustice.org
Angelo Guisado*
 aguisado@ccrjustice.org
Guadalupe V. Aguirre*
 laguirre@ccrjustice.org
Astha Sharma Pokharel*
 asharmapokharel@ccrjustice.org
Brittany Thomas*
 bthomas@ccrjustice.org
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 11201
212.614.6427

Jeremy Jong*
 jermjong@gmail.com
3527 Banks Street
New Orleans, LA 70119
504.475.6728

*Counsel for Petitioners-Plaintiffs*

**pro hac vice* applications forthcoming
***admitted *pro hac vice*

Case 4:20-cv-00304-AKK-JHE   Document 1   Filed 04/27/20   Page 65 of 65

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2020, I electronically filed the foregoing Amended Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Birmingham, AL
Dated: April 27, 2020

*/s/ Jessica Myers Vosburgh*
Jessica Myers Vosburgh