FILED

2020 May-06  PM 11:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

ARCHILLA, *et al*.,

    *Petitioners-Plaintiffs*,

    v.

WITTE, *et al*.,

    *Respondents-Defendants*.

Case No. 4:20-cv-596-RDP-JHE

---

**REPLY**

---

## INTRODUCTION

Plaintiff-Petitioners (Petitioners) seek modest relief in light of extraordinary circumstances. These seventeen medically vulnerable Petitioners do not seek any class wide relief nor do they aim to set aside any criminal conviction or to challenge their underlying grounds for removal. As *civil* immigration detainees, the Fifth Amendment's Due Process Clause requires that their detention bear a reasonable relationship to a legitimate government interest. And, while Petitioners concede the government has a legitimate interest in preventing flight and ensuring appearances in removal proceedings, Immigration and Custom's Enforcement's (ICE) own data show alternatives to detention assure appearances nearly 100% of the time. In light of the potentially lethal danger Petitioners now face and the alternatives to detention, Petitioners' continued detention during this health crisis has become unreasonable.

Reported COVID-19 cases are exploding in ICE detention centers and are necessarily underreported given the near categorical failure to test individuals and facilities in Alabama

1

remain particularly vulnerable.  The actions that officials of the Etowah County Detention Center (ECDC) have taken have not been effective in stopping the spread of a this uniquely dangerous disease. In these unprecedented circumstances, anything short of Petitioners' release will subject them to irreparable harm.  Accordingly, as numerous courts have found,[1] this court has authority via habeas to find a Due Process violation and order their release. Doing so will protect these seventeen individuals and the public from grave harm.

## SUPPLEMENTAL FACTS

### I.  ICE Detention Centers Have An Alarming And Undercounted Rate of Growth of COVID-19 Cases.

ICE has lost control of the COVID-19 in its detention centers.  On April 7, 2020, ICE reported 19 confirmed cases of COVID-19 among detained people; less than a month later, the number exploded to 705.[2] ICE has tested less than five percent of its detained population.[3] Of the over 29,675 immigrants held in ICE detention, only 1,460 ICE detainees nationwide have been tested and nearly half of those tested have tested positive.[4] COVID-19 rates are therefore likely to be much more prevalent in ICE detention centers, especially in Alabama.[5] Following the regional and national trend, ICE detention centers under the jurisidciton of the New Orleans Field Office (which includes Etowah) have an alarming rate of COVID-19 infections, now iwth

---

[1] *See, e.g. Dada v. Witte*, No. 1:20-CV-00458 at *21 (M.D. La. Apr. 30, 2020) (report and recommendation); *Vazquez-Berrera v. Wolf*, No. 20-cv-1241, 2020 WL 1904497, at *5 (S.D. Tex. Apr. 17, 2020); *Malam v. Adducci*, No. 20-10829 (E.D. Mich. Apr. 20, 2020); *Coronel v. Decker*, No. 1:20-cv-02472-AJN, 2020 U.S. Dist. LEXIS 53954 (S.D.N.Y. Mar. 27, 2020); *Calderon Jimenez v. Wolf*, No. 18-10225 (MLW), ECF No. 507 (D. Mass. Mar. 26, 2020); *Hope v. Doll*, No. 1:20-cv-00562-JEJ (M.D. Pa. Apr. 7, 2020); *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020); *Basank. v. Decker, et al.*, No. 1:20-cv-02518-AT, 2020 U.S. Dist. LEXIS 53191 (S.D.N.Y. Mar. 26, 2020); *Hope v. Doll*, No. 1:20-cv-5622020, U.S. Dist. LEXIS 63970 (M.D. Pa. Apr. 7, 2020); *United States v. Martin*, No. 19 Cr. 140-13, 2020 U.S. Dist. LEXIS 46046, at *2 (D. Md. Mar. 17, 2020).

[2] ICE COVID-19 Guidance, https://www.ice.gov/coronavirus (last accessed May 6, 2020).

[3] *Id.*

[4] *Id.*

[5] Eaton Decl. ¶ 15.

over one hundred confiremd cases.[6] As of May 4, ICE acknowledged one COVID-19 case at Etowah.[7]



Richwood Correctional Center, which, like ECDC, holds both civil immigration and pretrial criminal detainees, provides a cautionary tale as to the failure of ICE to contain COVID-19. There, COVID-19 has already killed two guards as positive cases rose from one to 61 in the span of three weeks.[8] Given the hyper-contagious nature of COVID-19 and Respondents' failures to implement sufficient safeguards at ECDC, an outbreak may have already begun there.

## II.     Respondents Are Incapable of Containing COVID-19.

Respondents have failed to comply with basic CDC guidelines, thereby imperiling Petitioners:

- **Communications Systems:** Dr. Homer Venters, a physician, epidemiologist, and former Chief Medical Officer of the New York City jail system with two years experience analyzing medical care in ICE's detention network, has found that ICE lacks the systems necessary to prevent a COVID-19 outbreak. Ex. 24, Declaration of Dr. Homer Venters ¶¶

---

[6] ICE COVID-19 Guidance, supra n. 2; Huber. Decl. Addendum A.
[7] *Id.*
[8] WIFR, *2 guards at ICE jail die after contracting coronavirus* (Apr. 29, 2020), https://www.wifr.com/content/news/2-guards-at-ICE-jail-die-after-contracting-coronavirus-570057531.html; There are now 64 confirmed cases at Richwood according to ICE. *See* ICE COVID-19 Guidance, *supra* n. 2.

1-4. For example, ICE's guidance "creates an unwieldy and unrealistic process for facilities to notify ICE headquarters regarding high risk detainees," lacks "capacity to provide daily clinical guidance to all of the clinical staff" in light of fast evolving COVID-19 care guidelines, and "fails to establish or mandate a respiratory protection program, a critical guideline of the CDC." *Id.* ¶¶ 24, 26, 28.

- **Social distancing:** ICE's guidance  only requires social distancing "whenever possible,"[9] but a distance of 6 feet from any other people must be maintained at all times. Hassig Decl. ¶ 7; Venters Decl. ¶ 34. Nor do Respondents have any discernible social distancing plan for "showers and bathrooms, medication lines, medical and mental health clinics, hallways, sallyports." Venters Decl. ¶ 33(e). The CDC recommends that higher-risk individuals "should not be cohorted with other quarantined individuals" and requires that if such cohorting is unavoidable, jailers should make "all possible accommodations to reduce exposure risk for the higher-risk individuals."[10] However, Respondents rely heavily on cohorting as a mitigation strategy, even for asymptomatic detained people who have been in contact with a known COVID-19 case. *See* ECF No. 11, Resp. at 9. No arrangements have been made to identify and reduce exposure of higher risk individuals like Petitioners. Respondents decided to consolidate over 100 detained people, including all Petitioners, into a single unit. ECF No. 11-1, Declaration of Bryan S. Pitman ["Pitman Facility Decl."] ¶ 13. While even ICE's own guidance directs it to reduce density, Respondents have chosen to increase the density as ECDC. Directing detainees to stay 6 feet apart is meaningless if it is impossible to stay 6 feet away from other detained

---

[9] ICE Enforcement and Removal Operations, *COVID-19 Pandemic Response Requirements*, 13-14 (April 10, 2020), *available at* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.
[10] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

individuals. Hassig Decl. ¶ 11. Additionally, while Respondents attest to measures they have taken to increase social distancing and hygiene within this single ICE unit, they do not provide "any case information on the [non-ICE] inmate population," even though that population shares a medical unit, hallways, and ECDC staff with Petitioners. Resp. at 11 n.3; *Id*. ¶ 18.

●  **Transfers**: To limit the spread of COVID-19, the CDC guidance[11] provides that all transfers of detained persons should be suspended, and should only occur when "absolutely necessary."[12] Respondents make no representation that they have attempted to limit transfers or new admissions, either for county or for ICE detainees. In fact, Respondents have brought at least 248 new county detainees into ECDC since the CDC promulgated its March 23, 2020 detention facility guidance,[13] and continue to admit new ICE detainees. Ex. 25, Supplemental Declaration of Randane Williams ¶ 3; Ex. 26, Supplemental Declaration fo Karim Golding ¶ 3. Respondents purport to deny entry "to any incoming detainee who exhibits a fever and/or respiratory symptoms unless that detainee has tested negative for COVID-19."[14] This is patently untrue. Respondents have transferred visibly ill detainees.[15] Inexplicably and in contravention of its own policy, Respondents even chose to bring a COVID-19 positive man into ECDC, repeating the mistake it made at Pine Prairie ICE Processing Center. Pitman Facility Decl. ¶ 18. There, ICE similarly chose to bring a COVID-19 positive man into the detention center, and a

---

[11] *Id*.

[12] *Id*.

[13] Etowah County Sheriff's Office, *Booked Last 24 Hours*, http://etowahcountysheriff.com/mugshots.php (accessed May 5, 2020).

[14] Resp. at 9.

[15] Kimberly Kindy, Emma Brown and Dalton Bennett, *'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat,* (March 25, 2020). https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html

month later, 26 detained people have tested positive.[16] Although negative pressure rooms

are critical in preventing the airborne spread to neighboring units and staff, Respondents

do not purport to house their confirmed COVID-19 positive man in a negative pressure

room. *Id*.

- **Hygiene:** Per CDC guidelines, hand sanitizer or soap should be available to each detainee

  before and after meals, toileting, and frequently throughout the day. In reality, conditions

  for ICE detainees at the Etowah County Detention Center limit access to soap, hand

  hygiene and require close contact with detainees.[17] Further, although the CDC does not

  recommend using fog-based disinfection because of safety and efficacy issues,

  Respondents purport to clean Petitioners' unit with a machine that "distributes a

  disinfectant solution into the air and on surfaces in order to disinfect common areas."[18]

  Though the CDC warns against using these fog machines in inhabited spaces,

  Respondents do not move Petitioners from their unit before fogging.[19] Moreover, even if

  this disinfection method were to work, Respondents fail to describe any cleaning

  interventions, "which are essential to implement in tandem with disinfection."[20]

- **Masks:** The CDC also recommends that surgical masks only be used once.[21] However,

  Respondents state only generally that "[d]etainees, inmates, and staff are all provided

  with a face mask to wear" without specifying that any arrangements have been made to

---

[16] *Id.*
[17] Eaton Decl. ¶16; Williams Suppl. Decl. ¶¶5-6.
[18] Eaton Decl.  ¶¶ 30-31, R. at 12.
[19] Golding Suppl. Decl. ¶ 8.
[20] Venters Decl. ¶ 33(d).
[21] CDC, *Understanding the Difference (surgical masks, N95 FFRs, and Elastomerics) Infographic*,  available at
https://www.cdc.gov/niosh/npptl/pdfs/UnderstandingDifference3-508.pdf

replace said masks.[22] In fact, Petitioners receive only one single-use surgical style mask

every 3 weeks.[23]

- **Testing:** Respondents notably do not disclose how many tests have been conducted at

    ECDC. The CDC categorizes symptomatic people in "congregate living settings,

    including prisons" as high risk.[24] The White House Coronavirus Task Force has

    emphasized the need for testing of asymptomatic people in congregated settings.[25]

    However, in lieu of expanding testing capabilities, Respondents "increased medical

    screenings in the form of daily vital sign checks of all detainees in order to further

    mitigate the spread of the virus."[26] This measure does little to mitigate the impact and

    reach of COVID-19 because "as many as 30 to 50 percent  of individuals with COVID-

    19 will have no signs or symptoms of disease despite being infectious (e.g. asymptomatic

    shedding)."[27] Further, this approach is likely to miss staff as they bring in and transmit

    the virus while asymptomatic.[28] Despite the known risks, Respondents mention no plans

    for widespread testing and contact tracing necessary to control a COVID-19 outbreak.[29]

    Under these circumstances, COVID-19 cases may not be detected until there is already a

    full-blown outbreak.

## II.    Petitioners Are Longtime Residents with Extensive Family and Community Ties in the U.S. and Safe Places to Shelter and Self-Isolate Upon Release.

---

[22] Resp. at 13.
[23] Golding Suppl. Decl. ¶ 7; Williams Suppl. Decl. ¶ 7.
[24] CDC, *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19)*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-criteria.html.
[25] The White House, *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing* (Apr. 27, 2020), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-33/
[26] Resp. at 11.
[27] Eaton Decl. ¶ 33.
[28] Venters Decl. ¶ 14(A).
[29] *Id*.

All seventeen Petitioners who remain in detention have deep roots and extensive family and community ties in the United States. All but one has lived in the U.S. for well over a decade (the remaining Petitioner, Ms. Mbendeke, has resided in the U.S. for eight and a half years). Many have lived here since they were minor children[30] or young adults.[31] All Petitioners have close family members—including spouses, parents, grandparents, and children—who are U.S. citizens or lawful permanent residents (LPRs). Most Petitioners are represented by immigration counsel on a pending petition for review[32] or in agency proceedings on remand.[33] Every Petitioner has a safe place to self-isolate for at least fourteen days if they are released, and to comply with applicable local orders and public health guidelines thereafter.

Below is a summary of each Petitioner's length of residence and family ties in the United States. Unless specifically noted, this information is not disputed by Respondents:

- **Sarail Michael Archilla** was brought to the U.S. from Canada by his mother in or around 1981, when he was about five or six years old. Archilla Decl. ¶ 9.[34] He has two U.S. citizen children, a U.S. citizen girlfriend, and various family members with lawful status in the U.S. *Id.* ¶¶13, 14.

- **Maxime P. Blanc** has resided in the U.S. since 1994. Blanc Decl. ¶ 10.[35] He later became an LPR. *Id.* He is represented by counsel in his removal case before the Eleventh Circuit Court of Appeals. *Id.* ¶ 10. The immigration judge in his case concluded that he has "extensive family ties in the United States, consisting of siblings, cousins, nieces and nephews, and godchildren." *Id.* ¶ 14.

- **Geovanny Gerardo Castellano** has resided in the U.S. since 1979. Castellano Decl. ¶ 9. He has various U.S. citizen and LPR family members in California. *Id.* ¶ 14.

---

[30] *See* Archilla Decl. ¶ 9, Garcia Rivera Decl. ¶¶ 1, 7, Golding Decl. ¶ 6, Miller Decl. ¶ 8, Olano Decl. ¶ 8, Webster Decl. ¶ 8, Williams Decl. ¶ 9.

[31] *See* Blanc Decl. ¶ 10, Castellano Decl. ¶ 9, Castro Decl. ¶ 11, Flores Decl. ¶ 9, Quito Decl. ¶ 9.

[32] See Blanc Decl. ¶ 10, Golding Decl. ¶ 8, Mbendeke Decl. ¶ 5 (sealed document), Williams Decl. ¶ 10.

[33] *See* Flores Decl. ¶ 12. Additionally, undersigned counsel is currently assisting Mr. Garcia Rivera to identify legal counsel to investigate his claim of U.S. citizenship.

[34] ICE claims that Mr. Archilla "is believed to be from Jamaica." Pitman Detainees Decl. ¶ 13.

[35] Respondents incorrectly state that Mr. Blanc is a citizen of the Dominican Republic. Resp. at 24. He is a native and citizen of Dominica. Blanc Decl. ¶ 1.

- **Antonio Melquezideth Castro** entered U.S. on a visa in 2000 and later adjusted to LPR status. Castro Decl. ¶ 11. He has three young U.S. citizen children and an LPR cousin who is willing to host him if he is released. *Id*. ¶¶ 15-16.

- **Edson Flores** has resided in the U.S. since 1991. Flores Decl. ¶ 9. The Second Circuit recently granted his petition for review and remanded his case to the BIA, and his pro bono counsel has agreed to continue representing him in agency proceedings. *Id*. ¶ 12. He has various U.S. citizen family members, including his mother. *Id*. ¶ 17.

- **Ray Fuller** entered the U.S. on a spousal visa in 1999 and later adjusted to LPR status. Fuller Decl. ¶ 9. His three children and two sisters are U.S. citizens. *Id*. ¶ 13.

- **Jose Antonio Garcia Rivera** is a U.S. citizen by birth. Garcia Rivera Decl. ¶ 1.[36] He has resided in the U.S. since he was a teenager. *Id*. ¶ 7. He has a U.S. citizen partner and son. *Id*. ¶ 10.

- **Karim Tahir Golding** has resided in the U.S, since 1994, when he was nine years old. Golding Decl. ¶ 6. He is represented by counsel in his removal case before the Second Circuit Court of Appeals. *Id*. ¶ 8. His mother is a U.S. citizen. *Id*. ¶ 12.

- **Alex Hernandez** has resided in the U.S. for over three decades. ECF No. 11-2, Declaration of Bryan S. Pitman [hereinafter "Pitman Detainees Decl."] ¶ 10. He is represented by counsel in his removal case before the Ninth Circuit Court of Appeals.

- **Bakhodir Madjitov** has resided in the U.S. since 2006. Pitman Decl., ECF No. 11-2, ¶ 17. His wife and three children are U.S. citizens. *See* Madjitov Decl. ¶¶ 30-31. He is represented by counsel in his removal case before the Eleventh Circuit Court of Appeals, and in legal proceedings related to his injury during ICE's attempt to unlawfully deport him. He has no criminal convictions.

- **Kenneth Manning** has resided in the U.S. since 1985. Manning Decl. ¶ 7. The Second Circuit recently granted his petition for review and remanded his case to the BIA for further review of his claim that he will be tortured if deported to Jamaica because of his cooperation with U.S. law enforcement authorities investigating gang activity in that country. *Id*. ¶ 9.

- **Landry (Emily) Mbendeke** has resided in the U.S. since 2011. Pitman Detainees Decl. ¶ 24. She has immediate family members with lawful status. Mbendeke Decl. ¶ 16 (sealed document). She is represented by counsel in her removal case before the Second Circuit Court of Appeals. *Id*. ¶ 5; Pitman Detainees Decl. ¶ 24.

---

[36] ICE disputes Mr. Garcia Rivera's identity and biographical information, claiming that his name is Domingo Castillo and that he is a citizen of the Dominican Republic. *See* Garcia Rivera Decl. ¶ 3; Pitman Detainees Decl. ¶ 21. According to ICE, he entered the U.S. at an unknown date and time. Pitman Detainees Decl. ¶ 21.

- **Tesfa Miller** has resided in the U.S. since 1990, when he was about eight years old. Miller Decl. ¶ 8. He obtained LPR status through his mother. *Id*. He has various U.S. citizen family members, including his mother, grandmother, and daughter. *Id*. ¶ 15.

- **Allen Roger Olano Esparza** has resided in the U.S. since 1997, when he was 14 years old. Olano Decl. ¶ 8. He later adjusted to LPR status. *Id*. His mother and three-year-old daughter are U.S. citizens. *Id*. ¶ 13.

- **Sergio Quito** has resided in the U.S. since 1994. Quito Decl. ¶ 9. His daughter and most of his wife's family are U.S. citizens. *Id*. ¶ 13.

- **Churvin Webster** has resided in the U.S. since the 1960s, when he was a small child. Webster Decl. ¶ 8. He obtained LPR status in the 1970s. *Id*. He has two U.S. citizen sisters and extensive employment, family, and community ties in New Jersey. *Id*. ¶ 12.

- **Randane Williams** has resided in the U.S. since 2004, when he was fourteen years old. Williams Decl. ¶ 9. He was granted LPR status as a special immigrant juvenile. *Id*. He is represented by counsel in his removal case before the Ninth Circuit Court of Appeals. *Id*. ¶ 10. He has aunts, nephews, niece and cousins who are U.S. citizens and two LPR brothers. *Id*. ¶ 13.

Publically available data from DHS and the Department of Justice demonstrate that the overall appearance rate for non-detained individuals in removal proceedings in the U.S. is approximately 80 percent. *See* Ex. 27, Declaration of Aaron Reichlin-Melnick ¶ 10. That rate increases to 88 percent for individuals who have been in the U.S. for over one year, and over 91 percent for individuals—like nearly all Petitioners—who have resided in this country for over ten years. *Id*. ¶ 18. Appearance rates for individuals represented by immigration counsel nears 100 percent. *Id*. ¶ 11. And previously detained individuals released from ICE custody are even *more likely* to appear than individuals who have never been detained. *Id*. ¶ 17.

## ARGUMENT

I. **THE COURT HAS JURISDICTION OVER THE HABEAS CLAIMS BECAUSE THE ONLY REMEDY SOUGHT IS RELEASE, AND IT INDEPENDENTLY HAS JURISDICTION AND AUTHORITY TO ORDER RELEASE UNDER RULE 65.**

Contrary to Respondents' narrow characterization, Petitioners do not bring their § 2241 habeas claims in order to challenge their conditions of confinement.  As an emerging consensus

of courts confronting similar arguments have held, because the facts and expert testimony show that the only viable remedy for the unconstitutional conditions is release from detention, their claims sit at the core of habeas.  And, habeas is a broad, flexible remedy that fully authorizes release.  The court independently has federal question jurisdiction pursuant to 42 U.S.C. § 1331 to consider their constitutional claims and to issue a TRO ordering release pursuant to Rule 65 and the court's inherent equitable authority.

A. **Because Plaintiffs Seek Release, Not Alterations of Conditions, Their Claims are at the Core of Habeas**.

Respondents correctly note that courts have distinguished between claims brought in habeas that challenge the "fact or duration" of detention and claims brought in habeas that seek to alter unlawful "conditions of confinement," and correctly observe that the Supreme Court has left open the question of whether habeas provides courts the authority to bring "conditions of confinement" claims.  *See* Resp. Br. at 38. They note that there is a circuit split on the question of whether conditions claims can be brought in habeas, *compare, e.g. Aamer v. Obama*, 742 F.3d 1023, 1031-38 (D.C. Cir. 2014) (permitting habeas claim challenging allegedly unconstitutional force feeding of prisoners) *with Graham v. Broglin,* 922 F.2d 379, 381 (7th Cir.1991) (habeas not available to challenge prison's rules regarding work permission), and posit that the Eleventh Circuit should be counted among the Circuits who would deny conditions claims brought via habeas.  But this theoretical question is irrelevant to resolving this case.

Here, contrary to Defendants' formulaic conception, Plaintiffs do not seek judicial intervention in order to improve their conditions of confinement of the sort of attempted by habeas petitioners in the cases Defendants rely upon, *see* Resp. Br. 38-39,[37] nor could they bring

---

[37]    The cases Defendants rely upon that foreclose habeas seek remediation of inadequate conditions; they do not seek release because of irremediable conditions, as do Plaintiffs. *See Gomez v. United States*, 899 F.2d 1124, 1125 (11th Cir. 1990) (rejecting habeas where petitioner challenged the "medical treatment" during the course of

such a civil rights claim.  The conditions are what compels release.  As the Southern District of Texas stressed in granting a similar TRO under § 2241, "The mere fact that Plaintiffs' constitutional challenge requires discussion of conditions in immigration detention does not necessarily bar such a challenge in a habeas petition." *Vazquez Barrera v. Wolf*, No. 20-cv-1241, 2020 WL 1904497, at *4 (S.D. Tex. Apr. 17, 2020).  Indeed, the very premise of the habeas petition – supported by uncontroverted record evidence – is that the conditions producing irreparable harm in these circumstances cannot be remediated by any judicial order, which therefore renders the *fact* of their continued detention unlawful under due process.  *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) ("a determination that [the petitioner] is entitled to immediate [ ] or a speedier release" is proper habeas claim); *see also Dada v. Witte*, No. 1:20-CV-0458, Dkt. 17 at *9 (W.D. La. Apr. 30, 2020) (Report and Recommendation) (explaining that "the remedy for conditions claims is generally corrective. The remedy for fact claims, however, generally terminates the detention altogether, or alters it such that a new form of custody or control is imposed" and recommending release of 13 petitioners under § 2241); *Vazquez Barrera*, 2020 WL 1904497, at *4 ("Because Plaintiff's are challenging the fact of their detention as unconstitutional and seek relief in the form of immediate release, their claims fall squarely in the realm of habeas corpus").

Respondents' reliance on *A.S.M. v. Donahue*, No. 7:20-CV-62 (CDL), 2020 WL 1847158, at *1 (M.D. Ga. Apr. 10, 2020) is curious, as the court there "agrees that the general principle eschewing habeas relief as a means for remedying condition of confinement constitutional violations rests upon the assumption that eliminating the contested confinement

---

detention.); *Vaz v. Skinner*, 634 Fed. Appx. 778, 781 (11th Cir. 2015) (rejecting habeas petition seeking better medical treatment.); *Cook v. Baker*, 139 Fed. Appx. 167, 169 (11th Cir. 2005) (dismissing § 1983 action as frivolous because habeas corpus was the exclusive remedy for petitioner's claim challenging the propriety of his conviction.); *Daker v. Warden*, No. 18-13800, 2020 WL 751817, at *2 (11th Cir. Feb. 14, 2020) (rejecting habeas petition seeking adequate food and medical care.)

conditions is possible without releasing the detainee from detention," and thus accepted the possibility of COVID-19 release claims in habeas, even as it concluded the factually weaker record in that case did not demonstrate release was necessary.  Otherwise, Defendants rest their argument almost entirely on one case, *Toure v. Hott*, No. 1:20-cv-395, 2020 WL 2092639, *6 (E.D. Va. Apr. 29, 2020). The case is contrary to another holding in the same circuit, *see Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020) ("First, and most fundamentally, although the grounds on which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement, which is 'the heart of habeas corpus.'") and runs contrary to an emerging consensus that recognizes such claims sound in habeas.[38]

Defendants argue that accepting this principle would permit litigants to pull the wool over a judge's eyes because, "virtually all claims would be cognizable under section 2241 so long as the petitioner includes a prayer for release." Resp. Br. 37.  But habeas is not so manipulable.  No judge would accept a habeas claim to seek, say, more recreation or halal meals, as a "fact of detention" claim simply because a petitioner demanded release from such inadequate conditions.  The *A.S.M.* case upon which Defendants rely proves the point: the court recognized that habeas claims could be brought where conditions were so bad that release was

---

[38]     *See Vazquez Barrera*, 2020 WL 1904497, at *8; *Essien v. Barr*, No. 20-CV-1034-WJM, 2020 WL 1974761, at *3 (D. Colo. Apr. 24, 2020) ("In theory, these causes of action are oil and water: a habeas claim may lead to an order releasing the prisoner or detainee or nothing at all; whereas a conditions-of- confinement claimant may only lead to an order requiring the government to improve the conditions of confinement, but not an order releasing the prisoner or detainee."); *Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020) ("The plaintiffs' claims, as they have framed them, do bear on the duration of their confinement (they contend, ultimately, that they cannot be held in the Jail consistent with the Constitution's requirements), and they are not the sort of claims that are, or can be, appropriately addressed via a claim for damages."); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), as amended (Apr. 6, 2020) ("Supreme Court and Sixth Circuit precedent support the conclusion that where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas."); *Sheikh v. Gillis*, No. 5:19-cv-134 Dkt 19 at 4 (S. D. Miss. Apr. 29, 2020) (Report and Recommendation); *Wilson v. Williams*, No. 20 cv 794, Dkt. 22 at 10-11 (N.D. Ohio Apr. 22, 2020); *Basank v. Decker*, No. 20 CIV. 2518, 2020 WL 1481503, at *6 (S.D.N.Y. Mar. 26, 2020).

the required remedy, but found as a matter of fact the limited evidence in the case did not make

that showing.  2020 WL 1847158, at \*1.  Here the overwhelming evidence, from Plaintiffs, from

multiple experts, and from Defendants themselves, shows that the only remedy to cure these

distinct and unprecedented circumstances is release.[39]

### B. Both Habeas and the Federal Courts Inherent Equitable Authority Fully Authorize the Requested Relief.

#### 1. § 2241 Authorizes Release

"Habeas is at its core a remedy for unlawful executive detention." *Munaf v. Geren*, 553

U.S. 674, 693 (2008).  It invests in federal courts broad, equitable authority to "dispose of the

matter as law and justice require," 28 U.S.C. § 2243, as the "very nature of the writ demands that

it be administered with… initiative and flexibility." *Harris v. Nelson*, 394 U.S. 286, 291 (1969);

*see Boumediene v. Bush*, 553 U.S. 723, 780 (2008) ("Habeas is not 'a static, narrow, formalistic

remedy; its scope has grown to achieve its grand purpose.'") (quoting *Jones v. Cunningham*, 371

U.S. 236, 243 (1963)).

A court is fully empowered to remediate the particular illegality here – an outbreak of

lethal and unavoidable virus that threatens petitioners and violates their constitutional rights to be

free from arbitrary and punitive detention – by ordering their release. Habeas corpus is, "above

all, an adaptable remedy," *Boumediene*, 553 U.S. at 780, and federal courts retain "broad

discretion in conditioning a judgment granting habeas relief . . . 'as law and justice require'."

*Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (quoting 28 U.S.C. § 2243). That authority

---

[39]      The fact that there is a parallel class action, *Fraihat v. ICE*, 5:19-cv-01546-JGB-SHK (C.D. Cal.), which requires ICE to make custody redeterminations for individuals, including petitioners in no way forecloses the relief this Court should provide.  Petitioners' independent habeas claims need be considered independently based on the particular exigencies of these cases. Critically, despite undertaking a review of Petitioners' they are choosing to detain all but Petitioner Soho, Resp. Br. 16.  This demonstrates that the Fraihat injunction cannot remedy the ongoing constitutional violations before the Court in this case.  Absent court intervention, these Petitioners face irreparable, even life-threatening, harm.

includes an order of release, *Boumediene*, 553 U.S. at 779, so as "to insure that miscarriages of justice within [the writ's] reach are surfaced and corrected." *Harris*, 394 U.S. at 291.[40]

### 2. Rule 65 and the Court's Inherent Equitable Authority Authorize Release

The Court has subject matter jurisdiction under 28 U.S.C. § 1331, and federal courts have enjoyed equitable authority for over a century to fashion injunctive relief to remediate unconstitutional governmental action. *See Ex Parte Young*, 209 U.S. 123 (1908). That authority includes – independent of habeas – issuing "orders placing limits on a prison's population" to remediate unconstitutional conditions. *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (affirming order releasing low-bond pretrial detainees as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224-25 (S.D. Ala. 1984) (exercising remedial powers to order a prison's population reduced to alleviate unconstitutional conditions.)

Defendants assert that a TRO is only permitted where a plaintiff seeks to preserve the status quo, but that here "release would change the status quo." Resp. Br. 42. This is incorrect for two reasons. First, even if, as Defendants assume, the proper baseline status quo to examine is Petitioners' detention ICE custody, release from physical detention does not necessarily change that status quo. *See Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004) ("[O]ur understanding of custody has broadened to include restraints short of physical confinement"); *Duran v. Reno*, 193 F.3d 82, 84 (2d Cir. 1999) (holding that custody for habeas corpus purposes is not limited to actual, physical confinement). Even if released, and especially if placed on supervisory release, Petitioners are still under ICE's supervision and obligated to attend removal proceedings. More fundamentally, however, Defendants miss the pressing status quo that must be preserved:

---

[40] Contrary to Defendants' unexplained assertion, Petitioners are *presently* being held "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. §2241, and so seek an order now – not based on a future contingency – ordering release.

Petitioners' health and safety.  Petitioners seek a TRO in order to ensure they do not fall ill, or

die.  As detailed below, preserving that status quo is of the highest order in the TRO calculus.

## II.   PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE CONTINUED DETENTION OF MEDICALLY VULNERABLE INDIVIDUALS WHERE THERE ARE READILY AVAILABLE ALTERNATIVES TO DETENTION VIOLATES DUE PROCESS.

Respondents are entirely unclear as to what standard this court should apply when

examining Petitioners'– individuals in *civil* detention – Fifth Amendment claims; they refer only

cursorily to the governing reasonable relationship test articulated in *Bell v. Wolfish*, 441 U.S.

520, 561 (1979), and then conflate the deliberate indifference standard with the professional

judgment standard. Defs' Br. at 3, 45. To be clear: Eleventh Circuit and Supreme Court

precedent require, first and foremost, that civil confinement must be "reasonably related to a

legitimate governmental objective," and if the confinement is "excessive" in relation to that

purpose then it constitutes impermissible punishment. *Bell*, 441 U.S. at 561; *Jacoby v. Baldwin

Cty.*, 835 F.3d 1338, 1345 (11th Cir. 2016); *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir.

2004).

It is unquestionably excessive to continue detaining Petitioners at a facility with known

COVID-19 infection when Respondents have plenty of alternative methods to effectuate their

articulated governmental objective. Respondents miss the mark in arguing that, generally, the

government has an interest in detaining individuals so as to effectuate removal. Resp. Br. at 3.

That may be true in the ordinary course. However, these are not ordinary circumstances. *See

Alcantara v. Archambeault*, No. 1:20-cv-756 (DMS), at *16 (C.D. Cal. May 1, 2020) ("Although

'under normal circumstances' the confinement of ICE detainees pending removal proceedings is

rationally related to the legitimate governmental interest of ensuring their appearance for their

deportation proceedings and preventing danger to the community, the current circumstances [in

ICE detention facility with rapid increase of spread of COVID-19 cases]… are anything but normal.") (citations omitted). Any reason for detention must be forward-looking in order to support a continuing, legitimate purpose and must be based on an individual's particular circumstances. *Foucha v. Louisiana*, 504 U.S. 71 (1992). While the government may possess a general legitimate interest in detaining some individuals in removal proceedings and pending removal, that interest dissipates where, as here, continuing detention puts those individuals' lives at imminent risk.

Thus, the relevant inquiry here is whether it is excessive to continue to detain these medically vulnerable Petitioners in a facility where an unprecedented viral infection with no known treatment is present, and where it is impossible for Petitioners to protect themselves from the risk of death or serious bodily harm. *See Vazquez Barrera,* 2020 WL 1904497, at \*6 ("[r]equiring medically vulnerable individuals to remain in a detention facility where they cannot properly protect themselves from transmission of a highly contagious virus with no known cure is not rationally related to a legitimate government objective..."); *Dada*, No. 1:20-CV-00458 at \*21 (immigrant plaintiffs are likely to succeed in showing that detention during COVID-19 does not reasonably relate to a legitimate governmental objective); *Hope v. Doll*, No. 1:20-cv-00562-JEJ (M.D. Pa. Apr. 7, 2020) (continued detention of immigrant plaintiffs during COVID-19 not reasonably related to governmental objective).

Continued detention is especially excessive because Respondents have alternative methods of ensuring that Plaintiffs attend their check-ins or removal hearings after release, and the chances of Petitioners absconding, particularly given COVID-19-related travel restrictions, are virtually nonexistent. A study of ICE data reveals that non-detained immigrants overall appear at immigration court more than 80% of the time; those released from detention appear at

higher rates than those who were never detained; those who are represented by attorneys, as the Petitioners have been, appear at every scheduled immigration hearing at a rate of 97%; and longtime residents, like all Petitioners, have overall higher rates of appearance. *See* Declaration of Aaron Reichlin-Melnick, Reply Exhibit 3, ¶¶ 6, 17.   Moreover, the appearance rate for individuals, like all Petitioners, who have put down roots and have resided in the U.S. for over a year is at 84% and the appearance rate for those who have been here for ten years or more reaches 91%. *Id*. ¶18. As Judge Ellison stressed in *Vazquez Barrera*, "ICE has many other means besides physical detention to monitor noncitizens and ensure that they are present at removal proceedings and at time of removal," including routine check ins. 2020 WL 1904497 at *6. Given the availability of alternatives to detention, requiring Plaintiffs to remain in a detention facility with COVID-19 infection present is unquestionably excessive.[41]

In addition to detaining Petitioners under punitive conditions, Respondents' choice to not release them from a facility where COVID-19 infection is present demonstrates deliberate indifference to a substantial risk of harm to Petitioners, which is also prohibited under the Fifth Amendment. *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985). The risks from COVID-19 are open and notorious, producing guidance from the CDC, nearly nationwide lockdowns, and daily, front-page news.   Respondents undoubtedly know that this highly infectious disease spreads rapidly, and in congregative settings such as ECDC, it is simply impossible to implement the measures required to stop its spread. Eaton Decl. ¶ 29. Release is the *only* constitutional measure to address the risk faced by Petitioners. What measures Respondents claim to have adopted (ECF 11-1), are patently ineffective or entirely lacking, as described *supra*. *See also* Venters Decl. ¶¶ 14-29 (detailing insufficiency of nationwide

---

[41] To state the obvious, Defendants can ensure that Plaintiffs are present at removal proceedings and at removal only if Plaintiffs are able to protect themselves from serious illness or death from COVID-19.

responses of ICE); *id*. ¶¶ 30-35 (detailing severe insufficiency of measures taken at ECDC specifically). Moreover, contrary to Respondents' assertions, Petitioners uniformly report unsanitary conditions, inadequate access to cleaning and protective supplies, continued transfers of new detainees into the facility, and lack of medical responsiveness to individuals with symptoms consistent with COVID-19. *Compare* ECF. No. 11-1 *with* ECF 2-1 at 8-9, Golding Supp. Decl. ¶¶ 4, 7, 8; Williams Supp. Decl. ¶¶5, 6, 7, 8, 10; Venters Decl. ¶34.

Given the dozens of courts nationwide that have ordered the release of individuals from ICE detention, and ICE's own review and release of some individuals, it is clear that Respondents are fully aware of the substantial risks of continued detention and the benefits of release. By continuing to detain Petitioners despite this knowledge, Respondents demonstrate deliberate indifference. *See Malam v. Adducci*, No. 20-10829, 2020 WL 1899570, at *6 (E.D. Mich. Apr. 17, 2020) ("the public health evidence before the Court shows that, even given current precautionary measures, the risk is substantial and unreasonable. Additionally, Respondent… has additional precautionary measures at her disposal: the release of Petitioner... Accordingly, any response short of authorizing release from [immigration detention] for this Petitioner, whose underlying health conditions expose her to a high risk of an adverse outcome if infected by COVID-19, demonstrates deliberate indifference to a substantial risk."); *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 2086482, at *4 (S.D. Fla. Apr. 30, 2020) (S. D. Fla. Apr. 30, 2030) (adopting report and recommendation) ("it is clear that ICE fully understands the benefit of reducing the detainee population. Thus, to the extent that ICE fails to commit to addressing the conditions complained of, ICE has demonstrated deliberate indifference."); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (government acts with deliberate indifference when

it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness and needless suffering").

Indeed, ICE chooses to ignore known risks in its detention facilities, in order to, as ICE Director Albence recently admitted, prove that ICE is "enforcing our immigration laws."[42] That ICE would prioritize public relations over the known health risks of a vulnerable population is the height of deliberate indifference and arbitrary detention.

Respondents fail even under the professional judgment standard articulated in *Youngberg v. Romeo*, which Respondents cite to: they continue to detain Petitioners under circumstances where it is impossible to practice social distancing and ensure adequate hygiene, contrary to the basic, widely accepted public health standards that are imperative to protect from infection. 457 U.S. 307, 323 (1982) (liability may be imposed on government "when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."); *see also In re Kumar*, 402 F. Supp. 3d 377, 384 (W.D. Tex. 2019) (applying professional judgment standard to claims brought by an individual in immigration detention).

## III.   ABSENT AN INJUNCTION PETITIONERS WILL SUFFER IRREPARABLE HARM, AND THE PUBLIC INTEREST IN PUBLIC HEALTH AND BALANCE OF EQUITIES FAVOR RELEASE

The Eleventh Circuit requires only a "substantial likelihood" of irreparable injury. *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000). Aside from the harm Petitioners demonstrate through a showing that Respondents have violated their constitutional rights, *Cunningham v.*

---

[42]     Press Release, U.S. House of Representatives Committee on Oversight and Reform, DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus (April 17, 2020), https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees.

*Adams*, 808 F.2d 815, 822 (11th Cir. 1987), the imminent risk to Petitioners' health and their lives suffices to establish irreparable harm.

A court "need not await a tragic event" to afford injunctive relief. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting, "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.). *Thakker, et. al. v. Doll, et. al.*, No 1:20-cv-00480-JEJ *6 (M.D. Pa. Mar. 31, 2020) (plaintiffs need not wait "until the pandemic erupts in our prisons."); *Chambers v. Coventry Health Care of Louisiana, Inc.*, 318 F. Supp. 2d 382, 389 (E.D. La. 2004) (irreparable harm found where late detection of cancer could lead to death). The totality of the evidence reveals that Petitioners' continued detention places them at risk of significant and imminent injury—if not death, lasting and severe medical complications. *See* ECF. Doc. 2-20 ¶ 38. Although Respondents aver that Etowah only has one case of COVID-19, ECF Doc. 11-1 ¶ 18(a), it is impossible to obtain a realistic number because of chronic government under-testing—as of May 6, 2020, ICE had tested only 1,460 people out of the over 30,000 it detains.[43] Far from the rigorous testing and contact tracing that has allowed other nations to halt the spread of the virus,[44] the most Respondents can muster are "daily vitals and weight checks." ECF 11-1 ¶ 18(a). Similar palliative deficiencies abound throughout Etowah, Venters Decl. ¶¶ 30-35, and this unfortunate reality is exacerbated by Respondents' own admission that individuals are still being transferred into the facility, jeopardizing the health of all those within. ECF 11-1 ¶ 24-26.

---

[43] ICE Guidance on COVID-19, Confirmed Cases (last visited May 6, 2020), https://www.ice.gov/coronavirus; Golding Supp. Decl. ¶¶ 3, 5.
[44] Max S. Kim, *Seoul's Radical Experiment in Digital Contact Tracing*, The New Yorker (Apr. 17, 2020) (last accessed May 5, 2020, 05:24 p.m), https://www.newyorker.com/news/news-desk/seouls-radical-experiment-in-digital-contact-tracing

As described above, at least 248 new county detainees have been transferred into ECDC *since* the CDC promulgated its March 23, 2020 detention facility guidance.[45]

Respondents' argument that some Petitioners are members of the *Fraihat* class and thus cannot suffer irreparable harm should not persuade this Court. As an initial matter, even if Respondents had provided those Petitioners individualized custody determinations pursuant to the *Fraihat* order, that still would not afford them the "the maximum relief available on their claims," ECF Doc. 11 p. 43, because outright release is still possible. *See* ECF Doc. 2-1 n.35 (citing cases). While Respondents' brief seems to imply that custody reviews were done pursuant to *Fraihat* the Pittman declaration only states that ICE conducted an initial search to determine *who may be eligible* for a *Fraihat* review. *See* ECF Doc. 11-2 ¶ 27.[46] Setting aside this sleight of hand, even though *Fraihat* was ordered on April 20, over two-and-a-half weeks ago, only one Petitioner has been released pursuant to any form of ICE review.

In any event, ICE cannot simultaneously argue that its discretionary custody determination is an adequate substitute to a court-ordered release and yet deny relief in nearly every case. This Court still has a role. *See Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, 2020 WL 2059848, at *4 (N.D. Cal. Apr. 29, 2020) ("It does not appear that Judge Bernal intended, by the general nationwide relief he ordered, to interfere with the ability of facility-specific litigation to proceed. Nor, in any event, does a nationwide class action covering specific relief at specific facilities seem manageable.").

An injunction is also in the public interest and the balance of the equities tips in Petitioners' favor. Respondents' asserted interest in enforcing U.S. immigration law is an

---

[45] Etowah County Sheriff's Office, Booked Last 24 Hours (accessed May 5, 2020), *available at* http://etowahcountysheriff.com/mugshots.php
[46] Respondents deny that Sergio Quito and Randane Williams are *Fraihat* class members, but given their comorbidities, they too are at immediate risk of irreparable harm in any event. *See* Eaton Decl. ¶¶ 38(o), (r).

insufficient counterweight to the grave public health consequences that continued detention presents.  First, Respondents routinely release scores of immigrants—even those with criminal convictions detained under 236(c)—a practice that has not yet brought the system to its knees.[47] Both ICE and this Court have authority to order release of individuals detained pursuant to 236(c).  *See, e.g.*, *Cabral v. Decker*, 331 F. Supp. 3d 255, 259 (S.D.N.Y. 2018) (collecting cases). Second, "ICE has a number of alternative tools available to it to ensure enforcement, which it is free to use with Petitioners" including "ICE's conditional supervision program." *Vazquez Barrera*, 2020 WL 1904497 at *7. This alternative supervision program is highly effective, with a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings among supervised individuals.[48] Respondents are not bound to detain Petitioners—especially not during a global pandemic—and any assertions to the contrary should be ignored.

Defendants predictable assertion that Petitioners are not entitled to release to avoid potentially lethal illness because of prior criminal convictions is contrary to law. *See, e.g.*, *United States v. Muniz*, Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19); *United States v. Grobman*, No. 18-cr- 20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detained person being housed at a detention center"); *United States v. Meekins*, Case No. 1:18-cr- 222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-

---

[47] *See, e.g, Detainees Leaving ICE Detention from the El Paso Service Processing Center*, TRAC https://trac.syr.edu/immigration/detention/201509/EPC/exit/ ("ICE also has discretionary authority to "parole" individuals . . . with serious medical conditions . . .  and individuals whose parole is considered by ICE in the 'public interest.'"); *see* 8 U.S.C. § 1182(d)(5)(A).

[48] U.S. Gov't Accountability Office, GAO-15-26, *Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness* 30 (Nov. 2014), https://www.gao.gov/assets/670/666911.pdf.

sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to people in detention).

Releasing Petitioners would also promote public health and safety, considerations that traditionally weigh heavily in the movant's favor. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 472 (5th Cir. 2017). Multiple courts have ordered detained individuals released citing the public's interest in preventing or mitigating outbreaks, which invariably spread to correctional officers and other staff members, their families, and the public. *See Dada*, No. 1:20-cv-00458-DDD-JPM at *27; *Vazquez Barrera*, 2020 WL 1904497 at *7 (S.D. Tex. Apr. 17, 2020); *United States v. Raihan*, No. 20-cr-68-BMC- JO, E.C.F. No. 20, Proc. At 10:12-19 (E.D.N.Y. Mar. 12, 2020) E.C.F. No. 20 ("[t]he more people we crowd into that facility, the more we're increasing the risk to the community"). Defendants suggestion, Resp. Br. 48, that Petitioners would be safer in the tinderbox of ICE detention rather than in the safety of a home – even homes in the Northeast – cannot be taken seriously; Dr. Venters thoroughly discredits such magical thinking. Venters Decl. ¶¶ 8-14. Nor could the end of a shelter-in-place order, Resp. Br. 50, change the realities of the inevitable spread of COVID-19 inside ICE facilities such as ECDC. Venters Decl. ¶¶ 8-14.

Recently, the Western District of Louisiana noted that "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions." *Dada*, No. 1:20-cv-00458-DDD-JPM at *27 (quotations omitted). And, as Judge Ellison explained in *Vazquez Barrera*, "an outbreak among the . . . detainee population will inevitably spread through the surrounding community, as MPC staff members, who live outside the detention facility, will be exposed to sick detainees . . . [and] will put additional strain on

hospitals and health care resources in the community." 2020 WL 1904497, at *7. This too supports a finding that Petitioners' release would be in the public interest.

**CONCLUSION**

For the foregoing reasons, Plaintiffs Petitioners' respectfully request that this Court grant the motion for a temporary restraining order and order their immediate release from custody.

Dated: May 6, 2020

Respectfully submitted,

  _/s/_ Jessica Vosburgh
Jessica Myers Vosburgh
jessica@adelantealabama.org
**ADELANTE ALABAMA**
**WORKER CENTER**
2104 Chapel Hill Road
Birmingham, AL 35216
205.317.1481

Sirine Shebaya*
sirine@nipnlg.org
Matthew S. Vogel*
 matt@nipnlg.org
**NATIONAL IMMIGRATION PROJECT**
**OF THE NATIONAL LAWYERS GUILD**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
718.419.5876

Jeremy Jong*
 jermjong@gmail.com
3527 Banks St
New Orleans, LA 70119
504.475.6728

Baher Azmy*
 bazmy@ccrjustice.org
Ghita Schwarz*
 gschwarz@ccrjustice.org
Angelo Guisado*
 aguisado@ccrjustice.org
Lupe Aguirre*
 laguirre@ccrjustice.org
Astha Sharma Pokharel*
 asharmapokharel@ccrjustice.org
Brittany Thomas*
 bthomas@ccrjustice.org
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
212.614.6427

*admitted _pro hac vice_
_Counsel for Petitioners-Plaintiffs_

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2020, I electronically filed the foregoing document and accompanying exhibits with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system. I also certify that there are no non-CM/ECF participants to this action.

Dated: May 6, 2020                                    */s/* Jessica Myers Vosburgh
                                                    Jessica Myers Vosburgh