FILED
2020 May-15  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **SARAIL MICHAEL ARCHILLA, et al.,** | } | |
| | } | |
| **Petitioners,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:20-cv-00596-RDP-JHE** |
| | } | |
| **DIANNE WITTE, et al.,** | } | |
| | } | |
| **Respondents.** | } | |

**<u>MEMORANDUM OPINION</u>**

This case is before the court on Petitioners' Motion for Temporary Restraining Order ("TRO") (Doc. # 2), filed on April 29, 2020. Petitioners are currently detained at the Etowah County Detention Center (the "ECDC"). They seek release from the custody of Immigration and Customs Enforcement ("ICE") due to the COVID-19 outbreak. After careful review, and for the reasons explained below, the court concludes that Petitioners' Motion (Doc. #2) is due to be denied.

**I.      Procedural History**

On March 5, 2020, one of the Petitioners in this case, Randane Williams, filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (Doc. # 1 in 4:20-cv-00304-AKK-JHE). Williams' petition challenged his detention by ICE, arguing it runs contrary to the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001), as well as constitutional guarantees of substantive and procedural due process. Although the magistrate judge informed Williams that he had the right to file affidavits or other materials in support of his initial section 2241 petition, he did not do so. Instead, on April 27, 2020, Williams filed an "Amended Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief" on behalf of himself and

seventeen other individuals detained at the ECDC. (Doc. # 10 in 4:20-cv-00304-AKK-JHE). Immediately thereafter, Williams filed a "corrected" version of the petition and complaint. (Doc. # 11 in 4:20-cv-00304-AKK-JHE). The Corrected Amended Petition asserted new grounds for relief, separate from his initial section 2241 Petition. In addition to Williams' original *Zadvydas* claim, the Corrected Amended Petition asserted that he and his seventeen co-filers are "high-risk" detainees who should be released from ICE custody because of their increased chance of contracting COVID-19, becoming seriously ill, or dying in custody. (*Id.*).

On April 29, 2020, saying that the amendment "strikes the court as an attempt to circumvent the [court's] random assignment [process]," Judge Kallon severed Williams' Corrected Amended Petition from his original section 2241 Petition. He then directed Petitioners to refile their Corrected Amended Petition (containing only the new grounds for relief) in a newly opened, randomly-assigned case.

The undersigned received the new case assignment on the random re-draw and entered a briefing schedule on Petitioner's Motion. (Doc. # 5). The court entertained oral argument on May 12, 2020. The Motion (Doc. # 2) is now under submission.

## II.     Factual Background

The court draws the "facts" referenced below from Petitioner's Corrected Amended Petition and the parties' submissions, including the declarations and other evidence presented by both sides.

### A.     ICE Detainees Housed at the Etowah County Detention Center

Petitioners have all been lawfully detained by ICE at the ECDC. The ECDC is a county detention center run by the Etowah County Sheriff's Office ("ECSO") in Etowah County, Alabama. (Doc. # 30 at 2). The ECDC has contracted with ICE to house up to 320 detainees and

has the capacity to hold that number. ECSO is a law enforcement agency that provides the facility, management, personnel, and services for the 24-hour supervision of the immigrant detainees in ICE custody at the ECDC. (*Id*. at 2). As of May 12, 2020 (the date of the hearing), there were 112 ICE detainees at the ECDC. (Doc. # 30 at 3). Most of those (96) are currently housed in a large unit in the ECDC, which has the capacity to hold up to 110 people. (*Id*.). Ten detainees are held in a separate unit. (*Id*.).  One detainee is separately housed in still another unit. (*Id*.). Another single detainee (who has tested positive for COVID-19) is medically quarantined in another, separate unit. (*Id*.). The remaining four detainees are awaiting assignment. (*Id.*).

The ECDC has contracted with the federal government and is required to separately house all ICE detainees sent there. That is, they are held in a different set of units than the state prisoners at the ECDC. Although there is not much disagreement about the contract and the requirement of separate units, the parties have some disputes about when and how often there may be limited contact between ICE detainees and state prisoners. Petitioners, for example, contend that state prisoner trustees perform certain services for the ICE detainees. It is not clear what those are and whether that practice has continued since the advent of the COVID-19 pandemic.

ICE detainees who enter the ECDC are medically reviewed and screened. In fact, the single detainee who has tested positive for COVID-19 is someone who entered ICE custody on April 21, 2020. Upon entry, as a new admittee, he was quarantined for fourteen days as a matter of practice and policy. (Doc. #11-1 at 5, ¶ 18a). During that mandated quarantine, he tested positive for the virus. (*Id*.). After testing positive, he was medically quarantined and has remained in that status during his entire stint at the ECDC. (*Id*.). He has not had any known contact with any other detainee, including Petitioners, during his stay at the ECDC. (*Id*.).

Petitioners question the effectiveness of the ECDC ICE staff to quarantine COVID-19 prisoners. They complain that the isolation units are not at a hospital or medical center type standard (*i.e.*, they are not hermetically-sealed or negative-pressure rooms).

**B.    The COVID-19 Crisis Generally**

Judge Wood of the Southern District of Georgia summarized accurately and succinctly the background of the COVID-19 pandemic facing our nation. Her description is consistent with the parties' submissions.

> The first outbreak of the virus causing COVID-19 is believed to have originated in late 2019 in Wuhan, China. Within months, the World Health Organization ("WHO") declared COVID-19 to be a pandemic. In February 2020, community transmission of Coronavirus was detected in the United States. Since then, the virus has continued to spread rapidly, infecting hundreds of thousands of people in this country as of the writing of this opinion.
>
> To date, there is no known vaccine to protect against COVID-19, nor is there an antiviral treatment for those who are infected. Instead, the most effective approach to minimizing fallout from the disease is to stay clean and to avoid contact with others. Specifically, the CDC recommends, inter alia, frequent handwashing, avoiding close contact with others, using face coverings while in public, and cleaning and disinfecting frequently touched surfaces.
>
> Symptoms from exposure to Coronavirus range from mild cold-like symptoms to severe respiratory distress and even death. Though relatively little is known about the risk factors for COVID-19, preliminary data suggests that older adults and individuals with certain underlying medical conditions are most susceptible to developing serious medical complications from the infection. Conditions that might increase the risk of death or permanent injury from COVID-19 include, but are not limited to, chronic lung disease, severe obesity, diabetes, liver disease, serious heart conditions, and other conditions that comprise the immune system, such as HIV or AIDS.

*Benavides v. Gartland*, 2020 WL 1914916 *1-2 (S.D. Ga. April 18, 2020) (footnotes omitted).

In response to this unprecedented, global pandemic, the federal government has urged, and some state and local governments have ordered, all citizens to undertake mitigation strategies and for some citizens to "shelter in place" or "quarantine" at home. These strategies are designed to

slow the spread of COVID-19 and to protect individuals who have an increased risk, including older adults and those with underlying health conditions. Petitioners claim they are at severe risk of contracting COVID-19 while confined at the ECDC because they fall into these categories and cannot properly isolate themselves from other detainees or maintain proper sanitary measures.

In support of their petition, Petitioners have presented a clump of data and statistics, but not all of it is relevant to the specific circumstances at the ECDC. For example, they have presented national data about COVID-19, as well as data concerning the cases of COVID-19 throughout the state of Alabama, in Etowah County, and in ICE detention centers (not just the ECDC) across the nation. (The court has where possible updated some of that information through of May 12, 2020, the date of the hearing on Petitioners' Motion.). As of that date, there were 1,390,392 confirmed cases of COVID-19 in the United States.[1] Of that number, 10,167 confirmed cases were in the State of Alabama, and 193 confirmed cases were in Etowah County, Alabama.[2] According to ICE, out of a nationwide detainee population of 27,908 (as of May 9, 2020), there are currently 965[3] confirmed cases of COVID-19.[4]

### C.    COVID-19 at the ECDC Specifically

Although Petitioners have submitted a substantial amount of information about the COVID-19 pandemic's effect on the United States, Alabama, Etowah County, and ICE detention

---

[1] *Coronavirus*, WORLDOMETER (last updated May 12, 2020), https://www.worldometers.info/coronavirus/country/us.

[2] *Id.*

[3] *COVID-19 in Alabama*, ALA. DEP'T OF PUB. HEALTH, DIVISION OF INFECTIOUS DISEASES & OUTBREAKS (last visited May 15, 2020), https://dph1.adph.state.al.us/covid-19.

[4] *Detention Management*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (last updated May 7, 2020), https://www.ice.gov/detention-management; ICE *Guidance on COVID-19 (Confirmed Cases)*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (last updated May 15, 2020), https://www.ice.gov/coronavirus.

centers around the country, they have not heavily focused on the facility where they are detained. Out of the 965 ICE COVID-19 cases, there is currently only one confirmed case of COVID-19 at the ECDC.[5] As noted above, the infected detainee is on medical observation and is separated from the general ICE detainee population at the facility. (Doc. # 11-1 at 5, ¶ 18a). In fact, he has remained quarantined during his entire stint at the ECDC. (*Id.*).

### D.    ICE Measures in Response to COVID-19

On March 23, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") issued its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correction and Detention Facilities."[6] In an effort to prevent or mitigate the introduction and spread of COVID-19 in these facilities, the CDC recommends that a number of steps be taken at detention facilities, including but not limited to: (1) restricting or suspending the transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases.[7] The ECDC states that it has incorporated the CDC's guidelines and requirements, and it contends that it is in substantial compliance with them. (Doc. # 11-1 at 3-8, ¶¶ 8-27; Doc. # 30 at 4, ¶ 9). Although Petitioners

---

[5] (Doc. # 30 at 4, ¶ 7).

[6] *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019ncov/downloads/guidance-correctional-detention.pdf.

[7] *Id.*

disagree, it does appear that the ECDC reviews its detainees who are at higher risk for severe illness to determine if detention is appropriate, considering health, public safety, mandatory detention requirements, and adjusted custody conditions. (Doc. # 11-1 at 8, ¶ 27). In fact, as discussed in more detail below, they have been ordered to do so by another court.

On April 10, 2020, ICE Enforcement and Removal Operations (ERO) released its *ERO COVID-19 Pandemic Response Requirements (PRR)* document, which set forth specific mandatory requirements to be adopted by all detention facilities housing ICE detainees.[8] The ERO guidance requires non-dedicated ICE detention facilities to comply with the CDC's interim guidance, and it also mandates that cloth face coverings should be worn by detainees and staff.[9] The ECDC contends it has incorporated and is in compliance with all ICE ERO requirements. (Doc. # 11-1 at 3-8, ¶¶ 8-27).

But, under Petitioners' theory of the case, none of this evidence about ICE's measures (even if it is conflicting) is relevant, except to support their only requested remedy – release. That is, Petitioners contend that there are absolutely no steps ICE can take to protect them from COVID-19. They claim that their underlying health conditions and age render them among the group most vulnerable to contracting the virus (and, as a consequence, they are at high risk for serious illness or death.). (Doc. # 2). They further argue there is absolutely no mitigation effort that the ECDC can possibly undertake that would permit them to be confined in a safe manner.[10] Petitioners have

---

[8] *See* U.S. IMMIGR. AND CUSTOMS ENFORCEMENT, ENFORCEMENT AND REMOVAL OPERATIONS, *ERO COVID-19 Pandemic Response Requirements* (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19 responseReqsCleanFacilities.pdf.

[9] *Id.*

[10] This assertion is somewhat curious in light of matters occurring in *Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020), where Petitioner Alex Giovanni Hernandez is a representative of one of the certified subclasses. In *Fraihat*, in connection with claims asserted under *Bivens* and § 504 of the Rehabilitation Act, the petitioners appear to request (as alternative relief) that ICE should take necessary steps to

been crystal clear that there is only one adequate remedy here:  release them from confinement. (Doc. # 2 at 27-28). As recently as May 11, 2020, Petitioners have argued that expert opinions "mandate that the only reasonable measure to abate that risk is release." (Doc. # 29 at 6). Of course, even if they are right about that (more on that later), and even if that is a remedy the court can provide (and much more on that later), there are other considerations.

ICE has a process for reviewing which detainees should be released on supervision generally, and also has a process for determining which detainees should be granted release due to the threat of COVID-19. (Doc. # 11-1 at 8, ¶ 27; Doc. #30 at 4, ¶ 9). Petitioner Soho has been released on an order of supervision,[11] but that does not appear to be related to any threat to him posed by COVID-19. Three other detainees have also been released during the COVID-19 crisis. (Doc. #30 at 4, ¶ 9). And, a district judge in the Central District of California has ordered ICE to implement certain measures in doing these reviews. *Fraihat*, 2020 WL 1932570 at *29. Petitioners nevertheless complain ICE's process is woefully deficient and, in any event, because no process will protect them, they must be released on supervision because of their susceptibility to the virus.

### E.    The *Fraihat* Class Action

A number of ICE detainees around the country filed a complaint for declaratory and injunctive relief in the Central District of California on August 19, 2019. *Fraihat v. U.S. Immigration and Customs Enforcement*, 5:19-cv-01546 (C.D. Cal.) (Doc. # 1, August 19, 2019). That filing, which was made before the COVID-19 pandemic hit, broadly challenged the conditions of confinement of ICE detainees held across the nation. The plaintiffs in *Fraihat*, who

---

protect them while in custody. *Id.* at *29. Petitioner Hernandez is a class representative in *Fraihat*. All but two of the remaining Petitioners are members of a *Fraihat* subclass. (Doc. # 11-2 at 11, ¶ 27).

[11] Soho's claims have been dismissed from this case because they are now moot. (Doc. # 33).

include immigration detainees with a range of serious health conditions (and two organizations), asserted *Bivens*[12] claims alleging that the federal defendants had violated their Fifth Amendment rights and asserting a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. No Section 2241 claim was asserted in that case. *Id.*

On March 25, 2020, the *Fraihat* plaintiffs filed emergency motions for class certification and for preliminary injunction. *Fraihat v. U.S. Immigr. and Customs Enf't*, 2020 WL 1932570, *2 (C.D. Cal. Apr. 20, 2020). They sought emergency relief because of the dangers posed to them and other detainees by COVID-19. The court certified a class and a subclass. Petitioner Hernandez is one of the Rule 23 representatives of a certified subclass. The *Fraihat* court also entered a preliminary injunction.

The *Fraihat* court noted the exponential spread of COVID-19 in all areas of our society and the dangers posed to those with certain health conditions. One of the particular things that Hernandez and his co-plaintiffs challenged on behalf of the class was how the federal defendants were going about their assessments of which detainees should be released during the COVID-19 outbreak. Although the *Fraihat* plaintiffs obviously did not ask for individual release assessments while pursuing class certification,[13] they did challenge ICE's policy for making release determinations during COVID-19. And, this was clearly reflected in the injunctive relief awarded by the *Fraihat* court.

> The Court further GRANTS Plaintiffs' motion for preliminary injunction as follows:

---

[12] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

[13] Doing that would make it difficult to achieve class certification, even in the Ninth Circuit, which the *Fraihat* court noted takes the view that Rule 23(a)(2) should be construed "permissibly." *Id.* at *17 (citing *Stanton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003)). The court notes that *Stanton* pre-dates *Walmart v. Dukes* by nearly a decade. 564 U.S. 338 (2011). That may raise serious questions, particularly for a district judge who for the last decade has taught complex civil litigation classes to 2Ls and 3Ls.  But, this is not the occasion for the court to ponder whether, in relying on *Stanton*, the *Fraihat* court engaged in a "rigorous analysis" of the Rule 23 factors, as *Dukes* requires. *Id.* at 351.

• Defendants shall provide ICE Field Office Directors with the Risk Factors identified in the Subclass definition;

• Defendants shall identify and track all ICE detainees with Risk Factors. Most should be identified within ten days of this Order or within five days of their detention, whichever is later;

• Defendants shall make timely custody determinations for detainees with Risk Factors, per the latest Docket Review Guidance. In making their determinations, Defendants should consider the willingness of detainees with Risk Factors to be released, and offer information on post-release planning, which Plaintiffs may assist in providing;

• Defendants shall provide necessary training to any staff tasked with identifying detainees with Risk Factors, or delegate that task to trained medical personnel;

• The above relief shall extend to detainees with Risk Factors regardless of whether they have submitted requests for bond or parole, have petitioned for habeas relief, have requested other relief, or have had such requests denied;

• Defendants shall promptly issue a performance standard or a supplement to their Pandemic Response Requirements ("Performance Standard") defining the minimum acceptable detention conditions for detainees with the Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic;

• Defendants shall monitor and enforce facility-wide compliance with the Pandemic Response Requirements and the Performance Standard.

These measures shall remain in place as long as COVID-19 poses a substantial threat of harm to members of the Subclasses. The parties may apply to modify or terminate the injunction.

*Fraihat*, 2020 WL 1932570, at *29. So, while the *Fraihat* court did not grant release to Hernandez or anyone in the subclass he represents, that court is actively supervising ICE as it makes release decisions about those detainees in its custody. *Id.*

Since that interim class-wide relief was granted in *Fraihat*, Bryan Pitman, the Supervisory Detention and Deportation Officer for Enforcement and Removal Operations of ICE, has represented to the court that:

> ICE has reviewed its "at risk population" to include the elderly, detainees with compromised immune systems, and those with chronic care conditions, to ensure that when detention is mandated, it is done so in a safe, humane, and appropriate environment given the circumstances. Custody determinations are made on a case-by-case basis given the totality of circumstances to include, among other factors, the public safety risk that such release could create, flight risk, and the requirement to detain certain aliens under law. *See* Section 236 of Act, 8 U.S.C. § 1226. ICE will continue to review its "at risk population" in the days and weeks ahead when deciding whether any detainees should be released from custody. As of May 13, 2020, ICE has released 3 detainees from the Etowah County Detention Center as a result of individual custody reviews conducted as part of ICE's COVID-19 response.

(Doc. # 30 at 4, ¶ 9).

### F.    Petitioners' Criminal Histories, Immigration Status, and Medical History

The court next reviews Petitioner histories – medical conditions, criminal history, and immigration status. It begins with an observation. Petitioners have noted (in a footnote) that, "[a]lthough most [petitioners] have one or more criminal convictions, many of those convictions are from over a decade ago, some carried no jail time, and every Plaintiff has served their sentence and is no longer confined in criminal custody (if they ever were in the first place)." (Doc. # 2 at 27 n.46). These circumstances, Petitioners argue, negate "any supposed risk [they] may pose to the community based on their past convictions." (*Id.*). That is, at best, understating the gravity of many of the Petitioners' offenses.

Petitioner Allen Roger Olano-Esparza is a 37-year-old citizen of Peru. (Doc. # 11-2 at 3, ¶ 8). He was convicted of lewd and lascivious acts with a 14-15-year-old. (*Id.*). He was sentenced to 180 days of confinement. (*Id.*). On December 22, 2016, Petitioner Olano-Esparza entered ICE custody. (*Id.*). On April 3, 2018, an immigration judge ordered his removal to Peru. (*Id.*). On

September 14, 2018, the Board of Immigration Appeals dismissed his appeal. (*Id.*). On October 10, 2018, Olano-Esparza filed a Petition for Review in the Ninth Circuit Court of Appeals, resulting in an automatic stay of removal. (*Id.*). His petition is currently pending. (*Id.*). On January 7, 2019, Olano-Esparza was transferred to the ECDC. (*Id.*). Olano-Esparza suffers from hypertension, kidney stones, and has a thyroid issue. (Doc. # 2-3 at 56).

Petitioner Edson Flores is a 48-year-old citizen of Honduras. (Doc. # 11-2 at 3, ¶ 9). He was convicted of acting in a manner to injure a child less than 17. (*Id.*). He was sentenced to one year of confinement. (*Id.*). He was also convicted of sexual abuse in the first degree-sexual contact with an individual less than 11 years of age. (*Id.*). He was sentenced to 42 months of confinement. (*Id.*). Flores is a registered sex offender. (*Id.*). On June 10, 2011, Petitioner Flores entered ICE custody. (*Id.*). On January 6, 2012, an immigration judge ordered Flores' removal to Honduras. (*Id.*). On May 22, 2012, the Board of Immigration Appeals dismissed Flores' appeal. (*Id.*). On June 15, 2012, Flores filed a Petition for Review in the Second Circuit Court of Appeals resulting in a forbearance stay of removal. (*Id.*). On February 26, 2015, the Second Circuit Court remanded the case to the Board of Immigration Appeals. (*Id.*). On February 3, 2016, the Board of Immigration Appeals remanded the case to the immigration court. (*Id.*). On March 23, 2017, an immigration judge again ordered Flores' removal to Honduras. (*Id.*). On October 17, 2017, the Board of Immigration Appeals dismissed Flores' second appeal. (*Id.*). On October 23, 2017, Flores filed a second Petition for Review in the Second Circuit resulting in a forbearance stay of removal. (*Id.*). On November 2, 2017, Flores was transferred to the ECDC. (*Id.*). On October 29, 2019, the Second Circuit Court granted the Petition for Review and remanded the case to the Board of Immigration Appeals. (*Id.*). The case is currently pending. (*Id.*). Flores suffers from diabetes, high blood pressure, high cholesterol, and chronic inflammation. (Doc. # 2-3 at 19).

Petitioner Alex Giovanni Hernandez is a 48-year-old citizen of Honduras. (Doc. # 11-2 at 4, ¶ 10). He was convicted of robbery in the second degree. (*Id.*). He was sentenced to two years of confinement. (*Id.*). He was also convicted of possession of a firearm by a felon. (*Id.*). He was sentenced to two years of confinement. (*Id.*). Subsequently, he was convicted of robbery in the second degree and possession of a firearm by a felon. (*Id.*). He was sentenced to 25 years of confinement. (*Id.*). On September 29, 2016, Petitioner Hernandez was processed as an Administrative Removal under section 238(b) for having committed an aggravated felony under section 237(a)(2)(A)(iii). (*Id.*). On June 19, 2017, an immigration judge granted Hernandez relief from removal. (*Id.*). On July 6, 2017, both Hernandez and DHS appealed that decision to the Board of Immigration Appeals. (*Id.*). On November 24, 2017, the Board of Immigration Appeals dismissed Hernandez's appeal and sustained the appeal of the DHS, effectively ordering Mr. Hernandez's removal to Honduras. (*Id.*). On December 14, 2017, Hernandez filed a Petition for Review in the Ninth Circuit Court of Appeals, resulting in an automatic stay of removal. (*Id.*). That case is currently pending. (*Id.*). On December 20, 2018, Hernandez was transferred to the ECDC. (*Id.*). On January 9, 2019, Hernandez filed a Petition for Writ of Habeas Corpus in the United States District Court for the Northern District of Alabama. (*Id.*). On May 22, 2019, the District Court dismissed that Petition. (*Id.*). On January 23, 2020, Hernandez filed a second Petition for Writ of Habeas Corpus in the Northern District of Alabama. (*Id.*). That Petition is still pending. (*Id.*). Hernandez suffers from hypertension.  (Doc. # 2-3 at 31).

Petitioner Tesfa Miller is a 38-year-old citizen of St. Vincent and the Grenadines. (Doc. # 11-2 at 4, ¶ 11). He was convicted of false imprisonment. (*Id.*). He was sentenced to ten years with the first seven years to be served in confinement and the remainder to be served on probation. (*Id.*). He was also convicted of terroristic threats. (*Id.*). He was sentenced to five years of probation on

that conviction. (*Id.*). He was also convicted of battery. (*Id.*). He was sentenced to 12 months of probation on that conviction. (*Id.*). On February 20, 2018, Petitioner Miller was issued a Notice to Appear, charging removability under section 237(a)(2)(A)(iii). (*Id.*). On March 12, 2019, an immigration judge ordered Miller's removal to St. Vincent and the Grenadines. (*Id.*). On May 8, 2019, Miller was transferred to the ECDC. (*Id.*). On August 26, 2019, the Board of Immigration Appeals dismissed Miller's appeal. (*Id.*). On September 23, 2019, Miller filed a Petition for Review in the Eleventh Circuit Court of Appeals. (*Id.*). On November 1, 2019, the Eleventh Circuit granted a stay of removal, and on December 23, 2019, the Eleventh Circuit remanded the case to the Board of Immigration Appeals. (*Id.*). That case is currently pending. (*Id.*). Miller suffers from hypertension, high cholesterol, and chronic bronchitis. (Doc. # 2-3 at 53).

Petitioner Karim Golding is a 35-year-old citizen of Jamaica. (Doc. # 11-2 at 5, ¶ 12). He was convicted of criminal possession of a loaded firearm. (*Id.*). He was sentenced to one year of confinement. (*Id.*). He was also convicted of conspiracy to distribute and possess with intent to distribute cocaine base, three counts of distribution and possession with intent to distribute cocaine base, and attempted distribution and possession with intent to distribute cocaine base. (*Id.*). On April 10, 2015, Petitioner Golding was served with an I-247, Immigration Detainer-Notice of Action. (*Id.*). On October 27, 2016, Golding was issued a Notice to Appear, charging inadmissibility under section 212(a)(6)(A)(i). (*Id.*). On September 15, 2017, an immigration judge ordered Golding's removal to Jamaica. (*Id.*). On March 5, 2018, the Board of Immigration Appeals dismissed Golding's appeal. (*Id.*). Fourteen days later, Golding filed a Petition for Review and Motion for Stay of Removal in the Second Circuit Court of Appeals, resulting in a forbearance stay of removal. (*Id.*). On April 5, 2019, Golding filed a Petition for Writ of Habeas Corpus in the United States District Court for the Northern District of New York. (*Id.*). On July 28, 2019,

14

Golding was transferred to the ECDC. (*Id.*). On December 10, 2019, the Northern District of New York granted Golding a bond hearing within ten days. (*Id.*). On December 17, 2019, an immigration judge denied bond. (*Id.*). On January 16, 2020, Golding filed a Motion to Reopen and appeal of the bond denial with the Board of Immigration Appeals. (*Id.*). The motion and appeal are currently pending. (*Id.*). Golding suffers from asthma. (Doc. # 2-3 at 28).

Petitioner Sarail Archilla is 44 years old. (Doc. # 11-2 at 5, ¶ 13). Archilla claims to be from Canada, but there are no records confirming his citizenship. (*Id.*). He was convicted of conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. (*Id.*). He was sentenced to 144 months of confinement. (*Id.*). He is also currently in Failure to Comply Status for refusing to cooperate with removal efforts, as he has refused to confirm his citizenship. (*Id.*). Due to statements made during his criminal investigation, Archilla is believed to be from Jamaica. (*Id.*). And, he has been in multiple altercations while in ICE custody and has threatened ICE Officers with physical harm during liaison. (*Id.*). On May 4, 2017, Archilla was processed as a final administrative removal order under section 238(b) for having committed an aggravated felony under section 237(a)(2)(A)(iii). (*Id.*). On December 21, 2017, Archilla was transferred to the ECDC. (*Id.*). Archilla has been diagnosed with asthma, allergies, and high blood pressure. (Doc. # 2-3 at 5).

Petitioner Randane Junior Williams is a 30-year-old citizen of Jamaica. (Doc. # 11-2 at 6, ¶ 14). He was convicted of possession with intent to sell a controlled substance (trafficking). (*Id.*). He was sentenced to a term of 12 to 32 months of confinement, which was suspended, and he was placed on supervised probation for a period of three years. (*Id.*). He subsequently violated the terms of the court's probation order and his probation was revoked. (*Id.*). On August 20, 2004, Petitioner Williams was admitted to the United States as a temporary visitor for pleasure with

authorization to remain until February 19, 2005. (*Id.*). On October 14, 2008, Williams' status was adjusted to that of lawful permanent resident. (*Id.*). On February 6, 2018, Williams was released from the Nevada Department of Corrections to ICE custody. (*Id.*). Williams was issued a Notice to Appear, charging him with removability under section 237 (a)(2)(A)(iii). (*Id.*). On July 17, 2018, an immigration judge ordered Williams' removal to Jamaica. (*Id.*). On September 9, 2018, Williams was transferred to the ECDC. (*Id.*). On December 18, 2018, the Board of Immigration Appeals dismissed his appeal. (*Id.*). On January 14, 2019, Williams filed a Petition for Review in the Ninth Circuit Court of Appeals, resulting in a stay of removal. (*Id.*). On July 31, 2019, his request for a stay of removal was granted by the Ninth Circuit. (*Id.*). Williams has no pre-existing conditions that make him more susceptible to COVID-19.

Petitioner Maxime Peter Blanc is a 46-year-old citizen of the Dominican Republic. (Doc. # 11-2 at 6, ¶ 15). He was convicted of possession of 15 or more unauthorized access devices (*i.e.*, social security numbers) with the intent to defraud and aggravated identity theft. (*Id.*). He was sentenced to 30 months of imprisonment. (*Id.*). He was again convicted of possession of 15 or more unauthorized access devices and aggravated identity theft. (*Id.*). He was sentenced to 33 months of imprisonment. (*Id.*). On April 16, 1994, Petitioner Blanc was admitted to the United States as an immigrant. (*Id.*). On March 2, 2018, Blanc was encountered by ICE while in custody of the Federal Bureau of Prisons. (*Id.*). He was issued a Notice to Appear, charging him with removability under section 237(a)(2)(A)(ii) and (iii). (*Id.*). On June 26, 2018, Blanc was transferred to ICE custody and detained without bond due to his criminal convictions. (*Id.*). On December 31, 2018, an immigration judge ordered Blanc's removal to the Dominican Republic. (*Id.*). On March 26, 2019, Blanc was transferred to the ECDC. (*Id.*). On June 6, 2019, the Board of Immigration Appeals dismissed Blanc's appeal. (*Id.*). On July 3, 2019, Blanc filed a Petition for

Review with the Eleventh Circuit Court of Appeals. (*Id.*). On August 16, 2019, the Eleventh Circuit granted a temporary stay of removal. (*Id.*). Blanc suffers from the following chronic conditions: pre-diabetes; hyperlipidemia (high cholesterol); hypertension (high blood pressure); sciatica nerve pain; and allergies. (Doc. # 2-3 at 8).

Petitioner Churvin Roswill Webster is a 57-year-old citizen of Anguilla (a British Territory). (Doc. # 11-2 at 6, ¶ 16). He was convicted of possession with intent to distribute a controlled substance (cocaine) within 1000 feet of a school zone. (*Id.*). He was sentenced to three years of confinement. (*Id.*). He was also convicted of possession of a controlled substance in the third degree (heroin) and bail jumping. (*Id.*). He was sentenced to three years supervised probation. (*Id.*). On June 22, 1976, Petitioner Webster was admitted to the United States as an immigrant. (*Id.*). On October 20, 2017, Webster was issued a Notice to Appear, charging him with removability under sections 237 (a)(2)(A)(iii) and (a)(2)(B)(i). (*Id.*). On November 15, 2018, Webster was ordered removed to Anguilla. (*Id.*). On April 7, 2019, Webster was transferred to the ECDC. (*Id.*). On May 17, 2019, the Board of Immigration Appeals dismissed Webster's appeal. (*Id.*). On May 31, 2019, Webster filed a Petition for Review in the Third Circuit Court of Appeals. (*Id.*). A temporary stay of removal was granted the same day. (*Id.*). Webster suffers from asthma and hypertension. (Doc. # 2-3 at 65).

Petitioner Bakhodir Sabitovich Madjitov is a 38-year-old citizen of Uzbekistan. (Doc. # 11-2 at 7, ¶ 17). He is charged with failure to comply with removal order. (*Id.*). Briefly, on March 12, 2006, Petitioner Madjitov was admitted to the United States as a nonimmigrant with authorization to remain in the United States until July 20, 2006. (*Id.*). On January 17, 2007, Madjitov was issued a Notice to Appear, charging him with removability under with section 237(a)(1)(B). (*Id.*). On August 31, 2011, an immigration judge ordered Madjitov removed to

17

Uzbekistan. (*Id.*). On December 22, 2017, Madjitov was apprehended by Homeland Security Investigations and entered ICE custody. (*Id.*). On January 26, 2018, Madjitov was placed in Failure to Comply Status because he refused to complete travel document information. (*Id.*). On February 21, 2018, Madjitov was transferred to the ECDC. (*Id.*). On June 11, 2019, Madjitov was scheduled for removal to Uzbekistan through the John F. Kennedy Airport in New York City, but he refused to board the aircraft. (*Id.*). On September 30, 2019, Madjitov filed a Petition for Review and Motion for Stay of Removal with the Eleventh Circuit. (*Id.*). On October 29, 2019, the Embassy of Uzbekistan reissued the travel document for Madjitov. (*Id.*). On November 25, 2019, the Eleventh Circuit denied the stay of removal. (*Id.*). The Petition for Review remains pending. (*Id.*). Madjitov has stated that he does not intend to comply with his removal. (*Id.*). He suffers from high blood pressure and shortness of breath. (Doc. # 2-3 at 34).

Petitioner Ray Fuller is a 54-year-old citizen of Jamaica. (Doc. # 11-2 at 8, ¶ 18). He was convicted of attempted criminal sexual assault. (*Id.*). He was sentenced to four and a half years of confinement. (*Id.*). On November 10, 1999, Petitioner Fuller was admitted to the United States as a conditional immigrant (he was the fiancée of a United States citizen). (*Id.*). On November 29, 2004, his petition to remove conditions of his entry and become a permanent resident was denied by the United States Citizenship and Immigration Services. (*Id.*). On August 5, 2014, Fuller was encountered by ICE upon his release from the Illinois Department of Corrections and issued a Notice to Appear, charging removability under section 237(a)(2)(A)(iii). (*Id.*). On May 27, 2015, an immigration judge ordered Fuller's removal to Jamaica. (*Id.*). The Board of Immigration Appeals dismissed his appeal. (*Id*). On October 23, 2017, Fuller filed a Petition for Review with the Seventh Circuit Court of Appeals. (*Id.*). On March 21, 2018, Fuller was transferred to the ECDC. (*Id.*). On May 18, 2018, the Seventh Circuit granted a stay of removal. (*Id.*). On January

23, 2019, the Seventh Circuit remanded the case to the Board of Immigration Appeals. (*Id.*). The case is currently pending with the Board of Immigration Appeals. (*Id.*). Fuller suffers from hypertension, sleep apnea, a deviated septum, and high cholesterol. (Doc. # 2-3 at 22).

Petitioner Kenneth Manning Hernandez is a 61-year-old citizen of Jamaica. (Doc. # 11-2 at 8, ¶ 19).  He was convicted of murder and distribution of cocaine. (*Id.*). He received a sentence of twenty years to life in prison. (*Id.*). He was also involved in an altercation while in ICE custody, and became combative toward jail staff causing significant damage to his dorm room. (*Id.*). On August 25, 2016, Petitioner Manning Hernandez was issued a Notice to Appear, charging him with removability under section 212(a)(6)(A)(i). (*Id.*). On February 3, 2017, an immigration judge ordered his removal to Jamaica. (*Id.*). On June 13, 2017, the Board of Immigration Appeals dismissed Manning Hernandez's appeal. (*Id.*). On July 14, 2017, Manning Hernandez filed a Petition for Review and Stay of Removal in the Second Circuit Court of Appeals, resulting in an automatic forbearance of the stay of removal. (*Id.*). On July 5, 2018, the Second Circuit granted a stay of removal. (*Id.*). On July 29, 2018, he was transferred to the ECDC. (*Id.*). On March 31, 2020, the Second Circuit granted the Petition for Review and remanded the case to the Board of Immigration Appeals, where it is currently pending. (*Id.*). Manning Hernandez suffers from hypertension, prostate cancer, and a heart condition. (Doc. # 2-3 at 31, 44).

Petitioner Sergio Quito is a 45-year-old citizen of Ecuador. (Doc. # 11-2 at 8, ¶ 20). He was convicted of attempt to possess a sexual performance by a child. (*Id.*). Petitioner Quito entered the United States without inspection at an unknown date and location. (*Id.*). On March 29, 2007, Quito had his status adjusted to that of a lawful permanent resident. (*Id.*). On June 9, 2016, Quito was issued a Notice to Appear, charging removability under section 237(a)(2)(A)(iii). (*Id.*). On September 14, 2017, an immigration judge ordered Quito's removal. (*Id.*). On March 19, 2018,

the Board of Immigration Appeals dismissed Quito's appeal. (*Id.*). On April 10, 2018, Quito filed a Petition for Review in the Second Circuit Court of Appeals. (*Id.*). On May 23, 2018, Quito was transferred to the ECDC. (*Id.*). On May 13, 2019, Quito filed a Petition for a Writ of Habeas Corpus in the United States District Court for the Northern District of Alabama. (*Id.*). On January 29, 2020, the Petition for Habeas Corpus was denied. (*Id.*). On January 24, 2020, the Second Circuit denied his Petition for Review. (*Id.*). On January 27, 2020, a travel document request was sent to the Ecuadorian Consulate. (*Id.*). On February 12, 2020, Quito interviewed with the Consulate General of Ecuador and ERO was awaiting a decision on travel document issuance. (*Id.*). Quito suffers from a seizure disorder, stomach ulcers, and has hypertensive. (Doc. # 2-3 at 59).

Petitioner Domingo Castillo is a 56-year-old citizen of the Dominican Republic. (Doc. # 11-2 at 9, ¶ 21). He was convicted of aggravated assault. (*Id.*). He was sentenced to five years of incarceration. (*Id.*). He has three prior convictions for assault. (*Id.*). Petitioner Castillo entered the United States without inspection on an unknown date and at an unknown location. (*Id.*). On November 11, 2013, Castillo was arrested by ICE following his release from prison. (*Id.*). He was issued a Notice to Appear, charging him with removability under section 237(a)(2)(A)(iii). (*Id.*). Castillo claims birth in Puerto Rico. (*Id.*). That claim was vetted by ICE and determined to not be credible. (*Id.*). On April 30, 2014, an immigration judge ordered Castillo's removal to the Dominican Republic. (*Id.*). On May 7, 2014, Castillo was interviewed by the Consulate of Dominican Republic and again claimed to be a United States citizen. (*Id.*). He was subsequently placed in Failure to Comply status. (*Id.*). On April 22, 2015, Castillo was transferred to the ECDC. (*Id.*). Castillo claims he is actually Jose Garcia Rivera and that he suffers from asthma. (Doc. # 2-3 at 25).

Petitioner Antonio Melquezideth Castro is a 34-year-old citizen of Belize. (Doc. # 11-2 at 9, ¶ 22). He was convicted of endangering the welfare of a child. (*Id.*). On or about November 12, 2000, Petitioner Castro entered the United States as a nonimmigrant visitor. (*Id.*). On October 16, 2014, Castro adjusted his status to that of a lawful permanent resident. (*Id.*). On September 25, 2017, Castro was issued a Notice to Appear, charging him with removability under sections 237(a)(2)(A)(i) and (a)(2)(E)(i). (*Id.*). On July 18, 2018, an immigration judge ordered Castro's removal to Belize. (*Id.*). On November 28, 2018, Castro was transferred to the ECDC. (*Id.*). On December 13, 2018, the Board of Immigration Appeals dismissed his appeal. (*Id.*). On January 9, 2019, Castro filed a Petition for Review in the Third Circuit and a stay was granted. (*Id.*). On July 22, 2019, Castro filed a second Petition for Review with the Third Circuit, which was consolidated with the first petition. (*Id.*). The stay was continued. (*Id.*). On September 20, 2019, Castro filed a Petition for Writ of Habeas Corpus with the United States District Court for the District of New Jersey. (*Id.*). On December 13, 2019, the Third Circuit dismissed the Petition for Review. (*Id.*). Castro suffers from intestinal and stomach issues related to stomach cancer as a child, kidney stones, difficulty breathing during exercise related to bronchitis as a child, and abnormal cholesterol. (Doc. # 2-3 at 15).

Petitioner Gerardo Castellano Geovany is a 60-year-old citizen of Nicaragua. (Doc. # 11-2 at 9, ¶ 23). He was convicted of selling marijuana. (*Id.*). He was sentenced to 60 months, with a suspended sentence, and placed on probation. (*Id.*). But, his sentence was later reinstated, and he received 180 days in jail. (*Id.*). Subsequently, due to additional controlled substance arrests, his sentence was again reinstated, and he received 365 days of incarceration. (*Id.).* He was also convicted of selling and manufacturing narcotics. (*Id.*). He was sentenced to two years of incarceration. (*Id.*). He was later convicted of petty theft and received three days in jail. (*Id.*).

Petitioner Geovany entered the United States without inspection by an immigration officer on an unknown date. (*Id.*). On July 31, 1979, Geovany was issued an Order to Show Cause by the United States Border Patrol, charging him with deportability under section 241(a)(2). (*Id.*). On August 2, 1979, Geovany was released on bond. (*Id.*). On February 6, 1988, Geovany was arrested and detained. (*Id.*). On April 1, 1988, an immigration judge ordered Geovany's removal to Nicaragua. (*Id.*). On September 27, 1988, Geovany was released on an order of supervision. (*Id.*). On January 30, 2016, Geovany was turned over to ICE by another law enforcement agency. (*Id.*). On February 19, 2016, Geovany refused to complete a travel document application for Nicaragua, refused to be photographed, and refused to interview with the Consulate of Nicaragua for a travel document. (*Id.*). Geovany was subsequently placed in Failure to Comply status. (*Id.*). On November 2, 2016, Geovany was transferred to the ECDC. (*Id.*). On April 27, 2017, a travel document request was submitted to the Nicaraguan Consulate and Geovany interviewed with the Consulate; however, he would not provide credible information. (*Id.*). Castellano has high blood pressure, and was diagnosed with an irregular heart rhythm in 2017. (Doc. # 2-3 at 12).

Petitioner Landry Mbendeke is a 39-year-old citizen of Cameroon. (Doc. # 11-2 at 10, ¶ 24). He pled guilty to conspiracy to commit marriage fraud. (*Id.*). He was sentenced to 12 months of imprisonment. (*Id.*). On September 21, 2011, Mbendeke entered the United States as a resident alien. (*Id.*). On November 24, 2017, he was issued a Notice to Appear, and he was charged with removability under section 237(a)(2)(A)(i). (*Id.*). On December 7, 2018, an immigration judge ordered Mbendeke's removal to Cameroon. (*Id.*). On May 20, 2019, the Board of Immigration Appeals dismissed his appeal. (*Id.*). On July 1, 2019, Mbendeke filed a Petition for Review with the Second Circuit Court of Appeals, resulting in a forbearance stay of removal. (*Id.*). That case is still pending. (*Id.*). On August 25, 2019, Mbendeke was transferred to the ECDC. (*Id.*). Mbendeke

suffers from hypertension and other health conditions. (Doc. # 1 at 16).

Petitioner Joseph Debonnaire Soho is a 46-year-old citizen of Cameroon or the Ivory Coast who was transferred to the ECDC on September 11, 2019. (Doc. # 11-2 at 10, ¶ 25). He was released from confinement on April 27, 2020 on an order of supervision. (*Id.*).[14]

Petitioners have all testified that, were they to be released, they have a place to reside. (Doc. # 2-3 at 1-66). Some are more specific than others about their plans. However, none of them have provided specific information about the COVID-19-related circumstances or conditions in those places. Therefore, the court cannot answer the question of how those "new places" compare, from a COVID-19 perspective, to being at the ECDC with only a single, quarantined case of COVID-19.

## III.   Standard of Review

A temporary restraining order is an "extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion'" as to the following four requisites: (1) the movant has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest. *Long v. Sec'y, Dep't of Corrs.*, 924 F.3d 1171, 1176 (11th Cir. 2019); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Issuing a temporary restraining order "is the exception rather than the rule." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975)). A movant bears "the 'burden of persuasion' to clearly establish all four" elements. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (quoting *Siegel*, 234 F.3d at 1176).

---

[14] Because Petitioner Soho has been released from confinement, the court concluded that the motion for a TRO on his behalf is now moot. (*See* Doc. # 33).

## IV.   Discussion

Petitioners claim that they are entitled to a TRO because they are likely to succeed on their claims that, by continuing to detain them during the COVID-19 pandemic, Defendants are violating their rights under the Fifth Amendment. They claim they will be "irreparably harmed" if they remain detained, and that the balance of equities and the public interest favor release. (Doc. # 2 at 1-2). Respondents argue that (1) the court does not have jurisdiction to issue a TRO because Petitioners' claims are not cognizable under section 2241, (2) Petitioners have not shown they will face irreparable harm absent judicial action, (3) Petitioners are not likely to succeed in showing a substantive due-process violation based on the government's purported deliberate indifference to their medical needs, (4) the balance of the harms does not support release, and (5) the court should deny Petitioners' Motion as a matter of its judicial discretion. (Doc. # 11).

### A.   Petitioners Have Not Shown a Likelihood of Success on the Merits

To show that they are entitled to a TRO, Petitioners must establish that there is a substantial likelihood they will succeed on the merits of their claim. *Long*, 924 F.3d at 1176.

### 1.   Petitioners' Claim is Not Cognizable Under 28 U.S.C. § 2241

Petitioners filed their claim as a petition for a writ of habeas corpus under 28 U.S.C. § 2241. Section 2241 is a vehicle to allow prisoners and detainees the opportunity to request relief from unlawful imprisonment or custody. The remedy of habeas corpus does not extend to a prisoner unless he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The statutory language addresses the legality of a prisoner's custody, not the conditions that a prisoner may experience while incarcerated. At its core, a habeas claim has two elements: (1) a challenge to the fact or duration of physical imprisonment, and (2) a request for a determination that the petitioner is entitled to immediate or a speedier release.

*Preiser*, 411 U.S. at 500. Thus, "while the petition for writ of habeas corpus is the sole remedy for prisoners challenging the fact or duration of their imprisonment," whether it is available to contest the conditions of confinement is a question that the Supreme Court has expressly left open. *Gomez v. U.S.*, 899 F.2d 1124, 1126-27 (11th Cir. 1990) (*citing Preiser v. Rodriguez*, 411 U.S. 475, 504 (1973); *Bell v. Wolfish*, 441 U.S. 520, 527 n. 6 (1979)).

Despite their protestations otherwise, Petitioners' section 2241 claim in this case clearly challenges the conditions, not the validity, of their confinement. That is, Petitioners' constitutional claims, correctly characterized, are challenges to their conditions of confinement. They challenge the adequacy of the disease prevention measures at the ECDC[15] and contend that, as individuals who are at increased risk of serious complications from COVID-19, ICE is unwilling or, perhaps more precisely, unable to address their medical needs and/or adopt safety measures to protect them from actual or potential exposure. So, properly understood, Petitioners present a classic conditions-of-confinement claim.  Now, to be clear, the remedy they seek (release from custody) sounds in habeas. But tacking a traditional habeas remedy on to a prototypical conditions-of-confinement claim does not convert that classic civil rights claim into a habeas claim. So, the question is whether they can challenge their confinement conditions via a petition for a writ of habeas corpus.

The Supreme Court has "left open the question . . . ." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017); *see also Bell*, 441 U.S. 526 n.6 ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."). However, while that is the case, the court does not believe it is much of an open question in the Eleventh Circuit. Admittedly, the Eleventh Circuit has not answered the question in a published

---

[15] Because the majority of their proof relates to COVID-19's spread in the United States, Alabama, Etowah County, the ECDC's state prisoner population, and all ICE detention centers across the nation, it may be more accurate to say that Petitioners are challenging the disease prevention measures of ICE, generally.

decision, so in a technical sense it is "open."[16] But, in an unpublished opinion, a panel of this Circuit concluded that a petition for a writ of habeas corpus is not the appropriate mechanism for contesting a prisoner's conditions of confinement.[17] *See Vaz v. Skinner*, 634 F. Appx. 778, 781 (11th Cir. 2015) (per curiam) (finding section 2241 is "not the appropriate vehicle for ... a claim challeng[ing] the conditions of confinement").

In *Vaz*, a detained alien had been ordered removed (and was not confined under criminal process). In addition to presenting a *Zadvydas*[18] claim, Vaz also sought release on an alternate ground. He claimed he was receiving inadequate medical care. The panel squarely held that "Petitioner's § 2241 claim is not the appropriate vehicle for raising an inadequate medical care claim, as such a claim challenges the conditions of confinement, not the fact or duration of that confinement." *Vaz*, 634 F. Appx at 781. The *Vaz* court specifically cited and relied upon *Gomez* in concluding that Vaz's inadequate medical care claim, arising under the Fifth Amendment, did

---

[16] The other circuits that have squarely addressed the issue are split on how to resolve it. Seven courts have concluded that conditions claims are not cognizable under section 2241. *See Wilborn v. Mansukhani*, 795 F. Appx. 157, 162-64 (4th Cir. 2019) (per curiam) (describing circuit split). Only three have reached a contrary conclusion. *Id.* The court is convinced that the Eleventh Circuit would adopt the majority view. A published decision of our circuit has taken steps down that path. *See Gomez*, 899 F.2d at 1126 ("If these claims are considered in a habeas corpus context, however, this Court has held that even if a prisoner proves an allegation of mistreatment in prison that amounts to cruel and unusual punishment, he is not entitled to release."). A panel of this circuit has so held. *Vaz v. Skinner*, 634 F. Appx. 778, 780 (11th Cir. 2015) ("Claims challenging the fact or duration of a sentence fall within the 'core' of habeas corpus, while claims challenging the conditions of confinement fall outside of habeas corpus law."); *see also Cook v. Baker*, 139 F. Appx. 167, 168 (11th Cir. 2005). And, the district courts in our circuit have consistently reached this same conclusion. *See Daker v. Warden*, No. 18-cv-14984, 2020 WL 751817, at *2 (11th Cir. Feb. 14, 2020). In addition, other district courts in this circuit have applied this reasoning to deny preliminary relief in similar COVID-19-based challenges. *See, e.g.*, *A.S.M. v. Donahue*, No. 7:20-cv-62 (CDL), 2020 WL 1847158, at *1 (M.D. Ga. Apr. 10, 2020) (finding that habeas corpus "is not the appropriate mechanism" for the ICE detainee petitioner's request for release from confinement due to COVID-19); *Benavides v. Gartland*, No. 5:20-cv-46, 2020 WL 1914916, *5 (S.D. Ga. Apr. 18, 2020); *Gayle v. Mead*, No. 1:20-cv-21553-MGC, 2020 U.S. Dist. LEXIS 76040, *17-18 (S.D. Fla. Apr. 30, 2020) ("The appropriate relief from prison conditions that violate the Eighth Amendment is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment. Requirement of a discontinued practice does not amount to releasing 10 detainees who complain of prison conditions.").

[17] The very language of section 2241 does not purport to grant jurisdiction to enter anything other than a final judgment in the form of a writ of habeas corpus. 28 U.S.C. § 2241(c)(3).

[18] *Zadvydas v. Davis*, 533 U.S. 678 (2001).

not entitle him to habeas relief under section 2241. *Id.* ("[E]ven if petitioner established a constitutional violation, he would not be entitled to the relief he seeks because release from imprisonment is not an available remedy for a conditions-of-confinement claim.").[19]

Petitioners argue that *Vaz* is distinguishable because the *Vaz* detainee sought release because of the unavailability of adequate medical treatment, whereas here they seek release because there are no conditions of confinement that can be implemented at the ECDC that would *not* cause them (as civil detainees) to be unconstitutionally punished. To the extent there is a distinction between these two situations, it is a distinction without a difference, at least as it relates to section 2241.

Petitioners insist they are not complaining about their conditions of confinement. Rather, they say the COVID-19 threat makes the circumstances of their continued confinement unconstitutionally punitive. The problem is that their "circumstances" are synonymous with their "conditions." Notwithstanding Petitioners' effort to characterize their claim, at bottom, they are still complaining that the conditions of their confinement are violative of the Fifth Amendment.[20]

---

[19] To be sure, at least one circuit has said that "[s]ection 2241 does not purport to permit preliminary grants of habeas. It prohibits the writ from issuing unless the prisoner 'is' being held 'in custody in violation of the Constitution or laws or treaties of the United States,' not merely because he likely could make that showing in the future." *Hamama v. Adducci*, 946 F.3d 875, 877 (6th Cir. 2020).

[20] Petitioners contend that they are claiming a violation of the Fifth Amendment, not the Eighth Amendment. The *Vaz* panel also explained why that is legally correct, but also noted that the standard imposed as to prisoners under criminal process and pretrial detainees is the same.

> Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they are deliberately indifferent to a prisoner's serious medical needs. *McElligott v. Foley*, 182 F.3d 1248, 1254-57 (11th Cir. 1999). However, the protections of the Eighth Amendment do not attach until after a person has been convicted and sentenced. *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1572 (11th Cir. 1985); *see also Graham v. Connor*, 490 U.S. 386, 392 n. 4 (1989). Instead, a deliberate indifference claim raised by a pretrial detainee is governed by the Due Process Clause of the Fifth Amendment. *See Jordan v. Doe*, 38 F.3d 1559, 1564 (11th Cir. 1994). Nevertheless, the standard for providing adequate medical care to pretrial detainees under the Due Process Clause is the same standard required for convicted persons under the Eighth Amendment. *Hamm*, 774 F.2d at 1573-74. We held that release from custody is not an available remedy, even if a prisoner establishes an Eighth Amendment violation. *Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990). Instead, "[t]he appropriate Eleventh Circuit relief from prison conditions that violate the Eighth

This is a classic conditions-of-confinement claim. And, this is exactly the conclusion Judge Ruiz

reached in *Matos*:

> [T]he Court is unpersuaded by Petitioners' claim that an exception should be made here regarding the inapplicability of writs of habeas corpus to constitutional confinement claims because release from detention is the only meaningful remedy. As explained herein, the Court does not find that release is appropriate based on the present record. And even if it did, release from custody is not an available remedy for Petitioners' claims. *See Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990) ("The appropriate Eleventh Circuit relief from prison conditions ... is to require the discontinuation of any improper practices ... [it] does not include release from confinement."). Therefore, the Court declines to create a "narrow exception to the 'no habeas for constitutional confinement claims'" in this case. *A.S.M.*, 2020 WL 1847158 at *1. Concluding that a writ of habeas corpus is not the appropriate mechanism for seeking relief, the Court may not exercise jurisdiction under section 2241.

*Matos v. Lopez Vega*, 2020 WL 2298775 at *6 (S.D. Fla. May 6, 2020)

For these same reasons, the court is convinced that the Eleventh Circuit panel's decision in

*Vaz*, though unpublished, is the correct one. As our Circuit has indicated:

> The appropriate Eleventh Circuit relief from prison conditions that violate the Eighth Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment. *Cook*, 596 F.2d at 660. Although problems of prisons are complex and not readily susceptible to resolution by decree, *Sheley v. Dugger*, 824 F.2d 1551, 1559 (11th Cir.1987), relief of an Eighth Amendment violation does not include release from confinement.

*Gomez*, 899 F.2d at 1126, citing *Cook v. Hanberry*, 596 F.2d 658, 660 (5th Cir.), *cert. denied*, 442

U.S. 932 (1979)); *see also Vaz*, 634 F. Appx. at 780 ("Claims challenging the fact or duration of a

sentence fall within the 'core' of habeas corpus, while claims challenging the conditions of

confinement fall outside of habeas corpus law.") (citing *Nelson v. Campbell*, 541 U.S. 637, 644

(2004)).

---

Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment." *Id*.

*Vaz*, 634 F. Appx. at 781 (parallel citations omitted)

For almost three decades, district courts in this circuit have reached similar conclusions. *See e.g.*, *Price v. Bamberg*, 845 F. Supp. 825, 827 (M.D. Ala. 1993) (observing that the "law in the Eleventh Circuit appears reasonably settled.... [Section] 2241(c)(3) provides that the writ of habeas corpus shall not extend to a prisoner unless the prisoner is 'in custody in violation of the Constitution or laws or treatises [sic] of the United States.' ... The statute plainly refers to the constitutionality or legality of the basis of the prisoner's custody and not the conditions of that custody which a prisoner may experience while incarcerated.") (emphasis in original) (citations omitted); *see e.g.*, *Matos*, 2020 WL 2298775 at *6 (holding that "release from custody is not an available remedy for [the petitioners' Section 2241] claims") (citing *Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990)); *Gayle v. Meade*, 2020 WL 1949737, *25 (S.D. Fla. Apr. 22, 2020) (acknowledging that the Eleventh Circuit "does not permit release from prison as a remedy for an unconstitutional condition of confinement"); *Benavides*, 2020 WL 1914916 at *5 (noting that "constitutional challenges to [one's] confinement are ultimately objections to [the] conditions of confinement. Though circuit courts are divided on whether habeas is the appropriate mechanism for challenging conditions of confinement, the weight of authority in the Eleventh Circuit is that it is not."); *A.S.M.*, 2020 WL 1847158 at *1 (concluding "that a writ of habeas corpus [under Section 2241] is not the appropriate mechanism for seeking the relief" the petitioners request, which was release from confinement); *Helbig v. United States*, 2019 WL 3976571, *3 (N.D. Fla. July 31, 2019) (recognizing that "Section 2241 . . . does not authorize courts to provide the only relief Petitioner seeks: a reduction in her term of incarceration."); *Seugasala v. Warden, FCC Coleman, USP II*, 2019 WL 6311166, *3-4 (M.D. Fla. Nov. 25, 2019) ("The petition for writ of habeas corpus traditionally has been accepted as the specific instrument to obtain release from unlawful confinement. Habeas corpus cannot be used for any other purpose. Disciplinary actions that affect

only the conditions of confinement are not considered unlawful confinement subject to habeas unless the conditions affect the fact or duration of sentence.") (internal citations and quotation marks omitted); *Beasley v. Unnamed Respondent*, 2018 WL 10611667, *2 (N.D. Ga. Dec. 12, 2018) ("A habeas remedy does not extend to matters that do not affect either the fact or duration of confinement."); *Bryant v. Clay*, 2017 WL 4678484, *2 (N.D. Ala. Sept. 15, 2017) ("[T]he Eleventh Circuit intimates that the 'appropriate . . . relief from prison conditions that violate the [Constitution] during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment,' not a release from confinement pursuant to § 2241 habeas relief."); *Sears v. Chatman*, 2016 WL 1417818, *23 (N.D. Ga. Apr. 8, 2016) (holding that because the petitioner "assert[ed] only a claim concerning the conditions of his confinement, rather than his sentence of death . . . his claim '[fell] outside of habeas corpus law'") (citation omitted).

Against this backdrop, Petitioners point to language in one of those district court cases that they argue supports their argument. A careful review of that decision shows their argument is not supported. In *A.S.M.*, the district court determined that the Eleventh Circuit would, consistent with the majority rule, adopt the holding in *Vaz* and conclude that section 2241 cannot be used to challenge conditions of confinement. *A.S.M.*, 2020 WL 1847158 at *1. That was the court's holding. Petitioners point to dicta in *A.S.M.* where the court paused and said (as an aside) that, in the event there really was some risk of serious harm or death from unconstitutional conditions that could not be modified to eliminated, it *may* find the argument (that section 2241 provides relief) more persuasive. *Id*. Petitioners latch on to this language, but it is not the lifeline they think.

First, let's be clear about what Judge Land held, and what he said and did not say. He held that the petitioners could not go forward on a section 2241 claim. He rejected their section 2241

argument. And, he did not say that if release were the only possible appropriate remedy he would have concluded otherwise. He only said that, under those circumstances, the argument sounds more persuasive. Second, to the extent the *A.S.M.* court actually hinted that section 2241 could be used under those circumstances to secure release, this court disagrees. *See Matos*, 2020 WL 2298775 * 6 (rejecting that same position). Such a theory may succeed in the context of a *Bivens* claim (when federal defendants are sued) or a section 1983 claim (when state or municipal defendants are sued). But, the point here is that such a theory still challenges conditions of confinement, and section 2241 does not permit such a challenge. Courts who reach the opposite conclusion simply ignore the plain language of the statute and centuries of habeas jurisprudence. Third, it is also clear that Judge Land was speaking hypothetically. He found the evidence in that case, just like the evidence here, did not establish that "the only way to remedy Petitioners' [allegations about] constitutional violations is to release them from custody." *Id*.[21]

---

[21] Petitioners point to district court decisions outside this circuit to support their section 2241 argument. (Doc. # 31 at 2-3) (citing among other cases *Vazquez Barrera v. Wolf*, 2020 WL 1904497 (S.D. Tex. Apr. 17, 2020); *Mays v. Dart*, 2020 WL 1812381 (N.D. Ill. Apr. 9, 2020)). In *Vazquez Barrera*, the court engaged in a full session of mental gymnastics to work around the language of Section 2241 and conclude that the same challenge made here is a challenge to the fact of detention under that statute. That court looked at the remedy the petitioner sought, rather than the actual claim. Contrary to the *Vazquez Barrera* court's erroneous conclusion, these claims attack the conditions of confinement at ICE facilities.

The *Mays* case lends no more help to Petitioners. The court did not rule on the section 2241 jurisdictional question that was presented because it found the petitioners had failed to exhaust available state court remedies. *Mays*, 2020 WL 1812381, at *6. However, "to ensure a more complete record," the court discussed "the parties['] dispute [about] whether detainees can even challenge the conditions of their confinement through Section 2241 . . . ." *Id*. The court stated:

Were the Court required to address this point, it would not consider it to be an absolute bar to plaintiffs' motion for a temporary restraining order. The plaintiffs' claims, as they have framed them, *do* bear on the duration of their confinement (they contend, ultimately, that they cannot be held in the Jail consistent with the Constitution's requirements), and they are not the sort of claims that are, or can be, appropriately addressed via a claim for damages. The Court need not, however, decide this point definitively at this point.

*Id*. (emphasis in original). Again, that was not a ruling made by the *Mays* court. But, the problem with that (hypothetical) approach is this: a plaintiff (or, in this case, a petitioner) is not permitted to pretzel a civil rights claim in such a way as to create habeas jurisdiction where it does not exist. The key is what the claim complains about – *not* what remedy is sought.

The court lacks jurisdiction to grant Petitioners' release under section 2241.

      **2.**      **Petitioners Cannot Obtain Injunctive Relief On An Unmoored Rule 65 Claim**

Petitioners argue that Federal Rule of Civil Procedure 65 allows the court to release them even if section 2241 does not. They contend this court has "jurisdiction" to entertain their injunctive relief claim under 28 U.S.C. § 1331, and they can go forward on that claim even if their section 2241 claim fails. (Doc. 29 at 2 n. 1). That is plainly wrong. The first element a plaintiff must satisfy is to show a likelihood of success on the *merits* of a claim. The court cannot grant a TRO based on a legal claim that, on its face, cannot succeed. The Eleventh Circuit mandates that "any motion or suit for either a preliminary or permanent injunction [or a TRO] must be based upon a cause of action. . . . There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6)." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (internal citations and quotation marks omitted). Petitioners' claims are not cognizable under section 2241. Because Rule 65 does not create a private right of action, it cannot itself provide the relief sought. *See e.g.*, *Univ. Gardens Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 742 (D. Md. 2006) ("In keeping with its procedural function, Rule 65 does not confer either subject-matter or personal jurisdiction on the court. As is true of civil actions generally, an independent basis for asserting federal question or diversity jurisdiction must be shown . . . . The rule assumes that the district court already has acquired jurisdiction and that venue is proper.") (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil § 2941 (2nd ed. 1995)); *In re Managed Care Litig.*, 2009 WL 7848517, *7 (S.D. Fla. Mar. 27, 2009) ("'[I]njunctive relief' cannot be plead as a separate claim because it is not a cause of action but a form of relief."). Petitioners cannot rely

upon Rule 65 in a vacuum to secure their release. "It is well-settled that for Petitioners to be entitled to relief under Rule 65, they must tether their request for relief to a cause of action set forth in their pleading." *Benavides*, 2020 WL 1914916 at *4 (citations omitted).

### 3. Petitioners Have Not Presented Evidence Justifying Their Release

Even if Petitioners were entitled to challenge their conditions of confinement under section 2241 (and, to be clear, they are not), they have failed to show there is a factual basis for their release from custody. That is, the evidence before the court falls far short of establishing that release is the only appropriate remedy. *See A.S.M.*, 2020 WL 1847158 at *1 ("But based upon the present record, the Court does not find that the only way to remedy Petitioners' alleged constitutional violations is to release them from custody.")

First, ICE has a program for determining who should be released during the COVID-19 pandemic. At least three detainees at the ECDC have been placed on an order for supervised release because they were determined to be at risk and suitable candidates. Petitioners were also evaluated, but not released.  And, as discussed in more detail below, Respondents are subject to a preliminary injunction entered in a class action in the Central District of California, which imposes upon them mandatory measures related to their review of whether to release detainees with serious health conditions in light of COVID-19.

Second, release is a drastic remedy, particularly at this stage of the case (even assuming section 2241 permitted it, which it does not). Petitioners are lawfully detained. In fact, the majority of them are under final orders of removal. Two of the Petitioners—Tesfa Miller and Edison Flores—are detained under 8 U.S.C. § 1226(c), which mandates detention pending completion of removal proceedings. Congress has expressly prohibited release of individuals detained under 8 U.S.C. § 1226(c) due to the seriousness of their offenses. *Jennings v. Rodriguez*, 138 S. Ct. 830,

847 (2018). Many of them also have serious criminal convictions—including convictions for murder, assault, armed robbery, child exploitation, possession of child pornography, and the manufacture and sale of illegal drugs.[22] If Petitioners' request is granted, numerous individuals who the United States has detained and removed following their criminal convictions will be released, and the government's efforts to protect the public and to remove unlawful aliens who have been convicted of crimes in our nation will be undermined. *See Demore v. Kim*, 538 U.S. 510, 518 (2003) (describing mandatory detention as Congress's solution to "[t]he INS' near-total inability to remove deportable criminal aliens"). Petitioners arguments about alternatives to custody do not move the needle.

Third, the court notes that in other cases, and in particular in cases where COVID-19 was even more of a threat to detainees in their particular facilities, courts have almost uniformly denied requests for such a blanket remedy as broad release.

For example, in *Swain v. Junior*, --- F.3d. ---, 2020 WL 2161317 (11th Cir. May 5, 2020), the plaintiffs filed on behalf of a class of individuals detained at the facility and a subclass of medically vulnerable individuals. *Id*. at 2-4. The class sought relief under a similar factual theory that the Petitioners pursue here—that the ICE facility was acting in deliberate indifference to a known and excessive risk to health and safety. *Id*. at 2-4; 8. The District Court for the Southern District of Florida did not grant the plaintiffs' request for release, despite the fact that (1) there were 163 COVID-19 cases at that facility, and (2) the prisoners brought constitutional claims under § 1983, which is a vehicle that plainly permits a plaintiff to challenge his conditions of confinement. Instead, the district court granted alternative injunctive relief that required Miami-

---

[22] Although Petitioners correctly note that they have all served their sentences for these crimes, the fact of their convictions (and the nature of the crimes they committed) are still valid considerations in ICE's determination about who to release prior to their removal – and who not to release.

Dade County to implement a series of safety measures to prevent the spread of COVID-19 within its Metro West Detention Center.

On May 5, 2020, the Eleventh Circuit Court of Appeals (in a published decision) stayed the injunction entered by the district court. The panel's decision in *Swain* reiterates that in order to prevail on a deliberate indifference claim, the Petitioners must establish both "an objectively intolerable risk of harm" and that the prison official has "a subjective state of mind" akin to "criminal recklessness" when he "knows of and disregards an excessive risk to inmate health or safety." *Id*. at 9-10. The court identified a number of barriers to detainees establishing the subjective component for their deliberate indifference claim based on a facility's response to COVID-19. First, the court indicated that "where social distancing is impossible and cannot be achieved absent an additional reduction in [the facility's] population," "the inability to take positive action likely does not constitute a state of mind more blameworthy than negligence." *Id*. at 10. Second, the court suggests that where "it appears" that the facility has "implemented many measures to curb the spread of the virus," even if they are not "effective[] in all situations at . . . current population levels," Petitioners still must submit evidence that the Respondents "subjectively believed the measures they were taking were inadequate." *Id*. at 11. Finally, the court concluded that where the facility "provid[es] protective equipment, adopt[s] social distancing when possible, quarantine[es] symptomatic inmates, and enhance[es] cleaning procedures, the defendants' actions likely do not amount to deliberate indifference." *Id*. at 12.

Here, Petitioners rely on the same arguments regarding social distancing and population levels that the *Swain* court indicated are likely insufficient to support a finding of deliberate indifference. Moreover, Petitioners have pointed to the unavailability of mass testing to support their claims. But as the Eleventh Circuit noted, an "inability to take positive action" is not sufficient

to establish the subjective component of a deliberate indifference claim. *See id*. at 10. And, while Petitioners in this case are not detained under criminal process, and they have some wider berth to claim their conditions of confinement are punitive, they are still faced with only one quarantined COVID-19 case, not 163. And, that single detainee was immediately quarantined upon his arrival, and has never been in the general ICE population.

Even if release were a legally available remedy under section 2241, Petitioners have not presented evidence establishing that release of Petitioners is appropriate here. The staff at the ECDC, faced with this pandemic, and while continuing to manage other important public responsibilities (such as ensuring the continued enforcement of our Nation's immigration laws within real-world constraints involving existing resources and physical facilities)[23] has only one COVID-19 case.[24] Of course, this is not the end of the analysis; but, it is an important factor.

As explained above, ICE contends that, at least at the ECDC facility (the only facility at issue here), it has actively sought to address COVID-19 by implementing CDC guidance to the maximum extent possible. (Doc. # 11-1). It has been providing personal protective equipment such as masks to detainees, instructing detainees on hand washing and hygiene, increasing the scope and frequency of sanitation procedures, and regularly replenishing cleaning supplies and hand soap for detainees. (Doc. # 11-1 ¶ 20). Staff at the ECDC are monitoring for COVID-19 symptoms. They have been conducting intake medical screenings for all new detainees and quarantining all

---

[23] Petitioners are dismissive of the importance of enforcement of our nation's immigration laws.

[24] Petitioners argue that the ECDC is allowing new prisoners to enter the ECDC, even during the pandemic. But, like many of their arguments, this is somewhat of a misfire. The prisoners entering the ECDC are state prisoners (not ICE detainees). Those state prisoners are in a different, segregated part of the ECDC. ICE detainees have no interaction with the state prisoner population, with the exception (or so Petitioners claim) of state prisoner trustees serving some segment of the ICE detention block. (It is not clear if this practice is continuing during the COVID-19 restriction period). They also contend that new detainees are being transferred in from other ICE detention facilities. The evidence does not support that contention. The new detainees have come into the facility after being taken into ICE custody. And importantly, they are quarantined.

new and returning detainees for fourteen days, as well as anyone showing COVID-19 symptoms. (This is how they detected and isolated the single COVID-19 case at the facility). The ECDC staff are also administering temperature checks to personnel entering the facility before they assume their posts. And, they are encouraging social distancing in movements, housing, dining, common areas, showering, and throughout the facility, often by reducing occupancy limits in a given area. (*Id*. ¶¶ 20, 22, 25).

Petitioners of course dispute many, if not all, of these points. They contend that ICE is not properly handling the COVID-19 outbreak. But, they also assert that there is nothing ICE can do to protect them short of release. In their most recent filing, Petitioners raise a number of questions about the proper legal framework under which their claim should be analyzed. (Doc. # 29 at 2-5). They contend that, because they are civil detainees, Respondents are entitled to "less deference" here. (*Id*. at 3). They assert that the deliberate indifference standard does not apply to them, but nevertheless claim that they can easily meet it. The principal problem with this argument is simple: the cases on which Petitioners rely are all conditions-of-confinement cases under § 1983 or *Bivens*. Here, Petitioners are trying to shoehorn a conditions-of-confinement claim under section 2241.

This case's posture is significant in two ways. First, for all practical purposes, it renders the parties' disputes about what is happening at the ECDC moot. If release is the only possible remedy, then Petitioners have brought their claim under the wrong statute. Petitioners cannot use section 2241 to modify their conditions of confinement. Second, the relief they seek – judicially-ordered release – has not been granted by other courts where the risk to detainees posed by COVID-19 is much more prevalent. Not by the Southern District of Florida, which was dealing with 163 COVID-19 cases at Metro West. And, not by the Central District of California, which

37

provisionally certified a class and entered a preliminary injunction modifying release protocols at all ICE facilities nationwide, including the ECDC.

   **B.     Petitioners Have Not Demonstrated that They will Face Irreparable Injury Absent the Granting of a TRO**

   Even if they could pursue a release remedy under section 2241, Petitioners have not demonstrated that they will suffer irreparable injury absent the injunctive relief they seek in this case. To obtain injunctive relief, they must point to an injury that is actual and imminent, not remote or speculative. *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (internal quotation marks and citation omitted). Merely showing a "possibility" of irreparable harm is insufficient. *See Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*

   Although this court has concluded Petitioners are not entitled to release under section 2241, they are not left without an avenue for relief. Detainees are entitled to challenge the conditions of detention using a traditional civil rights claim—a *Bivens* action if he is held in federal custody or a section 1983 action if he is in the custody of state or municipal officials. Indeed, all but two of the Petitioners are actually doing that now—directly or through their currently certified class representatives. That is so because in *Fraihat* Hernandez has asserted a civil rights claim challenging the conditions of his confinement,[25] and all but two of the remaining seventeen Petitioners in this case are members of the certified class or subclass. At least arguably, the other two should benefit (either directly or indirectly) from the injunctive relief granted in that case. So,

---

   [25] The Eleventh Circuit forbids claim splitting. *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833 (11th Cir. 2017). This case (and the existence of the *Fraihat* class) may provide some insight into why Hernandez and his co-Petitioners have pursued his release claim under Section 2241.

the fact that this court lacks jurisdiction to address their petition under section 2241 does not leave them without a remedy and does not subject them to irreparable harm. They have a clear avenue to secure the relief they seek, whether in *Fraihat* or by asserting their own *Bivens* claims.

### C.    The Public Interest and the Balance of Harms Do Not Support the Release Remedy

The Supreme Court has recognized that "[t]he third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public interest in enforcement of the United States' immigration laws is significant. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant.") (citing cases); *see also Nken*, 556 U.S. at 435 ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permits and prolongs a continuing violation of United States law.") (internal quotation omitted).

Petitioners have pointed to comments attributed to Respondent Albence, including his purported statement that releasing non-violent immigrants in light of COVID-19 could give the impression that the Administration is "not enforcing [the] immigration laws," which could create a "rush at the borders."[26] But their citation to this comment is, at best, a distraction. Many of the

---

[26] The statement attributed to Albence is in a press release, not a subcommittee transcript. (Doc. # 2-1 at 1) (citing Press Release, House Comm. on Oversight and Reform, DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus (Apr. 17, 2020), https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees). In their submissions, Petitioners tried to put a different spin on this purported remark. They asserted that Albence "recently told Congress that it will no longer release individuals – even those at high risk for serious injury or death – because doing so could give the impression that the Trump Administration is 'not enforcing our immigration laws.'" (Doc. # 2-1 at 2). But, the document they cite contains the quote above in the context above.

Petitioners have violated our criminal laws in addition to our immigration laws. Most of them are under final orders of removal and have not been granted bond pending removal proceedings.

As Judge Ruiz noted in *Matos*, "[d]etention comes with its flaws. Even without a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases, such as the common cold or tuberculosis." *Matos*, 2020 WL 2298775, at *10 (S.D. Fla. May 6, 2020). But again, as in *Matos*, "Respondents have made conscious efforts to create a safe environment for the detainees and [ECDC's] staff, despite inherent obstacles and the novel COVID-19 virus." *Id.*

The court is also cognizant that Congress delegated certain duties to the Attorney General, rather than the judiciary, including "the authority to allow deportable aliens to remain in this country in certain specified circumstances," such as providing for interim release or relief from removal. *See I.N.S. v. Chadha*, 462 U.S. 919, 954-55 (1983). Therefore, judicial review of these discretionary decisions "must take appropriate account of the greater immigration-related expertise of the Executive Branch ... and the Nation's need to 'speak with one voice' in immigration matters." *Zadvydas*, 533 U.S. at 701. "The judiciary is ill-equipped to determine whether Petitioners in this action are more deserving of release than their detained neighbors. Nor is the judiciary prepared to strip an administrative agency of their discretionary decisions." *Matos*, 2020 WL 2298775, at *11.

## V.    CONCLUSION

The court is sympathetic to the plight of Petitioners, but they have not shown that the form of remedy they seek—complete release—is appropriate. An injunction is "not to be granted unless the movant clearly establish[es] the burden of persuasion as to all four elements." *CBS Broad v. Echostar Communs. Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001) (internal quotations omitted).

Petitioners have not carried their burden of persuasion on any of the four requisites to establishing an entitlement to temporary injunctive relief. For all of the reasons discussed above, the court concludes that Petitioners' Motion for a Temporary Restraining Order (Doc. # 2) is due to be denied.

　　　　**DONE** and **ORDERED** this May 15, 2020.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE